| | |
|---|---|
| BENJAMIN KING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 2:14-cv-70-WTL-DKL |
| | ) |
| DEPAUW UNIVERSITY, | ) |
| | ) |
| Defendants. | ) |

## ENTRY GRANTING MOTION FOR PRELIMINARY INJUNCTION

This cause is before the Court on the Plaintiff's motion for preliminary injunction (Dkt.

No. 33). The motion is fully briefed and a hearing has been held. The Court, having considered

the evidence presented at the hearing as well as all of the written submissions of the parties, now

**GRANTS** the Plaintiff's motion for the reasons set forth below.

## I. BACKGROUND FACTS

This case arises out of Defendant DePauw University's handling of a complaint of sexual

misconduct against Plaintiff Benjamin King. While King and DePauw disagree about what

actually happened on the night in question and whether King violated DePauw's code of

conduct, the facts relevant to the instant motion—that is, the facts surrounding DePauw's

handling of the complaint—are largely undisputed.

### A. The Complaint

On December 8, 2013, a female DePauw student, J.B., reported to DePauw authorities

that she had been the victim of sexual misconduct by another DePauw student, King. J.B. stated

that she had attended a party at the Delta Tau Delta fraternity house on Friday, December 6,

2013, that she had consumed alcohol during the evening, and that she had awakened the

following morning unclothed in King's bed without any memory of what had occurred between the two of them. When she later texted King to ask him what had happened, he told them that they had "tried having sex but it never actually happened." J.B. further reported that she felt pain in her vaginal area and had gone to the emergency room on Saturday evening to have a sexual assault examination performed. She reported that the nurse who performed the exam told her she observed vaginal tearing. J.B. did not, at that time, wish to make a formal complaint to DePauw's Office of Public Safety ("Public Safety") or pursue a police investigation of the incident, but she did want King to be interviewed by the university's Title IX coordinator, Dorian Shager.

Ten days later, Shager met with King, explaining that as the Title IX coordinator he was "conducting an inquiry to see if sexual misconduct may have occurred." Shager summarized King's statement to him as follows:

> Ben indicated that he and another student had tried to have sex that night, but they did not end up having sex. Ben stated that they knew each other a little bit from having class together. That they went up to his room and had a drink. That one of her friends called but the female student decided to stay in Ben's room. Ben indicated that they got naked and were making out. He stated they did not have verbal communication at this point. Then he fingered her. I inquired if Ben had asked for verbal consent before doing this, and he indicated no. They tried to have sex but it was not working. He said he was too drunk to keep it up. He stated that she asked him to try again multiple times. He also stated that it was too dark in the room to see what was going on and she did not want the lights on.

Dkt. No. 37-4.

DePauw's holiday recess was from December 20, 2013, through January 6, 2014. The next two weeks were DePauw's "winter term," during which approximately 70% of students are off campus. At the end of winter term, on January 22, 2014, J.B. informed DePauw that she wanted to pursue a charge of sexual misconduct against King.

**B.  The Investigation**

Pursuant to DePauw's policy, a formal report was filed with Public Safety and an investigation was begun that day by Captain Charlene Shrewsbury of that office, who is a sworn police officer.  One of her first steps was to call King in for an interview.  Because DePauw has an agreement with the county prosecutor's office that it will forward the results of any sexual misconduct investigations it conducts to the prosecutor for review, Captain Shrewsbury began the interview by advising King of his *Miranda* rights and informing him that the interview would be videotaped.  Not surprisingly, King declined to be interviewed at that point.

The remainder of Captain Shrewsbury's investigation consisted of an interview of J.B. and several DePauw students who had been at the same fraternity party; she later explained that she interviewed the students that J.B. remembered having the most contact with at the party.  J.B. gave a lengthy statement to Captain Shrewsbury on January 22, 2014.  She described first drinking at a party prior to going to the fraternity house.  She consumed at least two "Peppermint Patties," which involved someone pouring peppermint flavored vodka into her mouth followed by chocolate syrup.  She also consumed one, or perhaps two, mixed drinks that likely contained about two shots of liquor each.  She reported that she remembered drinking at least three cups full of the cider punch that was being served at the fraternity party, which she learned later was made with Everclear, a particularly potent form of alcohol.  Her reported memory of what occurred in the basement of the fraternity house was spotty, although she remembered that about midnight she was talked out of leaving the party by some freshman girls.  She stated that she did not remember the phone conversation or going upstairs with King; indeed, the next thing she reported remembering was waking up in King's bed the next morning.  She explained that she was very embarrassed to find herself in that situation, particularly because she was on her

menstrual cycle and no longer had a tampon inserted, although she did not remember what had happened to it. She reported that she recognized King but could not remember his name. She described him as throwing her clothes at her and acting "put off" when she asked him to take her to the room where she had left her coat. She stated that King acted "very rude and weird" and did not show her how to get out of the fraternity house. Finally, she emphasized that she did not typically attend parties, that she was a virgin, and that spending the night in a fraternity house was not something she would typically do.

The relevant information from Captain Shrewsbury's summaries of the remaining witness's statements and the written statements provided by some of the witnesses after their interviews is as follows:[1]

· Student M.B., who was interviewed on January 24, 2014, was not aware of how much alcohol J.B. had consumed, but believed that she was "very drunk" because she was exhibiting "uncharacteristic behavior" when she saw her in the basement of the fraternity house. When asked to describe that behavior, M.B. stated that J.B. was talking about how wonderful her sorority was when she typically "is very reserved on the topic of her sorority as she wants everyone to make their own decision."[2]

---

[1] Captain Shrewsbury's summaries of the student statements and the written follow-up statements are found at Dkt. Nos. 37-12 and 37-13.

[2] The Court assumes this refers to the decision of which sorority to join. In her written statement, M.B. explains that "talking up" one's sorority to freshmen girls to influence their decision is "illegal in the sorority world" and when J.B. told her she would be great as a member of her sorority, that was "when I knew she wasn't just intoxicated; she was very drunk."

4

- F.J., who was interviewed on January 27, 2014, was one of J.B.'s roommates. F.J. also was not aware of how much J.B. had to drink on the night in question. She stated that J.B. appeared "kind of intoxicated" and "past the point of tipsy" at the party. She described J.B. as someone who did not "go out" very often and typically drank in moderation. She explained that when she and her friend, E.C., were ready to leave the party, J.B. was no longer in the basement of the fraternity house. E.C. called J.B., but J.B. was not ready to leave and told E.C. that she was "fine and not to worry as she was with friends." E.C. told F.J. that J.B. "did not sound too drunk."

- E.C., another of J.B.'s roommates, was also interviewed on January 27, 2014, and gave a statement that was consistent with that of F.J. with regard to her call with J.B. E.C. reported that J.B. "seemed very coherent and [was] speaking clearly. She did not see her falling or stumbling and [she] was not showing any typical signs of intoxication." She reported seeing J.B. "tak[e] two pulls of a handle" while they were dancing in the basement of the fraternity house. In her written statement, she recalled that J.B. drank at least two cups of the cider being served at the party and she described J.B. as seeming "ever so slightly drunk . . . but very coherent" toward the end of the night.

- M.T., who was interviewed on January 29, 2014, reported that she saw J.B. at another party before they went to the fraternity party. She described J.B. as "already intoxicated as she was dancing very animatedly and was very 'lovey dovey' with everyone," although she did not see her consume alcohol at that location. She did see her take "at least two fairly large pulls from handles" while

5

in the basement of the fraternity house.  She described J.B. as acting out of character at the party—taking someone's glasses off and putting them on and putting her arms around people—something the normally reserved J.B. would not typically do.  She also reported that J.B. was slurring her words and that she fell in the basement of the fraternity house, although she could not say whether she fell due to being intoxicated or because of the slippery floor.  She thought it was odd that J.B. did not seem embarrassed by the fact that she fell.  She described her as dancing "all over the place" as if she did not have "complete control over her limbs."  In her written statement, she said she could tell she was "very intoxicated . . . by her lack of control over her body—very wild and lanky movements and just constantly running around people."  M.T. saw King briefly at the party, but she did not see him interact with J.B.

· J.D. reported to Captain Shrewsbury on February 4, 2014, that she was extremely intoxicated on the night in question and had no memory of what had occurred.

By letter dated February 12, 2014, DePauw notified King that it was charging him with nonconsensual sexual contact and sexual harassment.  Captain Shrewsbury conducted two more interviews after that date:

· D.H., a member of King's fraternity, reported to Captain Shrewsbury on February 17, 2014, that he saw J.B. when she arrived at the fraternity house and that she was "a little buzzed" at that point.  About an hour later he saw her in the basement of the fraternity house; at that point she was "more drunk" than before but "able to stand without swaying, make eye contact, and carry on a conversation."  He saw her later in the evening, at which point she "seemed a little more intoxicated

. . . but was still able to have a decent conversation." He did not see her again until the next morning when she and King came to his room to retrieve J.B.'s coat. He described J.B. as "not acting herself," but he does not remember her crying. He described King as "hung over and possibly still intoxicated."

- J.W., the fraternity member who had invited J.B. (and three other girls) to attend the party, reported on February 18, 2014, that he did not know how much alcohol J.B. had consumed. He observed her "dancing and having fun" at the party and described her as "obviously drunk," but he could not "judge her level of intoxication as he does not spend enough time with her when she's drinking alcohol."

Another witness, W.W., provided a short written statement at the request of King in which he recalled seeing King "interacting and talking to a young women [sic] who looked to be in good spirits" near one of the entrances to the fraternity house. He believed that King was "walking her to the door after she had spent the night" at the house.

## C. The Hearing and the Board's Decision

Pursuant to DePauw's policy, complaints of sexual misconduct are heard by a panel of three members of a seven-member Sexual Misconduct Hearing Board ("the Board"). Both complainants and accused students are entitled to have an advisor to help them through the hearing process. J.B.'s advisor was Sarah Ryan, Director of the Women's Center and DePauw's Sexual Assault Survivor's Advocate. Ryan is married to Title IX coordinator Dorian Shager. DePauw suggested that King use J.C. Lopez, a member of the Board who was not on the panel for King's case, or PJ Mitchell from the Fraternity Life Department, as his advisor, but also advised him that he should choose a faculty member he knew and felt comfortable with. King

therefore chose another advisor, a professor with whom he was familiar but who had no experience dealing with sexual misconduct complaints.

The hearing originally was scheduled for February 20, 2014. King requested a one-week delay because he needed additional time to prepare; his request was denied. The hearing was then delayed until February 24, 2014, to accommodate another scheduling issue.

At the hearing, both King and J.B. were permitted to give opening statements and to ask questions of the witnesses if they wished. Captain Shrewsbury testified briefly about her investigation and then several of the students whom she had interviewed testified. Each student was asked a few questions—mostly tracking his or her previous statements—and, with the exception of W.W., who indicated he had not seen J.B. during the party—each also was asked to indicate, "on a scale of 1 to 10, with 1 being not drunk at all and 10 being very drunk," how intoxicated she was on the night in question and how intoxicated she believed J.B. had been.[3] The hearing testimony consisted of the following:

- M.T. testified that she was "probably a 6" herself and J.B. was "maybe a 7." She was not asked to discuss or elaborate on her descriptions of J.B.'s behavior contained in her previous statements, other than to describe how J.B. reacted when she fell; she stated that "[s]he was just laughing and I helped her back up."

- M.B. testified that she was "maybe like a 5" and J.B. was "very drunk, like closer to the 9 area." When asked what made her think that J.B. was that intoxicated, she said that she "was screaming and jumping up and down" and again reiterated

---

[3]All quotes from the Board's hearing transcript are found at Dkt. No. 37-6.

that she had violated the rule against promoting her sorority, which she did not believe J.B. would do if she were sober.

- E.C. testified that she was a "one or a two" herself and that J.B. was "probably a 4." Consistent with her earlier statements, she testified that she had called J.B. before she left the party and "there wasn't anything in her speech or whatnot that would tip me off to her being extremely intoxicated." She testified that she knew J.B. very well, that they were roommates and socialized together "really often," and that J.B.'s behavior was typical of her behavior "in a going out setting, I didn't think it was as bad as she sometimes can be . . . I had seen her much more intoxicated than when I last saw her at this point in the night."

- F.J. testified that she was "around a 6 or a 7" and J.B. was "around an 8," explaining "as the night went on, [J.B.] was acting much more free spirited, a little all over the place, very giggly . . . at one point we both ran outside in the snow and were rolling around and playing around and just acting completely goofy and it just seemed that at that point she had reached a level of intoxication beyond just sort of tipsy, happy-go-lucky drunk and I was in the same room with her for most of the time. I wasn't always with her but she just seemed very chatty, smiley, all over the place which, just knowing [J.B.] since freshman year, knowing her behavior when she is drunk, certainly seemed to match." Compared to other nights she had seen J.B. drink, F.J. testified that "[s]he was definitely more intoxicated, a little bit more wild, clearly not the same."

> I think part of it was the fact that she and I had been running around, we had been standing on couches and singing and dancing all over the place. Like I said, we had run out in the snow dancing

9

around.  I know that I fell because I had little bruises the next
morning which means I didn't care about it or notice it the night
before and she was rolling around and doing the same.  We were
probably both drunk.  She was sort of hanging on people,
wandering around just being a very social butterfly which tends to
heighten when she gets drunk.  She likes to talk to people.  But
again, because I was intoxicated as well, I might have not known
for sure but you could just tell that yeah she was drunk.

J.B.'s testimony reiterated what she said in her written statement.  She testified that she believed

she was "from the point that I still have memory of, I was very drunk you know like 8, 9 and the

fact that I later lost memory, kind of speaks to the fact that I was in a worse state and I also

remember being told that I passed out at some point as well and I think that sort of speaks to my

level of drunkenness."

Finally, King testified that he was acquainted with J.B. before the party because the two

of them had had a class together the previous spring and he had "seen her out a couple of times at

Delt at parties and stuff."  She had previously given him her number and he had "texted her

maybe two or three times," but they did not know each other well.  He first saw her the night of

the party at about 1:00 a.m. in the basement of the fraternity house.  He approached her, and the

two talked for awhile before he suggested that it was too loud to carry on a conversation and

asked her if she wanted to go to his room.  She agreed, and the two walked up the 54 steps to his

room, where they continued their conversation.  King testified that his intoxication level was

"probably around a 4" and hers was "probably like a 3 or 4 like me."  He testified that she was

"coherent.  Having a fine conversation.  It didn't seem any different than any other conversation

we have had in the past.  I just went up and talked to her at parties.  That is about the only

reference I really had was talking to her at parties and she seemed no different."  At some point

J.B.'s friends called her, and she indicated she did not want to leave.  She then suggested that the

10

two "take a shot," which they did.  King testified that the two then made their way to his bed and

J.B. removed his shirt and then removed her own clothing while he removed the remainder of his

clothing.  The two then began making out.  When asked who initiated "the touching back and

forth," he testified that

> It was at the same time.  Again, it was kind of mutual.  I mean she first took my
> shirt off and then we started making out and after that, that's really, like she was
> rubbing my area and I was rubbing her area at the same time and it was a mutual
> thing.

King then explained that "everything kind of stopped" when she told him she was on her

menstrual cycle; he denied knowing how or when her tampon had been removed.  Finally, when

asked about Shager's summary of his interview with King, which indicates that King said they

tried to have sex but it was "not working" because he was too intoxicated, he answered that

"[t]hat was whenever I was rubbing her and then she told me she was on her period and I wasn't

really wanting to at that point."  When asked again later about this apparent discrepancy between

the reason he told Shager they did not have sexual intercourse (he was too drunk) and his

testimony at the hearing (she was on her menstrual cycle) he answered:  "I was drunk at the time

but it wasn't because I was too drunk, it was also because [she] was on her period.  I feel kind of

a little bit my words are kind of a little bit taken out of context with [Shager].  That's about all.

That's exactly how I worded it."  When asked about the fact that he told Shager he had

"fingered" J.B., King explained that he did not mean penetration, but rather he was "just rubbing

her vaginal area."  Finally, he explained that when he told J.B. that she had "passed out" in his

bed, he just meant that she had fallen asleep, that "passing out" and "falling asleep" are used

interchangeably among his peers.

King was asked several questions regarding the issue of consent. When asked what indication J.B. gave that she wanted to engage in sexual activity, King testified:

> She asked me to turn the lights off and then while we were making out she told me multiple times she wanted to have sex. That was mainly what it was and she was touching me and stuff and taking my clothes off and she said she wanted to stay. Well she told her friends on the phone that she wanted to stay. She voluntarily came up to my room. Walked by herself fine. Just nothing pointed to anything to her saying that she didn't want to.

When asked if he asked "at any time for [J.B.'s] consent to engage in any type of sexual activity" he answered "No, I mean I didn't ask her personally but I felt like she was getting physical so it was ok. . . . Well, taking her clothes off and being ok with making out with me and saying that she wanted to have sex spoke to me as consent to rubbing her." Finally, King was asked about the statement in Shager's summary that King "indicated that they got naked and were making out. He stated they did not have verbal communication at this point. Then he fingered her. I inquired if Ben had asked for verbal consent before doing this, and he indicated no." King explained that he did not "necessarily agree with that. I had verbal communication, verbal consent is that what you are asking for? Consent? We had verbal communication before that before we made our way to the bed." He further testified that after they disrobed and before he decided not to have sex, she "told me she was on her period and she wanted to have sex and I asked if I could turn the lights on and she said don't turn the lights on and I try to reach my hand and she pulled my hand down."

Following the hearing, the Board found that King was "responsible for non-consensual sexual contact and sexual harassment." It determined that the appropriate sanction was expulsion. In a written explanation of its decision, the Board noted the following:

The board saw this case as being a question of not whether sexual activity had taken place, because Ben clearly said in his conversation with Dorian Shager that there was sexual activity, but of whether or not [J.B.] had given or was in a state to give consent, and should Ben have known that she was in a state to not give consent.

In deliberation regarding responsibility, the board took into consideration the number of drinks [J.B.] remembers having on the night in question as well as the behaviors that her friends reported that she displayed and her experience of not remembering anything from being in the basement of the Delta Tau Delta house until the next morning. These facts lead the board to believe that it was more likely than not that [J.B.] was intoxicated to the level of incapacitation. Based on [J.B.'s] behaviors, as described by her friends, it should have been apparent to Ben that [J.B.] was extremely intoxicated, to the point that she could not give consent to any sexual activity.

Ben shared during the hearing that the reason why he suggested to [J.B.] that he go up to his room was so that they could talk more easily because the basement was too loud. One of the witnesses shared that when she last saw [J.B.], which would have been prior to her leaving the basement with Ben, the party was winding down and the lights were being turned on in the basement. There was also a discrepancy in what Ben told Dorian [Shager] about the sexual contact and what he stated in the hearing. In the notes from Ben's conversation with Dorian, it is noted that Ben told Dorian that he fingered [J.B.]. In the course of questions during the hearing, Ben described the sexual contact as rubbing in her vaginal area but no penetration. These discrepancies led the board to feel that Ben's story was less credible.

The board also considered the fact that both Ben in his verbal statement and [J.B.] in her written statement indicated that Ben had expressed interest in [J.B.] earlier in the semester, something that [J.B.] did not reciprocate towards Ben. In deliberation of the sanction, the board felt that Ben had seen [J.B.] in an intoxicated state and targeted her. Board members felt that this was opportunistic behavior. Additionally the board felt that Ben did not have any recognition that what happened that evening was wrong. With all of these factors, the board felt that the only way to make sure that Ben did not commit this violation again in the future on DePauw's campus was to expel him.

Dkt. No. 37-7.

## D. The Appeal

King, through counsel, submitted a timely appeal of the Board's decision to Cindy Babington, who was at that time DePauw's Vice President for Student Life. King raised

numerous issues in his appeal which he argued demonstrated that the Board's decision should be reversed:

- the failure to permit King to provide an impact statement to the Board before it decided the appropriate sanction, despite the fact that the literature he received from DePauw stated (because of a typographical error) that he had the right to do so

- the failure to conduct a prompt investigation and hearing

- the failure to conduct a thorough investigation; specifically the choice by Captain Shrewsbury to only interview the witnesses J.B. remembered having the most contact with, rather than interviewing additional likely witnesses that were revealed by the various interviews and statements given

- the failure to investigate and consider King's level of intoxication

- the failure to obtain follow-up written statements from D.H. and J.W., while such statements were obtained from the witnesses who were J.B.'s friends

- the failure to interview W.W., a witness suggested by King

- the Board's failure to call D.H. as a witness at the hearing

- the failure to consult with medical experts about the relevance of findings noted in J.B.'s examination

- the failure to consider the possible effect of the prescription amphetamines contained in J.B.'s system in combination with alcohol which, according to an article from the Journal of Forensic Sciences submitted by King with his appeal, can result in an "alcohol blackout" that affects short-term memory but does not

result in "obvious impairment in coordination, balance, social interaction, or speech"

· the failure to request the text messages between J.B. and King from earlier in the semester that would have confirmed or refuted J.B.'s characterization that he "pursued her" and she was "obviously not interested" in him, which apparently led the Board to conclude that King acted in a predatory manner

· the failure of the Board to consider inconsistencies in J.B.'s various reports of how much alcohol she remembered consuming

· the fact that J.B. was provided an advisor with extensive experience in handling complaints of sexual misconduct while King was permitted to choose an unqualified advisor without being warned of the disadvantages of doing so

· the fact that many of the participants in the process had close social and professional relationships—including the fact that J.B.'s advisor is married to Title IX coordinator Shager, whose summary of an informal statement King made to him was used to impeach King

· the fact that a relative of J.B. had recently made a substantial donation to DePauw[4]

· the fact that the issue of sexual assault and the manner in which such allegations are treated by DePauw was a prominent issue on campus and in the college newspaper at the time of the hearing

_____

[4]Because this argument by King has no bearing on the Court's ruling, the Court has not considered the affidavits tendered by DePauw at the hearing that are relevant only to that issue and **denies as moot** DePauw's motion to admit them as evidence.

- the refusal of King's request for a one-week extension of the hearing date to give him more time to prepare, although the hearing was then rescheduled due to a scheduling conflict

- the failure of the Board to ask critical questions during the hearing

- the overall lack of evidence supporting the Board's decision

Babington issued a written decision on King's appeal on March 13, 2014. She upheld the Board's finding of responsibility but reduced the sanction to suspension for the remainder of that semester (Spring 2014) and the following semester (Fall 2014), finding that there was not sufficient evidence to support the Board's finding that King's conduct was "predatory." While King had been permitted to remain on campus during his appeal, he was required to leave DePauw within 24 hours of Babington's decision.

## E. This Action

Three days after Babington issued her decision, King filed this action and moved for a preliminary injunction to permit him to resume his studies at DePauw. The parties reached an agreement to resolve that motion: King was permitted to return to his classes at DePauw and complete the semester, but he was not permitted to be on campus for anything other than his classes. When the parties were unable to reach a settlement of this case over the next few months, King filed the instant motion, again seeking preliminary injunction to permit him to resume his studies, this time for the fall semester that begins next week.

## II. <u>DISCUSSION</u>

King asserts seven claims against DePauw in his complaint, but only addresses three of them in the context of the instant motion: two claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., and a breach of implied contract claim under

Indiana law. The Seventh Circuit has described as follows the standard applicable to the Court's determination whether King is entitled to preliminary injunction:

> The task of the district court asked to grant a preliminary injunction is "to estimate the likelihood that the plaintiff will prevail in a full trial and which of the parties is likely to be harmed more by a ruling, granting or denying a preliminary injunction, in favor of the other party, and combine these findings in the manner suggested in such cases as *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir.1992): 'the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side.'" *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013). This formulation is a variant of, though consistent with, the Supreme Court's recent formulations of the standard, in such cases as *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L.Ed.2d 249 (2008): "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

*Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013) (some citations omitted). Thus, the Court must first determine whether King has any likelihood of success and, if so, whether he will suffer irreparable harm if he does not receive the injunction he seeks; if both of those questions are answered in the affirmative, the Court must perform the balancing described above.

## A. Likelihood of Success

The threshold question before the Court is whether King has demonstrated a likelihood of success on either his Title IX claims or his breach of implied contract claim.

### 1. Title IX Claims

Title IX guarantees that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Although it does not appear that the Seventh Circuit has addressed such a claim, the parties agree that a claim may be brought under Title IX under an "erroneous outcome theory" in cases in which a university has erroneously disciplined a student and gender was a motivating factor in the decision to impose the discipline. *See, e.g.*, *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1994). King also asserts that DePauw is liable under Title IX under a somewhat unique take on a deliberate indifference claim because, he argues, DePauw, through Babington, was deliberately indifferent to the Board's discriminatory actions.

The Court does not believe that King has demonstrated a likelihood of success on the merits of his Title IX claims. King has not pointed to anything that persuades the Court that King's gender was a motivating factor in any of DePauw's actions. King points to the fact that out of the twelve previous sexual misconduct charges identified by DePauw, all of them involved accusations against male students and ten of those students were found responsible. But DePauw is not responsible for the gender makeup of those who are accused *by other students* of sexual misconduct, and the fact that a vast majority of those accused were found liable might suggest a bias against accused students, but says nothing about gender. King's argument really seems to be that DePauw's actions have had a disparate impact on male students, but the Court is unaware of any authority that permits a disparate impact claim under Title IX. *Cf. Hayden v. Greensburg Community School Corp.*, 743 F.3d 569 (7th Cir. 2014) ("The discrimination must also be intentional in order to support a claim for damages under Title IX."). In the absence of any evidence that DePauw has, or would, treat a female student accused of sexual misconduct less favorably than it has treated its male students in that position, it is unclear how King could prevail on his Title IX claims. In other words, it would not be enough for King to convince a jury that J.B. received more favorable treatment from DePauw than he did; he would have to

prove that the disparity in treatment was due to his gender, rather than his status as a student accused of sexual misconduct (or, perhaps, rather than her familial status). The Court cannot say at this juncture that King has even a more than negligible chance of making such a showing.

### 2. Breach of Implied Contract Claim

Indiana law recognizes that "[a]lthough courts have analyzed the relationship between student and university under many different legal doctrines, the most pervasive and enduring theory is that the relationship between a student and an educational institution is contractual in nature. The terms of the contract, however, are rarely delineated, nor do the courts apply contract law rigidly." *Chang v. Purdue Univ.*, 985 N.E.2d 35, 46 (Ind. Ct. App. 2013) (internal quotation marks and citations omitted). Here King alleges that DePauw breached at least two of the "Rights of the Respondent" that are contained in the "Sexual Misconduct Policy" section of DePauw's Student Handbook: (1) the right to "have adequate notice and time to prepare for [the] hearing"; and (2) the right to "have complaints responded to properly and sensitively, investigated appropriately, and addressed competently." As the court in *Chang* noted,

> Although it is generally accepted that a university's catalogues, bulletins, circulars, and regulations that are made available to its students become of part of this contract, our courts have taken a very flexible approach to the scope of contractual promises between students and universities and have noted that hornbook rules cannot be applied mechanically where the principal is an educational institution and the result would be to override an academic determination. . . . University disciplinary determinations in most cases are premised upon the subjective professional judgment of trained educators, and therefore our courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community. As a result, in the area of academic services, our approach has been akin to the one used in the case of contracts conditioned upon the satisfaction of one party. The university requires that a student's academic performance be satisfactory in the university's honest judgment. Absent a showing of bad faith on the part of the university or a professor, the court will not interfere. The good faith judgment model both maximizes academic freedom and provides an acceptable approximation of the educational expectations of the parties. Bad faith in this context is not simply bad

19

judgment or negligence, rather, it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. Literal adherence by a university to its internal rules will not be required when the dismissal of a student rests upon expert judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at. *Our sole function when reviewing disciplinary actions such as in the present case is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith.*

*Id.* at 46-47 (emphasis added).

The question before the Court, therefore, is whether King is likely to succeed in demonstrating at trial that DePauw's decision to find him liable for sexual misconduct and sexual harassment and to suspend him for two semesters was reached in an illegal, arbitrary, or capricious manner, or whether DePauw acted in bad faith in its treatment of King. The Court finds that he is.

As an initial matter, it is important to note what King was found responsible for. Not surprisingly, DePauw's sexual misconduct policy prohibits "engag[ing] in sexual activity with a person one knows or should know is incapacitated." The policy explains that

Incapacitation is an important and specific concept. A person who is incapacitated is incapable of recognizing what is going on around him/her. An incapacitated person is not able to recognize the sexual nature or extent of the situation she/he is in.

As the Board noted in its written decision, the question was whether J.B. "had given or was in a state to give consent, and should Ben have known that she was in a state not to give consent." The Board ultimately concluded that "it was more likely than not that [J.B.] was intoxicated to the level of incapacitation. Based on [J.B.'s] behaviors, as described by her friends, it should have been apparent to Ben that [J.B.] was extremely intoxicated, to the point that she could not give consent to any sexual activity." Quite frankly, the Court sees very little evidence that supports this conclusion.

It is clear that J.B. was intoxicated on the night in question.  Indeed, given all of the information the Board had before it, it was not unreasonable for it to conclude that J.B. was intoxicated to the point of incapacitation that night.  The Board knew:  (1) she had consumed a significant amount of alcohol (although the exact number of drinks she had is impossible to pin down); (2) she was not a regular binge drinker; (3) some of her friends recognized her behavior at the party as unusual for her; (4) she lacked any memory of much of the evening; (5) she was a virgin and would not ordinarily participate in sexual activity or spend the night with a young man she barely knew; and (6) she was willing to subject herself to the indignities and embarrassment of a rape examination, which could be viewed as an indication that she believed she had been the victim of sexual misconduct.  But the evidence is essentially uncontroverted that King did not know *any* of these facts when he engaged in sexual activity with J.B.  He was not with her for most of the night and therefore had not observed how much she had to drink or how she had behaved throughout the evening.  In any case, he did not know her well, having really only interacted with her at a few parties, so he was not aware of what behavior was and was not unusual for her—personalities vary, and some young people regularly engage in behavior while sober that others would only engage in while highly intoxicated.[5]  Similarly, there is no

_____

[5]For example, when asked to explain how J.B.'s intoxication manifested itself, M.B. described the fact that she was touting the virtues of her sorority and later said she was "screaming and jumping up and down"; F.J. described her as "giggly," "chatty" and "smiley, all over the place" and testified that the two of them had run outside in the snow and "act[ed] completely goofy."  It is not obvious to the Court that this type of behavior by college students is necessarily an indication of severe intoxication; college students—even sober ones—are known to engage in all manner of "goofy" behavior.  What the witnesses seemed to find key was the fact that J.B.'s normal behavior is apparently far more reserved.

indication that he had any way to know of her views on sex before marriage or what type of sexual behavior she did or did not normally engage in.

King's responsibility for sexual misconduct had to be based upon information that he had at the time—his observations of J.B.'s behavior in the relatively brief time the two spent together before the sexual activity occurred. Because J.B. has no memory of that time, and there is no testimony from witnesses who saw the two of them together that night, the only direct evidence of how J.B. was behaving at the relevant time comes from King, who was unequivocal in his testimony that J.B. did not seem to him to be intoxicated to the point of incapacity, and from E.C., J.B.'s roommate who testified that J.B. did not seem very intoxicated to her during a phone call that appears to have taken place immediately before the sexual activity began. In order to reach the conclusion it did, the Board had to have decided to discredit King's and E.C.'s testimony. But what was the contrary evidence on which they based their finding that King knew or should have known that J.B. was incapacitated? It had to be the testimony of those witnesses who described J.B.'s behavior earlier in the night. In other words, the Board had to conclude that the behavior described by those witnesses demonstrated that she must have behaved in such a way in her interaction with King that he knew or should have known she was incapacitated. But it is important to note that DePauw's sexual misconduct policy does not (as it presumably could) bar sexual activity with someone who is intoxicated to any degree, or someone who is intoxicated enough to have lost her normal inhibitions and behave in an uncharacteristic manner, or even someone who is intoxicated enough that she is (at least from the perspective of one witness) slurring her words and dancing as if she does not have complete control over her limbs. Rather, DePauw's policy bars sexual activity with someone who is "incapacitated." Given DePauw's own definition of incapacitation—"[a] person who is

22

incapacitated is incapable of recognizing what is going on around him/her"—and the evidence that was before the Board, which is described in detail above, the Court finds that King has at least some likelihood of convincing a reasonable jury that the Board's conclusion that he knew or should have known that J.B. was incapacitated was arbitrary.

As set forth above, King raised numerous other issues in his appeal to Babington which he reasserts in the instant motion. While King's arguments vary in their persuasiveness and support in the record, and the Court need not address all of them, the Court will note a few of them that bolster the likelihood of King's success at trial. First, the delay in the investigation was substantial, and a jury readily could determine that King was prejudiced by the fact that for most of the witnesses the night in question was likely just another Friday night on campus, so there was little reason to remember specific details. By the same token, the jury could find it troubling that after the substantial delay caused by the time J.B. took to decide whether to make a formal complaint, the Board was unwilling to give King an additional week to prepare for the hearing. Also problematic is the fact that the investigation admittedly consisted almost exclusively of interviews of witnesses suggested by J.B.; there was no attempt to use those interviews to ferret out other students who might have additional information. So, too, might the jury find troubling the incomplete nature of the questions the Board asked at the hearing. For example, the Board asked each witness to rate her own and J.B.'s level of intoxication from a scale of 1 to 10, but did not ask the witnesses to explain at what point they believed a person becomes incapacitated. Some witnesses may have believed that a person was incapacitated at a 5; others at a 7; others at a 10. The Board had no way of knowing what a particular witness's definition of, say, a "6 out of 10" was, because the Board did not ask. Finally, the fact that J.B.'s advisor is married to the Title IX coordinator, who obtained and summarized a statement from

23

King that was a prime reason for the Board's discrediting of his testimony,[6] is troublesome, as is the fact that King's own advisor was ill-equipped to be of any real assistance to him.[7]

When asked at the preliminary injunction hearing, Babington testified that she was proud of DePauw's investigation in this matter. It is, of course, entirely possible that a jury will agree with her assessment and determine that DePauw did not act arbitrarily or in bad faith, but rather fulfilled its obligation to King to give him adequate notice and time to prepare for the hearing and to have J.B.'s complaint against him "responded to properly and sensitively, investigated appropriately, and addressed competently." The Court finds, however, that King has demonstrated "some likelihood of success on the merits" of his breach of implied contract claim.

## B. <u>Irreparable Harm</u>

The Court also finds that King has demonstrated that he will suffer irreparable harm if an injunction is not entered. If King is not permitted to complete this upcoming semester at DePauw—even if, as DePauw asserts, he could choose to attend another university and ultimately graduate on time—he will forever have either a gap or a senior-year transfer on his record. The Court finds it inevitable that he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw. Successfully seeing this lawsuit to its

---

[6]As noted above, the Board questioned King's credibility in large part because his description of the details of his sexual contact with J.B. as summarized by Shager varied from his testimony at the hearing.

[7]DePauw takes the position that it recommended two appropriately trained faculty members to King, but he declined to follow its recommendation. Actually, the record indicates that while King was provided with two names of possible advisors, King did not know them, and Associate Dean of Students Cara Setchell specifically advised King to "first think about a faculty member you know and trust," not that he should consider the training and experiences of the advisor in dealing with such matters. Dkt. No. 51-1.

conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding. Money damages would not provide an adequate remedy at that point; DePauw's disciplinary finding—even if determined to have been arbitrary or made in bad faith—would continue to affect him in a very concrete way, likely for years to come.

### C.  <u>Balance of Harm to the Parties</u>

Because King has demonstrated some likelihood of success on the merits and that he will suffer irreparable harm in the absence of preliminary relief, the Court must now determine whether the "balance of equities" tips in his favor; that is, whether the risk of harm to King if the injunction is denied outweighs the risk of harm to DePauw if the injunction is granted. Put another way, the Court's goal is to determine how best to "minimize the costs of being mistaken." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012).

The Court disagrees with King's assertion that the only relevant harm to DePauw is the chance that King will pose a safety threat on campus. Although the Court agrees that that particular harm is virtually non-existent in light of the awareness King now has of the problems associated with engaging in sexual activity with intoxicated individuals, that is not the only type of harm DePauw would suffer if the Court were to mistakenly permit King to return to campus. DePauw has an interest in enforcing its own rules of conduct pursuant to its own procedures. If the Court grants an injunction and King is ultimately unsuccessful in this case, DePauw will have been erroneously denied that right. The deterrent effect achieved by consistent application of disciplinary rules is diminished if sanctions are largely eliminated by court intervention at the preliminary injunction stage. Universities have a difficult job when it comes to dealing with allegations of sexual misconduct, and they should be permitted to do that job without

unnecessary court intervention. DePauw is harmed simply by having its actions second-guessed by a Court after such an abbreviated process which by its nature requires the Court to work within time constraints and without a full record because the parties have not had the benefit of discovery.

That said, the Court finds that if DePauw ultimately wins this suit, the harm it will have suffered by King's court-ordered return to campus this fall, while real, will not be as great as the harm King will have suffered if he is not permitted to return to campus but ultimately wins. A win by DePauw would vindicate its policies and its process in this case. King will still have been found responsible for sexual misconduct by DePauw, as his record will reflect, and he would have suffered significant consequences, although not the full extent of the consequences DePauw intended him to suffer. On the other hand, as discussed above, if the situation is reversed, in the absence of a preliminary injunction King will continue to suffer real, unavoidable consequences even if he wins this suit. Accordingly, the Court finds that the balance of equities is firmly in King's favor.

### D. **Public Interest**

Finally, the Court must consider the effect, if any, that granting or denying King's motion for preliminary injunction will have on the public interest—that is, on nonparties to this suit. As J.B. is no longer a DePauw student, King's return to campus will not have any direct effect on her. It is also unlikely to have any concrete effect on anyone else. The public—and specifically the DePauw community—has an interest in seeing DePauw's policies applied fairly to both complainants and respondents in disciplinary actions. If an injunction is granted and King ultimately loses, that interest will be thwarted to the same extent that DePauw's own interest would be. By the same token, if an injunction is denied and King ultimately wins, that interest

26

will also have been thwarted. The Court therefore finds that the public interest factor does not tip the scale one way or the other in this case.

## III. CONCLUSION

For the reasons set forth above, the Court finds that King is entitled to the preliminary relief he seeks. Accordingly, his motion for preliminary injunction is **GRANTED**. DePauw is hereby **ENJOINED** from enforcing its suspension of King for the fall 2014 semester. King shall be permitted to enroll in and attend DePauw without restriction. The Court is unaware of any request by DePauw for a bond to be posted by King; the Court also is unaware of the need for such a bond. However, if DePauw believes otherwise, it shall file a motion to that effect **within seven days of the date of this Entry.**

SO ORDERED:

Dated: 8/22/14

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification