1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
2                       TERRE HAUTE DIVISION

3
     BENJAMIN KING,              )
4                                ) CAUSE NO.
            Plaintiff,           ) 2:14-cv-70-WTL-DKL
5                                )
            -vs-                 )
6                                ) Indianapolis, Indiana
     DEPAUW UNIVERSITY,          ) August 13, 2014
7                                ) 9:00 a.m.
            Defendant.           )
8

9                             **BEFORE THE**
                  **HONORABLE WILLIAM T. LAWRENCE**
10

11            OFFICIAL REPORTER'S TRANSCRIPT OF

12            PRELIMINARY INJUNCTION HEARING

13

14

15

16

17

18

19

20

21

22   Court Reporter:    Cathy Easley Jones, RMR, RDR, FCRR
                        Official Court Reporter
23                      46 East Ohio Street, Room 291
                        Indianapolis, IN  46204
24

25            PROCEEDINGS TAKEN BY MACHINE SHORTHAND
              COMPUTER-AIDED TRANSCRIPTION

1                       **A P P E A R A N C E S**

2

3    FOR THE PLAINTIFF:              Ms. Holly A. Reedy
                                     Mr. William W. Drummy
4                                    WILKINSON GOELLER MODESITT
                                       WILKINSON & DRUMMY
5                                    333 Ohio Street
                                     Terre Haute, IN  47808-0800
6

7    FOR THE DEFENDANT:              Mr. Brian W. Welch
                                     Ms. Margaret M. Christensen
8                                    BINGHAM GREENEBAUM DOLL LLP
                                     2700 Market Tower
9                                    10 West Market Street
                                     Indianapolis, IN  46204
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X   O F   W I T N E S S E S

2                                                         PAGE

3  For The Plaintiff:

4  CINDY BABINGTON
   Direct Examination by Ms. Reedy ................14
5  Cross-examination by Mr. Welch ................79
   Examination by The Court ......................93
6  Redirect examination by Ms. Reedy .............96
   Recross-examination by Mr. Welch .............110
7  Examination by The Court .....................112

8  EMILY CURNOW
   Direct Examination by Ms. Reedy ..............114
9  Cross-examination by Ms. Christensen .........123
   Redirect examination by Ms. Reedy ............124
10 Recross-examination by Ms. Christensen .......124

11 THOMAS B. KING
   Direct Examination by Mr. Drummy .............125
12 Cross-examination by Mr. Welch ...............147
   Redirect examination by Mr. Drummy ...........161
13 Recross-examination by Mr. Welch .............164
   Redirect examination by Mr. Drummy ...........166
14
   BENJAMIN KING
15 Direct Examination by Mr. Drummy .............167
   Cross-examination by Mr. Welch ...............193
16 Examination by The Court .....................215

17

18 FOR THE DEFENDANT:

19 CINDY BABINGTON
   Direct Examination by Mr. Welch ..............219
20 Cross-examination by Ms. Reedy ...............220

21

22

23

24

25

1                    I N D E X   O F   E X H I B I T S

2                                              PAGE

3   Plaintiff's Exhibit No.:

4   1 .........................................182

5

6

7

8

9

10

11

12

13

14

15   Defendant's Exhibit:

16   A1 through A7 ...............................11
     B1 and B2 ..................................11
17   C1 through C4 ..............................11
     E ..........................................35
18   L .........................................218

19

20

21

22

23

24

25

1        *(In open court)*

2              THE COURT:  We are the on the record on cause

3    No. 2:14-CV-70, Benjamin King, Plaintiff, versus DePauw

4    University.  The matter comes on now for the hearing as a

5    result of the second filing of a motion for preliminary

6    injunction.

7              Mr. Drummy, Ms. Reedy, who's doing the heavy lifting

8    over there today?

9              MR. DRUMMY:  We're going to split it up; but

10   probably, Ms. Reedy will do most of the heavy lifting, Judge.

11             THE COURT:  Who is with you today?

12             MR. DRUMMY:  This is Ben King.

13             THE COURT:  Very well.  Good morning.

14             Mr. Welch, good morning to you, sir.

15             MR. WELCH:  Good morning, Your Honor.

16             THE COURT:  And who is with you today?

17             MR. WELCH:  I have Meg Christensen, my colleague.

18   She and I will be sharing duties today, Your Honor.  I have

19   Cindy Babington, the vice president for admission and

20   financial aid at DePauw.

21             THE COURT:  Very well.  Good morning.

22             All right.  I have read the relevant pleadings.

23   Mr. Drummy, Ms. Reedy, is there any need for opening statement

24   this morning?

25             MR. DRUMMY:  I don't think so, Judge, unless you

1  think it would be useful to you.

2           THE COURT:  I really don't, unless there's something

3  that has not already been at least put before the Court in

4  pleadings.

5           MR. WELCH:  Your Honor, if your wish is that we not

6  have an opening, I'm okay with that.

7           THE COURT:  Very well.

8           All right.  How many witnesses do you anticipate?

9           MS. REEDY:  I'm sorry, Your Honor.  We have four

10  witnesses, Your Honor.

11           THE COURT:  Very well.  As far as I'm concerned,

12  let's get the evidentiary issues out; and then we'll proceed

13  to argument or whatever you wish.

14           MR. WELCH:  Your Honor, if I may, I think there are

15  two issues that I would like to raise with the Court before we

16  get started.

17           The first issue is the issue of DePauw's obligation

18  to protect certain information regarding its students.  The

19  Court will recall that we filed a motion to seal certain

20  exhibits that we tendered to the Court, and the Court granted

21  that motion.  What I thought, Your Honor, subject to what you

22  think, was that if we could have an agreement that when the

23  parties are speaking, lawyers and witnesses, to refer to the

24  complaining student in this matter as J.B. or the complaining

25  student, that will help satisfy DePauw's obligation.

1          And there are other students whose names may surface

2   as well.  It may be a bit cumbersome, but DePauw feels it's

3   got an obligation to protect that as well.  So if we could

4   refer to them by initial and we can let the court reporter

5   know whose names those are, that's my first issue.

6          My second issue, Your Honor, is completely at your

7   pleasure.  DePauw designated several exhibits, three

8   affidavits and exhibits to those affidavits in its response to

9   the second motion for preliminary injunction.  We're prepared

10  to offer those, Your Honor, to get the hearing started if that

11  helps the situation.  We can wait until our side of the case

12  if the Court would prefer.  So those are my two issues, Judge.

13         THE COURT:  Mr. Drummy, Ms. Reedy, in response to

14  those two issues?

15         MS. REEDY:  Your Honor, our issue with keeping the

16  witness -- or the students involved by initial, the first

17  issue I have with that is our exhibits are full of these

18  students' names.  I don't have an objection to these exhibits

19  being sealed.  DePauw originally tendered a transcript of the

20  hearing with the students' names blacked out; and being

21  someone who has read the transcript and heard the hearing

22  myself, it still was very difficult for me to follow without

23  their names involved.

24         One of the students will be testifying today

25  herself.  I think it just becomes very cumbersome and

1  difficult to follow the issues if we're referring to students

2  by initials.  I have an issue with trying to use initials.  I

3  think it's going to be confusing to the parties, to the

4  witnesses and to the Court; and these names are throughout our

5  document.

6          With regard to DePauw's exhibits, Exhibits -- the

7  three affidavits that they submitted to us yesterday

8  afternoon, Your Honor, we would object to those affidavits as

9  hearsay.  All three affidavits are DePauw employees who just

10  give a simple statement as to a pertinent issue in this case.

11  DePauw had an opportunity to list witnesses and chose not to

12  bring any of these witnesses live, and I think it's

13  prejudicial to our clients for these affidavits to come in and

14  for us to not have an opportunity to cross-examine them on a

15  very important issue in the case.

16          MR. WELCH:  Your Honor, our proposal stopped short

17  of the exhibits that we tendered to counsel yesterday.  My

18  proposal specifically was to offer the exhibits which we

19  tendered to the Court with our response to the motion.

20  They've had those for a long time; and we have had no

21  objection to any of that, Your Honor.

22          We can deal, I think, with the other exhibits which

23  we tendered to them yesterday as we get to them; but I'm

24  prepared to speak to them now if the Court would like.

25          THE COURT:  Let's just wait till that becomes

1  apparent to you, Mr. Welch, in regards to the three recently

2  communicated affidavits.  The ones that were affiliated with

3  your response, as far as I'm concerned, they can probably come

4  in.

5          Ms. Reedy?

6          MS. REEDY:  Your Honor, I just wanted to add, as far

7  as referring to the students involved by initials, I,

8  unfortunately, don't have a copy of the statute in front of

9  me; but I know FERPA has an exception for court-ordered

10  disclosures of student information.  So I believe it would be

11  appropriate if the Court ordered that those students' names

12  need to be disclosed for purposes of this hearing, that DePauw

13  would not be violating FERPA by doing that pursuant to the

14  Court's order.

15          THE COURT:  I assumed that was the case, Mr. Welch.

16          MR. WELCH:  We have no objection to that, Your

17  Honor.  We're just trying to discharge our responsibility.

18          THE COURT:  I understand.

19          All right.  I think the affidavits previously

20  submitted to the Court will be accepted by the Court as

21  stated.  I think for purposes of not only the record today but

22  the record going forward that the individual students should

23  indeed be mentioned by name, and I think that makes it a lot

24  clearer.

25          I know that the submissions have withheld that; but

1   it should, hopefully, be readily obvious to me as I review

2   this upon completion of today's hearing who everybody is.  If

3   there is an issue that you believe that I would not know and

4   be able to make the transition from the submissions to today,

5   let me know; and we'll make sure that that does not happen.

6         Otherwise, as far as I'm concerned, in today's

7   proceeding, you may refer to the individuals involved by name.

8   And as I suggest, I will accept the previously filed

9   affidavits as filed and be considering those.

10         MR. WELCH:  Your Honor, would it be helpful for me

11   to make a record of just exactly what those exhibits are?

12         THE COURT:  Yes.

13         MR. WELCH:  Your Honor, the exhibits are Exhibit A,

14   the affidavit of Cindy Babington.  There are eight exhibits to

15   that affidavit.  They are denominated as Exhibit A1 through

16   A8.

17         There is the affidavit of -- and Exhibit A, Your

18   Honor, is the affidavit of Cindy Babington.

19         Exhibit B is the affidavit of Charlene Shrewsbury.

20   There are two exhibits to that affidavit.  They are

21   denominated as Exhibit B1 and B2.

22         Then there's Exhibit C, Your Honor, which is the

23   affidavit of Kenneth Kirkpatrick, K-I-R-K-P-A-T-R-I-C-K; and

24   there are four exhibits to that affidavit, Your Honor,

25   denominated as Exhibit C1 through C4.

1      *(Defendant's Exhibits A1 through A7, B1 and B2, and C1*

2  *through C4 were received in evidence.)*

3           THE COURT:  Very well.  Ms. Reedy.

4           MS. REEDY:  Your Honor, I just had another issue I

5  wanted to bring up.

6           THE COURT:  Hold it just a second.  To keep this --

7  and I don't know if you have already premarked exhibits.

8           MR. WELCH:  We do, Your Honor.  We have a package

9  that we can give to the Court that I just identified.

10          THE COURT:  I don't want to have another Exhibit A,

11 B or C is what I'm thinking.  Did you start your exhibit

12 presentation with D, David?

13          MR. WELCH:  We did, Your Honor.

14          THE COURT:  Very well.  Your exhibits, if there are

15 any, have been premarked as?

16          MS. REEDY:  We are going to be using numbers.  We

17 haven't actually put numbers on them yet because we wanted to

18 make sure the Court was satisfied with us using numbers.

19          THE COURT:  That's fine.

20          MS. REEDY:  We planned on using one.  Any

21 attachments, exhibits we have used in the written pleadings

22 used letters.  So we wouldn't be able to continue any letters

23 anyway.  Really, I think everything that we're asking the

24 Court to rely on is going to be admitted today.

25          THE COURT:  And will be offered --

12

1          MS. REEDY:  Offered today.

2          THE COURT:  And numbered?

3          MS. REEDY:  Yes.  Yes, Your Honor.

4          THE COURT:  That's good.  And you had another issue?

5          MS. REEDY:  Yes, your Honor.  The question that I

6   would have for the Court, Mr. Drummy and I feel that this

7   case -- for the preliminary injunction standard, as the Court

8   is aware, there's a very small burden that Mr. King has to

9   prove today on reasonable likelihood of success on the merits.

10          The courts have referred to it as a better than

11   negligible standard.  Our position before we even start

12   presenting evidence today is that just based on the written

13   documentation presented to the Court, Mr. King has met that

14   burden; and we would suggest to the Court that perhaps we

15   don't even need to go for that prong of the case -- that we

16   don't even need to go into live testimony, that he has

17   presented enough evidence to show the Court that he has a

18   better than negligible chance of success on the merits of his

19   claim.

20          And if that is the case, then we would be moving

21   forward with our witnesses as to irreparable harm.  So we

22   would just suggest to the Court that we feel that there is

23   sufficient evidence and that it isn't necessary for additional

24   live testimony.

25          THE COURT:  Mr. Welch.

1          MR. WELCH:  Your Honor, we couldn't disagree more,

2     as you might suspect.  We think that the standard -- we agree

3     that the standard is not necessarily very high, but we don't

4     think they've met the standard that applies in this circuit.

5          We think, on the contrary, that the information that

6     has just been admitted by the Court in the affidavit of Cindy

7     Babington, the affidavit of Charlene Shrewsbury, and the

8     affidavit of Kenneth Kirkpatrick, go and establish that

9     plaintiff has not shown a likelihood of success on the merits.

10          The standard is they have to show a likelihood of

11     success on the merits; and there is case law out there, as the

12     Court is aware, that that standard is supposedly better than

13     negligible.  We don't think they meet it, Your Honor.

14          So we are not prepared to stipulate, if that's the

15     request.  We're not prepared to stipulate to that.  If it's a

16     motion, the Court can rule then.

17          THE COURT:  I think we've gone this far.  We might

18     as well just throw it against the wall and see what sticks.

19          All right.  You might present your first witness.

20          MS. REEDY:  Thank you, Your Honor.  We call Cindy

21     Babington.

22          THE COURT:  Would you raise your right hand, please.

23     *(Witness sworn.)*

24          THE COURT:  You may be seated.

25          Ms. Reedy, you may inquire.

1      **CINDY BABINGTON, PLAINTIFF'S WITNESS, SWORN**

2                  **DIRECT EXAMINATION**

3    BY MS. REEDY:

4    Q    Good morning, Ms. Babington.

5    A    Good morning.

6    Q    Could you please state your name for the record?

7    A    Cindy Babington.

8    Q    Where are you currently employed?

9    A    DePauw University.

10   Q    What is your title at DePauw?

11   A    My current title is vice president for admission and

12   financial aid.

13   Q    When did that title change?

14   A    July 1st of this year.

15   Q    Previously, what was your title at DePauw?

16   A    Vice president for Student Life and dean of students.

17   Q    How long did you have that title?

18   A    I was the vice president for Student Life for six years

19   and the dean of students for 16.

20   Q    Under which role was it your responsibility to be involved

21   in processing sexual misconduct claims?  Was it as Student

22   Life or as dean?

23   A    Well, probably vice president for Student Life was what I

24   was -- was the overall position to be responsible for the

25   sexual misconduct policy.

BABINGTON - DIRECT/REEDY                    15

1  Q    Okay.  And while you were dean in the role -- prior to

2  becoming vice president of Student Life, as the dean, were you

3  also involved in the sexual misconduct?

4  A    I was.

5  Q    And what was your role at that point?

6  A    At that point, I was also the overseer of the whole

7  process; but there was a separate vice president, and I was

8  acting under him in that capacity.

9  Q    What was his name?

10 A    James Lincoln.

11 Q    Is he currently employed by DePauw?

12 A    He is not.

13 Q    And so for the past 16 years, you have had a role of

14 overseeing allegations of sexual misconduct?

15 A    That's correct.

16 Q    When did you first become aware of the alleged misconduct

17 in this case?

18 A    Shortly after the complainant spoke with our SASA

19 representative.  So it would have been sometime the next day

20 or the day after that.

21 Q    Who told you about it?

22 A    She did, SASA, Sarah Ryan.

23 Q    And can you please list every individual, either a DePauw

24 employee or nonemployees perhaps, that you had any

25 communication with whatsoever regarding the allegations

1    against Ben King?  And I'm speaking of e-mail communications,

2    text messaging, face-to-face communications, any written

3    correspondence, spoken correspondence that you had with any

4    person?  Can you identify who those individuals would be?

5    A    I'll try my best.

6         So, Sarah Ryan, Dorian Shager, who was our Title IX

7    coordinator; Angie Nally, who on us our director of public

8    safety; Charlene Shrewsbury who is the investigator in the

9    case; Cara Setchell, who is responsible for the actual

10   process.

11        I spoke with the complainant at some point.  I would

12   have spoken with Emily Curnow, who was one of the witnesses in

13   the case.  I spoke with a person that I called to speak with

14   on appeal.  His name is Eric Malm.

15        I'm not sure -- I may be missing somebody in that

16   whole time span.  I assume you were talking about the whole

17   time span.

18   Q    Yes.  From the time -- excluding your attorneys, of

19   course -- I should clarify.  From the day you learned of the

20   allegation to today.

21   A    Right.

22   Q    Any individuals you've spoken with about this case.

23   A    I think that sums it up.

24   Q    What about Julia Sutherlin?

25   A    I don't know that I actually spoke directly to Julia

1   Sutherlin about the case.  She's in our office, but I don't

2   know that I spoke with her about the case.

3   Q    What about any of the other board members -- the hearing

4   board members in this case?

5   A    No.

6   Q    What about President Casey?

7   A    I did speak with President Casey about the case, yes.

8   Q    When did you speak with him about the case?

9   A    Probably at various times throughout the process.  It's

10  pretty much standard practice on my part that if attorneys get

11  involved in a case or if something seems particularly

12  contentious or I've had a phone call from a parent -- that

13  would be another person that I did speak to was the

14  complainant's father.

15  Q    When did you speak with him?

16  A    Some time before the hearing took place.

17  Q    Why did he call you?

18  A    He was concerned because the hearing was delayed for a few

19  days.  He was concerned about the impact that had on his

20  daughter.

21  Q    Would you agree that Jillian's father attended DePauw

22  University and is a prominent alum of the university?

23  A    I don't believe he did attend DePauw.

24  Q    You don't think he did attend?

25  A    I don't think he did.  I don't know that to be a fact.

1   Q    Do you know if Jillian's parents have a relationship with

2   President Casey?

3   A    I don't know.  I do know that her father also spoke with

4   President Casey at some point during this process.

5   Q    Do you know when that occurred?

6   A    I do not.

7   Q    How do you know that happened?

8   A    As I was sharing information with the president's office,

9   he made that apparent to me, that he had also spoken with her

10  father.

11  Q    Do you know when he made that apparent to you, at what

12  stage in the process?

13  A    No, I don't.  It probably would have been after the

14  hearing.

15  Q    Did he share with you what information was conveyed in

16  that conversation?

17  A    Any conversation that I'm aware of that Jillian's father

18  had with anybody was out of concern for his daughter and the

19  emotional toll this was taking on her.

20  Q    Did it have any concern with your decision on appeal?

21  A    No.

22  Q    Did you speak with him about any facts of the case?

23  A    No.

24  Q    What did you tell him when he called you and was concerned

25  about the delay in the appeal -- or in the hearing?  What was

2 14-cv-00070-WTL-DKL    Document 64    Filed 09/11/14    Page 19 of 225 PageID #: 1071

1  your response to him?

2  A   I told him that we had made that decision or that the

3  people that were in charge of the process, Cara, had made that

4  decision -- or the hearing board chair.  Actually, I think it

5  was the hearing board chair who ultimately made the decision

6  because there were other witnesses to be interviewed.  And

7  originally, Ben's advisor was a student; and he had class that

8  night.  So that was the cause for the delay of the hearing.

9  Q   And the decision maker on delaying the hearing was --

10  A   I think it was the hearing board chair.

11  Q   Julia Sutherlin?

12  A   Yes.

13  Q   Did you ever communicate to Julia that Mr. Balser -- am I

14  correctly stating that, Balser -- that Mr. Balser was

15  concerned about a delay with the hearing?

16  A   No.

17  Q   When was your first conversation with President Casey

18  about these allegations?

19          MR. WELCH:  Your Honor, I'm going to object.  I

20  think that question's been asked and answered.  She's already

21  asked her when she first had a conversation with the

22  president.

23          THE COURT:  I agree.  It may be preliminary,

24  however, to another question.  So I'll allow the question to

25  stand.

1          You may answer, if you know.

2    A    I'm not sure.

3    BY MS. REEDY:

4    Q    Do you know how many times you talked to him?

5    A    I'm not sure.

6    Q    Do you remember -- and how were your communications with

7    him?  Were they ever by e-mail?

8    A    No, generally not.

9    Q    Did you have any e-mails with President Casey about this

10   case?

11   A    Not to my recollection.

12   Q    Were you aware of the relationship --

13          MS. REEDY:  Strike that, Your Honor.

14   BY MS. REEDY:

15   Q    In your affidavit, Exhibit A to DePauw's response, in

16   paragraph 19, you describe the history over the last five

17   years in these cases and that DePauw has formally processed 12

18   charges in the last five years; and of those 12 charges, ten

19   opportunities were found responsible; is that correct?

20   A    Yes.

21   Q    Okay.  What percentage -- are you familiar with those 12

22   cases?  Were you involved in all 12 cases?

23   A    I probably was at some level, yes.

24   Q    Okay.  What percentage of those students were male, to

25   your recollection?

1   A    That were the accused students?

2   Q    The accused students.

3   A    All.

4   Q    Of the 12, all were male?

5   A    Yes.

6   Q    And what percentage of the complainants were female?

7   A    All were female.

8   Q    How many of those cases were appealed to you?

9   A    I don't know, actually.  Probably a good number of them

10  because generally, students do appeal because the consequences

11  often are a level of probation, suspension, expulsion; but I

12  don't know whether all 10 or all 12 were.

13  Q    Okay.  Do you recall ever -- and I know in this case,

14  you've reduced the sanction; but do you ever recall completely

15  overturning the decision of the board as to a finding of

16  responsibility?

17  A    No.  I've never done that.

18  Q    Of those 10 students who were found responsible, what

19  percentage of those cases involved alcohol?

20  A    Probably most of them, at least on the part of the

21  complainant.  I know of at least one case that did not involve

22  alcohol on the part of the accused student, but I haven't gone

23  back to review all those cases.  So I can't speak with

24  absolute certainty.

25  Q    So of the ten, there's only one that comes to mind that

1  did not involve the accused student also consuming alcohol

2  prior to the sexual act?

3  A    Right.

4  Q    How do you distinguish -- at what point is a female

5  student unable to consent to sexual activity because of

6  alcohol intoxication?

7  A    We have a standard --

8          MR. WELCH:  Your Honor, I'll object to that

9  question.  I don't think the witness is qualified to answer

10 it.  As I understood it, the question was at what point does a

11 female become unable to consent.  That seems to me to be a

12 medical question that this witness is not qualified to answer.

13         MS. REEDY:  Your Honor, I would respond that that

14 absolutely should be a medical question; but unfortunately,

15 DePauw delegates that to the dean of students and the vice

16 president of Student Life.  That's exactly the decision that

17 was made by her hearing board and by Ms. Babington on appeal.

18 So I think it's completely relevant.

19         THE COURT:  I think at this point, I need to hear a

20 little bit more.  Whether that's a preliminary question by

21 Mr. Welch or further investigation for proper foundation from

22 the plaintiff, I don't care how you do it.  I think I need to

23 know more of a background issue.  I don't care if you do it by

24 preliminary questioning or, Ms. Reedy, if you do it by further

25 foundation.

1          MS. REEDY:  I can lay a further foundation, Your

2   Honor.

3   BY MS. REEDY:

4   Q    Ms. Babington, would you agree that as a result of

5   DePauw's policies and procedures in place, it is the hearing

6   board and the board chair and then yourself in evaluating

7   appeals that makes the decision if a student could have

8   consented to sexual conduct as a result of alcohol

9   intoxication?

10  A    Yes.

11  Q    Do you ever consult with medical professionals to assist

12  you in making those decisions?

13  A    I can't speak for certainty that we haven't at some point

14  but not on a regular basis.

15  Q    In this case, did you consult with any medical

16  professionals?

17  A    No.

18  Q    Do you agree that the hearing board's decision in this

19  case and your decision on appeal was based on your individual

20  evaluations as to at what point a student becomes too

21  intoxicated to consent to sexual conduct?

22  A    I believe it was based on the hearing board's hearing of

23  testimony from witnesses that they were able to make that

24  decision.

25  Q    But that was the ultimate decision that they made?  That

1  is the deciding factor in the case against Mr. King?

2  A    It is one of the deciding factors.

3        MS. REEDY:  Your Honor, I think based on that,

4  Mr. King is entitled to find out what she bases that decision

5  on.

6        THE COURT:  Reask.

7        MS. REEDY:  Thank you, Your Honor.

8  BY MS. REEDY:

9  Q    At what point is a female student too intoxicated to

10  consent to sexual contact?

11       MR. WELCH:  Same objection, Your Honor.  Seems to me

12  that that question varies by individual almost by definition,

13  Your Honor.  DePauw has a -- DePauw has -- and you'll find it,

14  Your Honor, in Exhibit A1.  DePauw has a very detailed

15  statement about what constitutes consent under its policy.  So

16  I don't think it's a proper question for this witness.

17       MS. REEDY:  Your Honor, DePauw's employees are

18  implementing its policies; and I think their understanding of

19  their policy and understanding of their own standards is what

20  this case is all about.  They want to rely on her decisions if

21  Jillian Balser was too intoxicated in this case, but they

22  don't want to give us their basis for that decision.

23       THE COURT:  I think the subject matter is

24  appropriate.  I think you've laid the proper foundation.  I'm

25  somewhat hesitant because the question was "at what point is a

1  female student."  Then we get into probably some other issues.

2  Are you talking just generally?

3          MS. REEDY:  Yes, Your Honor.  And I will get into

4  the facts of this specific case, but I'm just trying to get an

5  understanding for this witnesses' opinions.  She's done the

6  appeal on numerous cases.  She's testified that in almost all

7  of the cases she's seen, there's alcohol intoxication involved

8  by the female student.  I'm interested in finding out and the

9  Court needs to know how she evaluates that, what are her

10 standards that she applies in evaluating these cases.

11         THE COURT:  Generally?

12         MS. REEDY:  Generally.

13         THE COURT:  I'm going to allow the question.

14 Objection overruled.

15 A   Do you want to reask the question?

16 BY MS. REEDY:

17 Q   Sure.  At what point is a female student unable to consent

18 to sexual activity due to alcohol intoxication?

19 A   We have a standard of incapacitation, which would mean

20 that we would be looking at a student's motor controls, their

21 ability to verbally consent, memory.  All of those things

22 would play into an incapacitation, as well as an accounting of

23 how much alcohol that student had had to drink that night.

24 There are calculations that you can use to determine what

25 someone's BAC potentially could be.

1  Q    Is that something that the board is trained to engage in

2  trying to calculate, BAC?

3  A    Yes, they are.

4  Q    Did you attempt to calculate BAC in this case?

5  A    I certainly attempted when I looked on appeal to add up

6  the number of drinks and the time span of which Jillian had

7  those drinks and then also closely scrutinize the witness

8  statements as to her behavior.

9  Q    In how many of those cases do you recall the male student

10  had also consumed alcohol?

11  A    Many of them.

12  Q    In those cases, do you believe that the male student's

13  level of intoxication is relevant?

14  A    It depends.

15  Q    Could you elaborate?  What does that depend on?

16  A    It depends on whether the male student articulated that he

17  couldn't remember the circumstances of the evening or whether

18  a male student referenced having had a lot to drink,

19  referenced memory loss, made a statement that they were having

20  trouble remembering.  And then at that point, it is very

21  possible that that could have played into the situation.

22  Q    You reference memory loss.  Is memory loss sort of a

23  requisite key piece of information for you to believe that a

24  student is too incapacitated to consent?

25  A    I don't know if it's a requisite piece of information as

1  much as it's a common piece of information.

2  Q   Would you agree that if a male student reports any sign of

3  being heavily intoxicated or consuming alcohol, that his level

4  of intoxication should be a relevant factor in the case?

5  A   I think -- again, what I said before is that we would make

6  that judgment and pursue that as an investigation point or

7  questions in a hearing depending on what a male student had

8  indicated to us.

9  Q   And in this case, did you review Mr. King's Appeal of

10 Sexual Misconduct Hearing Board's Finding of Fact and Sanction

11 of Expulsion against Benjamin King?

12 A   Yes.

13         MS. REEDY:  Your Honor, I would move to admit

14 Plaintiff's Exhibit 1.

15         MR. WELCH:  Your Honor, we don't know what that is.

16         Your Honor, it appears to be a copy of their appeal.

17 That exhibit is already in evidence as Exhibit A7.  I don't

18 think there's a need for this one.

19         THE COURT:  Let's just confirm that A7 previously

20 admitted is the same exhibit as is offered as Plaintiff's

21 Exhibit 1.

22         MS. REEDY:  Your Honor, it appears to be the same

23 document.

24         THE COURT:  Very well.  We will simply show that

25 Exhibit 1 as offered is the same as the exhibit previously

1  offered.  Therefore, I will decline to allow this exhibit.

2  You might want to double-check some of your other exhibits.

3  They may also be duplicates.  That may speed things along a

4  little bit.

5           MS. REEDY:  Sure.

6           MR. WELCH:  Your Honor, we have a set that could be

7  used for providing it to the witness, if counsel would like

8  that.  I just don't know how she would like to proceed.

9           THE COURT:  Do you have copies?

10          MS. REEDY:  I have copies as well.

11 BY MS. REEDY:

12 Q   You are familiar with the appeal?

13 A   Yes.

14 Q   You thoroughly reviewed that appeal?

15 A   Yes.

16 Q   Were you aware of Mr. King's text message to Jillian the

17 following morning?

18 A   Yes.

19 Q   What did Mr. King state in that text message about his own

20 level of intoxication?

21          MR. WELCH:  Your Honor, I'm going to object.  The

22 text message itself is the best evidence of what he said.  I

23 don't think we're here to test the witness's memory about

24 whether she's memorized the document.  She can provide that

25 document to the witness and --

BABINGTON - DIRECT/REEDY                    29

1          THE COURT:  Why don't you give the exhibit to the

2   witness.

3          MS. REEDY:  Your Honor, I would be interested in

4   knowing, though, the witness's knowledge of Mr. King's

5   intoxication.  She's reviewed the document, and she denied our

6   appeal.  I would be interested in knowing if she does know

7   what he stated his level of intoxication was in this hearing.

8   I think it's relevant, her actual knowledge.

9          If she does not, certainly I can show her the

10  document; but I think it's relevant to know if the person who

11  reviewed our appeal and confirmed the decision even knew my

12  client's level of intoxication.

13         THE COURT:  I think you can ask her if she did know;

14  but to ask her specifics, this is not a test of her knowledge

15  several, several months from the incident.

16         MS. REEDY:  Sure.

17  BY MS. REEDY:

18  Q   Do you know what his level of intoxication was?

19  A   I don't know that I know specifically.  I know the gist of

20  what the text messages were, which Ben seemed to be indicating

21  that he had a grasp of what had occurred that night, which I

22  think is what the investigators looked at when they were

23  looking at this case and investigating further.

24  Q   So his statement that, "You were acting normal to me, but

25  I was pretty drunk too," were you aware of that, that he told

1  Jillian the following morning that he was pretty drunk too?

2  A   I saw all that on appeal after the investigators had

3  already reviewed that as well as other information.

4  Q   Am I correct that you're stating that perhaps you

5  discounted that because he had a recollection of what

6  occurred?

7  A   No.  I'm saying I had more information by the time I had

8  an appeal, which was Ben himself testifying that he was at a

9  level 4 for being intoxicated.  That seemed to dispute that

10 text message.  So I had more information on appeal than just

11 that.

12 Q   Do you also recall Ben telling the Title IX coordinator,

13 Dorian Shager, that, quote, he was too drunk to get it up?

14 A   I do recall that; but I also remember many other things,

15 many other stories that contradicted that.

16 Q   Okay.  I'm going to get into greater detail as to Ben's

17 story and, actually, his testimony as to his intoxication a

18 bit later; but I want to move on with this discussion of

19 intoxication between students.

20      Have you had cases presented where both students were

21 intoxicated?

22 A   Yes.

23 Q   How do you resolve that discrepancy?  If both students are

24 intoxicated, what happens?

25 A   Cases are usually begun by one person or another.  And so

BABINGTON - DIRECT/REEDY                31

1  a complainant or a complaining student comes forward and talks

2  about a situation, and so the case rolls out from there.  So

3  they're making a complaint.  They're saying, "Something

4  happened to me."  So we're looking at it from that standpoint

5  of that person making the complaint.

6          Generally, someone is the instigator of the sexual

7  activity; and so that's the person who's on kind of the other

8  side of the equation.

9  Q   Is it typically the accused student who is the instigator

10 of the activity?

11 A   Yes.

12 Q   By the instigator, do you mean the person who initiated it

13 or came on to the other student?

14 A   Initiated, invited somebody to their room, gave them

15 drinks, whatever that might be.

16 Q   So if they're both drinking, they're both intoxicated, do

17 you place fault on the student -- the intoxicated student who

18 initiated it, invited the person to their room, offered

19 drinks?

20 A   Yeah.  Yes.  I think a hearing board would look at it in

21 the way of whoever began the action, who instigated it.  I

22 think that's what a hearing board would look for.

23 Q   Do you agree that in your experience it is the female

24 student who complains and the male student who is looked at as

25 the instigator of the action?

BABINGTON - DIRECT/REEDY                    32

1   A    That has been my experience.

2   Q    And if both of those students are intoxicated, then by

3   default, the male student is found responsible for sexual

4   misconduct?

5   A    Well, remember, we're not looking at intoxicated.  We're

6   looking at incapacitation, which is really different.  There's

7   a different standard there.

8   Q    What if they are both incapacitated?

9   A    I have not had a case like that.

10  Q    How would you resolve such a case?

11  A    I think it would be really difficult.

12  Q    So you've never had a case where the male student was so

13  intoxicated?

14  A    No.

15  Q    Do you agree that DePauw has had a problem with alcohol

16  consumption on its campus?

17            MR. WELCH:  Your Honor, I'm going to object to that

18  question.  I don't know what the relevance is.  The question

19  is do you agree that DePauw has an alcohol problem on its

20  campus.  We're not here to delve into DePauw's issues without

21  alcohol on its campus.  We're here to find out whether or not

22  the Court thinks DePauw discharged its obligations under Title

23  IX and its contract with this plaintiff in handling this

24  claim.

25            THE COURT:  Relevance, Ms. Reedy?

1          MS. REEDY:  Your Honor, the relevance is that as

2   Ms. Babington has testified, most of these cases involve

3   alcohol.  Our position is that there is a culture on campus

4   that fosters excessive alcohol drinking, consuming and that

5   that invariably results in -- pardon my language but drunk sex

6   or drunk sexual activity; and in these cases by default, the

7   male student ends up being accused and disciplined for drunk

8   sexual behavior in a culture that fosters drunk sexual

9   behavior.

10         MR. WELCH:  Your Honor, there's absolutely nothing

11  in this record to support the statement that counsel just

12  made.  It's completely irrelevant to this case, and it goes

13  way beyond any of the pleadings filed in this matter.  I don't

14  think it's relevant at all and we'll object.

15         THE COURT:  I agree.  Sustained.  Next question.

16         MS. REEDY:  Thank you, Your Honor.

17  BY MS. REEDY:

18  Q    Would you agree with me, Ms. Babington, that if you only

19  interview the witnesses in a general investigation -- I'm not

20  talking about this specific investigation but if you only

21  interview the witnesses identified by one party, that it is a

22  flawed investigation?

23  A    I don't know that I would say it's a flawed investigation.

24  I mean, I think you interview the witnesses that are relevant

25  to a case; and you interview those witnesses that you're aware

1   of and that you know about, and I think that's what happened

2   in this case.

3   Q    Are you proud of this investigation?

4   A    Sure.  Yes.

5            MS. REEDY:  I'm sorry.  I was going to be referring

6   to one of DePauw's exhibits.  Have they been admitted or you

7   said you had a binder?  I think that might be easier.

8            MR. WELCH:  DePauw's Exhibit E, the transcript.

9   Your Honor, the -- we provided the Court with a transcript --

10  excuse me just a second, Your Honor, so I can be specific

11  about this.

12           I'm going to let my co-counsel speak to this, Your

13  Honor.

14           MS. CHRISTENSEN:  If I may, Your Honor.  With

15  DePauw's brief, we submitted a copy of the transcript of the

16  disciplinary hearing with Cindy Babington's affidavit as

17  Exhibit A5.  After we submitted that, we realized that it

18  wasn't paginated and that there was a misspelling of one of

19  the hearing panel members' names.  So we fixed that and

20  provided a paginated copy to Ms. Reedy this week.

21           If it pleases the Court, we would submit that as an

22  exhibit so that everybody could follow along with page

23  numbers.

24           MR. WELCH:  Your Honor, the point is that we could

25  replace Exhibit A5 that the Court admitted with the revised

BABINGTON - DIRECT/REEDY                35

1    and corrected transcript or we could tender it as Exhibit E.

2              THE COURT:  I don't care.

3              MS. REEDY:  It makes no difference to me, Your

4    Honor.  I stipulate to it coming in.

5              MR. WELCH:  Your Honor, probably for the record, it

6    makes more sense to just have it be admitted as Exhibit E.

7    That way we haven't changed the record as it exists.

8              THE COURT:  Very well.  Is the offer at this point

9    as to E?

10             MS. REEDY:  Yes, Your Honor.

11             THE COURT:  You are offering that, Mr. Welch?

12             MR. WELCH:  DePauw can offer it, Your Honor.  It's

13   Exhibit E.  It is a corrected transcript of the hearing that

14   is at issue in this case.

15             THE COURT:  We will show it as a stipulated exhibit.

16       *(Defendant's Exhibit E was received in evidence.)*

17             MS. REEDY:  Your Honor, if I could have just a brief

18   moment.

19       *(A discussion was held off the record.)*

20   BY MS. REEDY:

21   Q   Ms. Babington, you stated that you were proud of this

22   investigation.  Did you listen to the audio recording of the

23   investigation while considering the appeal?

24   A   I listened to the audio of the hearing.  Is that what you

25   mean?

1  Q    I apologize.  The audio of the hearing?

2  A    Yes, I did.

3  Q    When you listened to that audio, were you concerned about

4  the witnesses that public safety selected to interview?

5  A    I was not.

6  Q    Okay.  I would reference you to page 4, halfway down the

7  page.  It is the fourth question from Sutherlin.  Sutherlin is

8  the hearing board chair, correct?

9  A    Yes.

10 Q    And she had a voting -- she had a right to vote on the

11 board?

12 A    I believe so, yes.

13 Q    And in that question, Sutherlin states, "Okay.  Thank you

14 for that clarification.  In Jillian's statement, she listed

15 five to six people that she interacted with in the basement

16 other than those that she interviewed.  There were quite a few

17 names that she gave to you.  How did you decide who to

18 interview of all the different people that she had indicated

19 that she interacted with that night?  How did you decide to

20 interview?"

21        And Shrewsbury is Captain Charlene Shrewsbury, the

22 public safety officer responsible for this investigation?

23 A    Right.

24 Q    And her response is, "I interviewed the ones that Jillian

25 remembers having the most contact with that evening."

1  A    Right.

2  Q    And quite frankly, this jumped off the page at me when I

3  read it and when I heard it in the audio recording.  Did that

4  concern you at all?

5  A    It didn't concern me.  In all of these investigations that

6  we're doing, there's matters of privacy.  We have students who

7  are on our campus.  The more people you talk to, the more

8  people are aware of a situation that could be damaging to

9  reputation.  So there's privacy issues.

10        There's also resource issues.  It's never the case

11  that we're going to interview every single person who was at a

12  party on any given night.  So I think Charlene made a

13  judicious decision in terms of who she should talk to.

14  Q    It's interesting you mention privacy issues.  Are you

15  referring to Jillian's privacy and not having this information

16  spread across campus?

17  A    I'm referring to everybody's privacy.

18  Q    Do you agree that this is essentially an educational death

19  sentence for Mr. King; and until you reduced it to a

20  suspension, it was the worst academic expulsion that you can

21  receive, expulsion?

22  A    Expulsion is the highest sanction that DePauw has for

23  student conduct.

24  Q    In weighing student privacy -- and I think that if anyone

25  would have asked Mr. King, he would have traded his privacy

1  for being expelled, in waiving -- weighing the victim's

2  privacy and Mr. King's potential for expulsion, do you agree

3  that privacy is greatly outweighed by potential for expulsion?

4  A   I maintain that we were concerned in an investigation for

5  everyone's privacy and that Ben had every opportunity to

6  identify witnesses who could be helpful to him, and they would

7  have been interviewed as well.

8  Q   Do you believe it's Ben's responsibility to lead the

9  investigation to important witnesses?

10 A   No, but I believe it's Ben's responsibility to participate

11 in his own defense and to identify witnesses who could be

12 helpful to him.

13 Q   And Ms. Balser identified 12 witnesses in her written and

14 verbal statement which we identified for you in our appeal,

15 Defendant's Exhibit A7, on page 5.  We list 12 witnesses that

16 she mentioned that she recalled seeing; and none of those

17 witnesses were interviewed, correct?

18 A   Yes.  I believe that's correct.

19 Q   And after we gave you the names of the 12 witnesses, you

20 didn't personally interview these witnesses either, did you?

21 A   No, I didn't, not on appeal, no.

22 Q   And you also stated that you will never interview every

23 single person at a party.  If the room is full of DePauw

24 students consuming alcohol and the issue is what happened

25 between two students at that party who were both consuming

1   alcohol, and the potential sanction is the expulsion of my

2   client, why wouldn't you take the time to interview every

3   single person at a party?

4          MR. WELCH:  Your Honor, I'm going to object to the

5   question.  I think she's explained her position with respect

6   to interviews.  It's argumentative and we will object on that

7   basis.

8          THE COURT:  Oh, I think it's fair game.

9          You may answer, if you know.

10  A   It would just be too many people.  It would delay the

11  investigation even further.  It just -- we wouldn't do it for

12  privacy reasons.  I mean, for all the reasons that I've said.

13         There's going to be a whole bunch of people that have

14  no relevant knowledge of the case, and Charlene -- and I don't

15  want to speak for her.  She can speak for herself --

16  interviewed the people that seemed the most relevant to the

17  investigation.

18  BY MS. REEDY:

19  Q   And you said there's going to be a whole bunch of people

20  who know nothing about the case; but without doing it, you

21  have no way of knowing if there's that one person that has the

22  key information in this case; is that correct?

23  A   That probably is correct.

24  Q   And my client suffers by not having DePauw use those

25  resources and time to interview the 30 students or the 12

1    students in the basement, correct?

2    A    In my opinion of reviewing this case, there were enough

3    students identified who gave enough testimony to Jillian's

4    state.  Ben did not give any other witnesses who could give a

5    different opinion.  So I felt like the investigation was as

6    thorough as it needed to be.

7    Q    Do you recall -- and I don't believe I have it in front of

8    me but you may recall -- Charlene Shrewsbury calling a student

9    in and it just being a very small entry of her interview with

10   this student.  The student -- generally asking the student,

11   "Were you at this party?  Do you remember anything," the

12   student stating, "I was so intoxicated I don't remember

13   anything" and Charlene -- Ms. Shrewsbury ending the interview

14   and not divulging any confidential information to that

15   student?  Do you recall that being in this file?

16   A    I don't recall that specifically, no.

17   Q    And again, I don't have it in front of me; but do you

18   agree that that is a strategy that could have been used to

19   interview these 30 -- 12 or 30 students who were there to say,

20   "Were you there?  Do you know Jillian?  Do you know Ben?"  End

21   of story if there's no questions --

22   A    Sure.  That's a strategy that could be used.

23   Q    But it was not used in this case for all the students at

24   the party?

25   A    It was not used for all the students at the party.

1   Q   Do you also have concerns with Ms. Shrewsbury stating, "I

2   interviewed the ones that Jillian remembers having the most

3   contact with that evening," because in this case from what

4   I've seen, part of the reason Mr. King was found responsible

5   was because Jillian said she didn't have memory for large

6   portions of this evening?  Do you agree that Jillian claimed

7   to not have a memory, and that led to the finding of

8   incapacitation?

9   A   Yes.   I agree that Jillian said she did not have any

10  memory of parts of the evening, not the whole evening.

11  Q   Is it concerning to you that your lead investigator on

12  this investigation relied on a student's memory who also

13  stated that she didn't have memory?  Is that concerning?

14  A   She never said she didn't have memory for the whole entire

15  evening.  She was missing parts of the evening.

16  Q   Did any of the witnesses identified by Jillian and

17  interviewed by Captain Shrewsbury ever see Ben that night --

18  Mr. King that night?

19  A   I don't believe so.

20  Q   Did any of the witnesses other than Mr. King testify to

21  Mr. King's level of intoxication that night?

22  A   I don't believe so.

23  Q   Do you agree that there was no testimony at the hearing by

24  any individual who physically saw Mr. King and Ms. Balser

25  together that evening?

1        MR. WELCH:  Your Honor, I'm going to object to that

2   question.  The best evidence of what happened at the hearing,

3   what was said, is the transcript of the hearing that is in

4   evidence.  She is now testing the witness's memory as to what

5   that transcript said.  I'm going to object to that basis.  The

6   best evidence of that is the transcript itself.

7        THE COURT:  Overruled.

8        You may answer, if you know.

9   A   I -- can you repeat the question?

10  BY MS. REEDY:

11  Q   Sure.  Do you agree that no witnesses testified at this

12  hearing that they had physically seen Mr. King and Ms. Balser

13  together that evening?

14  A   I think that is true.

15  Q   Do you also agree that these witnesses that Jillian

16  remembered having the most contact with also happened to be

17  her sorority sisters?

18  A   I don't know that that's the case necessarily.

19  Q   If the transcript and the written statements of those

20  students indicate that they were all her sorority sisters, the

21  ones Jillian identified --

22  A   I don't think they were.  I know there was at least one

23  who was a first-year student who was a member of the track

24  team.  I don't believe she was a member of her sorority.

25  Q   So we have the track team, which Jillian was a member of,

1  correct?  Jillian was a member of the track team?

2  A   Yes.

3  Q   And her sorority?

4  A   Yes.

5  Q   You stated -- I believe it was in your affidavit.  It was

6  certainly in your opinion on the appeal -- that, although more

7  witnesses could have been interviewed.  Do you have any

8  particular witnesses that you thought should have been

9  interviewed and were not?

10 A   Well, there was a witness's name who came out in the

11 hearing that I wish he had been part of the hearing.

12 Q   Who is that?

13 A   His name is Eric Malm.

14 Q   Was there anyone else?

15 A   That's the only one that comes to mind.

16 Q   Are there any groups of witnesses -- if you had this to do

17 over again, would you instruct Ms. Shrewsbury to contact those

18 12 witnesses that we listed in the appeal or to try to seek

19 out more students at the party?

20 A   You know, in hindsight, things -- you can always make

21 different decisions.  I did feel like Charlene interviewed the

22 people that were the most critical.  So I didn't have concerns

23 at the time.  Knowing that this student's name came out in the

24 hearing, I sure wish he had been part of the hearing.

25 Q   But were there any other students that, looking back on

1  it, would have made it a more thorough investigation to

2  interview?

3  A   No.  We really rely on both students giving us names of

4  witnesses.  Ben would have been the best source of any student

5  who saw him late in the evening with Jillian, and we didn't

6  have that information.

7  Q   And Ben was also -- I'll strike that, Your Honor.

8      Was Ben represented by counsel prior to the hearing

9  and at the hearing?

10 A   I don't know.

11 Q   Are you aware that Captain Shrewsbury called Ben in, had a

12 video camera set up, read him his Miranda rights, told him

13 that anything he said would be turned over to the Putnam

14 County prosecutor and then asked for his statement?

15 A   That's our process.

16 Q   So you were aware that that occurred?

17 A   Absolutely.  Our prosecutor has asked us to turn over all

18 of our cases to him.

19 Q   He's asked you to turn them over.  Has he asked you to

20 read Miranda rights and videotape interviews?

21 A   I think our investigators think that's what you have to do

22 to be able to get testimony in.

23 Q   And were the same procedures applied to Jillian?

24 A   No, I don't believe so.  I guess I don't know that to be a

25 fact.  She was probably videotaped or audiotaped, but I don't

1  know that for sure.

2  Q   If she had been video or audiotaped, would that have been

3  done by public safety?

4  A   Yes.

5  Q   Would that have been a part of the file that Mr. King was

6  permitted to have his attorneys drive to Greencastle and sit

7  in a room and listen to and read?

8  A   If she was.  That's something you're going to have to ask

9  Charlene about because I don't know for sure.

10 Q   Do you agree that calling a student in who is -- there's

11 been a mere accusation against him of sexual misconduct,

12 reading him his Miranda rights, telling him you're going to

13 turn it over to the prosecutor, and videotaping his statement

14 might serve to encourage him to not talk and to not

15 participate?

16 A   Well, he certainly would have that right.

17 Q   And if it's -- would you agree, though, that that's the

18 effect that it would have?

19 A   It hasn't had that effect on other students.

20 Q   And Mr. King did not give a statement at that time.  He

21 left, correct?

22 A   That's correct.

23 Q   But he also met with Cara Setchell?

24 A   Yes.

25 Q   What is her role in the process?

1  A    Cara is the shepherd of the process.  So she makes sure

2  that the process is running smoothly, charges, gets the

3  hearing board together.

4  Q    And Dorian Shager, the Title IX coordinator?

5  A    Right.

6  Q    He met with both of them?

7  A    Right.

8  Q    He did provide witness names prior to the hearing?

9  A    Um-hum.

10  Q    Were you aware of that?

11  A    I believe so.

12  Q    Gates Weaver and I believe Dan Howard were identified by

13  Mr. King?

14  A    Right.

15  Q    And Mr. Howard was not called to testify at the hearing?

16  A    Um-hum.

17  Q    Who makes the decision who testifies at the hearing?

18  A    The hearing board chair.

19  Q    And I would refer the Court to -- and unfortunately, these

20  are not paginated -- Exhibit T to DePauw's Exhibit A1 -- A7.

21  Excuse me, Your Honor.  Exhibit A7, Exhibit T, Dan Howard's --

22  well, this is actually Charlene Shrewsbury's summary of Dan

23  Howard's verbal statement to her.  Although there's a typo, it

24  looks like this was done on February 17th.

25        The last line of that statement, he's discussing

1  seeing Ben the next morning; and he said, "Ben seemed hung

2  over and possibly still intoxicated."

3       Do you think that that would have been an important

4  student to call to testify at the hearing, someone who had

5  knowledge of Mr. King's intoxication?

6  A   I don't know, and I'm not sure why he wasn't called.

7  Q   Other than Mr. King leaving the room when he was read his

8  Miranda rights, told he was going to be turned in to the

9  prosecutor, what other way did he not participate in this

10 investigation?

11 A   I don't know that he did not participate in the

12 investigation.  He did not give witnesses, and he did not ever

13 do a statement.

14 Q   Are you aware that he gave a verbal statement but chose to

15 not give a written statement?

16 A   I'm aware that he had a conversation with Dorian Shager.

17 Is that what you're referring to?

18 Q   Well, he did; and I think after that when Charlene

19 Shrewsbury requested a written statement, he contemplated that

20 and decided to do a verbal statement.

21 A   I don't know what the verbal statement was or where that

22 is --

23       MS. REEDY:  If the Court could just give me one

24 moment.

25       THE COURT:  You may.

1      *(A discussion was held off the record.)*

2   BY MS. REEDY:

3   Q   So your statement was he didn't give the videotaped

4   statement; and he also did not give the written statement,

5   correct?

6   A   I said he didn't give witnesses, and he didn't provide a

7   statement.

8   Q   But he did identify Dan Howard and Gates Weaver, correct?

9   A   Correct.

10  Q   And are you aware that on January 22nd, Charlene

11  Shrewsbury issued a university directive of no contact to

12  Mr. King?

13  A   Yes.  That's standard practice.

14  Q   Standard practice?  Did he comply with that request?

15  A   As far as I know.

16  Q   And an e-mail --

17          MS. REEDY:  Your Honor, if I may use the viewer,

18  this is going to be -- this is going to be an exhibit -- this

19  is going to be an exhibit admitted by DePauw; but at this

20  point, I'm just going to view it.

21  BY MS. REEDY:

22  Q   On February the 7th, Charlene Shrewsbury told Mr. King

23  that, "It is my understanding that you spoke with Dorian

24  yesterday afternoon and advised him you intended to submit a

25  statement.  Writing a statement allows those that are

1   reviewing my reports to hear your side of the story in your

2   words.  Please remember that both the university's sexual

3   misconduct process and the prosecutor for Putnam County will

4   review all material submitted for potential charges.  If you

5   have any questions about this, please contact me before you

6   submit your statement."

7          So once again, Mr. King has indicated that he's going

8   to give a written statement to Dorian and to Charlene; and

9   before he does that, he's reminded once again -- he's

10  essentially treated as a criminal that any statement he makes

11  is going to the prosecutor.

12          MR. WELCH:  Your Honor, is there a question in

13  there?

14          MS. REEDY:  I was getting ready to ask the question,

15  if I may finish.

16  BY MS. REEDY:

17  Q   Do you agree that making that statement to him encourages

18  him to not make a statement at all?

19  A   It certainly seems prudent to advise him of this.  I mean,

20  I would not want a student to make a statement and then find

21  out later that that went to the prosecutor without their

22  knowledge.

23  Q   But again, this is treatment that Mr. King was receiving

24  that Jillian was not?

25  A   Mr. King was the accused student.

BABINGTON - DIRECT/REEDY                    50

1  Q   And would you agree that your process treats the accused

2  student as if they did something wrong from the beginning?

3  A   No, I wouldn't.  I agree that our process is in compliance

4  with the prosecutor and our local county.

5  Q   Were you aware that a portion of the evidence presented to

6  the board and included in our appeal involved Ms. Balser's

7  medical records?

8  A   Yes.

9  Q   Were you aware if Ms. Balser tested positive for any drugs

10  the following day?

11  A   She tested positive for an amphetamine, which apparently

12  is her ADD medicine.

13  Q   When did you discuss that it was her ADD medicine with

14  her?

15  A   I asked the question while I was looking at the appeal in

16  terms of what exactly that meant.

17  Q   Did you ever ask her for a unredacted copy of her medical

18  records?

19  A   No, I didn't.

20  Q   Did you ever speak with her physician to determine if her

21  amphetamines could have interacted with alcohol?

22  A   No.

23       MS. REEDY:  And I would reference the Court to

24  DePauw's Exhibit A7.  The attached Exhibit S to that document

25  are Ms. Balser's medical records.

1   BY MS. REEDY:

2   Q    In those medical records, her past history is blacked out,

3   as well as her medications.  Were these documents blacked out

4   in this form when the board received them?

5   A    They were.

6   Q    And there was no inquiry as to what was blacked out?

7   A    There was not, I don't believe.

8   Q    Did you review the articles that Mr. King attached to his

9   appeal regarding the effects of alcoholism and amphetamines?

10  A    Yes.

11  Q    And did you consult with any outside sources regarding

12  those articles?

13  A    I did not.

14  Q    Do you recall?

15        MS. REEDY:  And I would reference the Court to

16  Exhibit -- DePauw's Exhibit A7, Exhibit L, as well as

17  Exhibit K.

18  BY MS. REEDY:

19  Q    According to one of those sources, the effects of

20  combining alcohol and amphetamines can be very serious,

21  including, quote, causing blackout states in which a person

22  remains conscious but has no memory of certain events.

23        The article also discusses reliable scientific

24  research that has shown that during an alcohol blackout, an

25  individual's cognitive and motor skills are not affected and

1   the individual does not have diminished capacity.  The

2   short-term memory is severely impaired, while cognitive and

3   motor skills are unaffected or only minimally affected, no

4   obvious impairment of coordination, balance, social

5   interaction or speech.  To all outward appearances, the person

6   is cognitively and physically intact but lacks short-term

7   memory.

8         Were you aware that that's what that stated when we

9   included this in the appeal?

10  A   Yes.

11  Q   How do you -- do you find that to be relevant -- possibly

12  relevant to this case?

13  A   Potentially relevant, but I think we had witness testimony

14  to say that her motor skills were impacted.

15  Q   But did you not also have conflicting witness testimony to

16  state that they were not impacted?

17  A   We always have conflicting testimony.  I mean, it's the

18  job of the hearing board to sort through all of that and come

19  to a decision.

20  Q   And if there is this outside source of information that

21  would more strongly support one side of the witness testimony,

22  wouldn't it be a prudent thing for the investigator or hearing

23  board or on appeal to at least look into that outside source,

24  if it's going to give more credibility to one side than the

25  other?

1  A    I suppose that that could possibly be something that would

2  be considered at times, but I thought the hearing board did a

3  good job of wading through all the information they had and

4  came to a decision.

5  Q   Do you agree that what I just read to you and what we

6  attached to our appeal very well could have explained the fact

7  that some of the witnesses found her to not be overly

8  intoxicated, that they had seen her much more intoxicated on

9  previous occasions?  Mr. King testified she wasn't

10  incapacitated, but she had no memory.  Based on this

11  scientific evidence, a person can have no short-term memory

12  during an alcohol blackout but can appear to be cognitively

13  functioning?  Do you agree that that could have happened in

14  this case, potentially?

15       MR. WELCH:  Your Honor, I'm going to object to the

16  question.  I don't think there -- there's a couple of

17  paragraphs in there.  I'm not sure exactly what the question

18  is.  So I'm going to object on that basis.

19       I also don't think that this witness is qualified to

20  assess the medical article that she's talking about.  The

21  article's there.  The witness has said that she looked at it,

22  and her decision on appeal is also before the Court.  So I

23  think the witness is not qualified to answer the question.  We

24  will object on that basis.

25       MS. REEDY:  Your Honor, my response would be that I

1    absolutely agree that this witness is not qualified to answer

2    that question; but she did assume that role and chose to not

3    hire -- not necessarily hire but consult a local physician.

4    Our office made a phone call to a local physician and

5    discussed these issues, and DePauw chose not to do that.

6    Although she's not qualified, she is their expert on this

7    issue by her own choice.

8            THE COURT:   I think she can answer if she knows.

9    A    What was the question again?

10   BY MS. REEDY:

11   Q    The question is what I described about amphetamines and

12   alcohol interacting, creating an alcohol blackout wherein the

13   person has short-term memory loss but cognitively appears to

14   not be impaired to those around her, do you agree that the

15   facts of this case, that could have been exactly what

16   happened?

17   A    That could have been.

18   Q    But do you think that Mr. King, when you're going to expel

19   him from college, deserves to have that looked into?

20   A    I think it probably -- you know, the hearing board

21   probably did consider all of those things.  I think the

22   hearing board had enough evidence to say that her abilities --

23   her cognitive abilities, her motor skills were impaired.  They

24   chose to come down on the side of that as opposed to whatever

25   the contradictory evidence was.

1  Q    But you agree that there was contradictory evidence on

2  that issue?

3  A    I think there was lots --

4           MR. WELCH:  I'm going to object.  The record is very

5  clear that there was contradictory evidence.  The witness has

6  already testified there was contradictory evidence.  We're

7  starting to plow old ground.

8           THE COURT:  I agree.  Next question.

9  BY MS. REEDY:

10 Q    Do you agree that if a witness has a relationship with one

11 of the parties, then, naturally, they may be bi- -- just in

12 general, again, not in this case.  In general, if a witness

13 has a relationship with a party, then, naturally, they may be

14 biased to try to testify to support that party?

15 A    I have no idea.  I mean, I assume that that could be true.

16 Q    Okay.  And if you have a person that has a relationship

17 with that party and then they testify adverse to that person,

18 doesn't it give their testimony more credibility?

19 A    I don't know that I would necessarily say that.

20 Q    So if we have a custody case and the Court's trying to

21 decide which is the best parent to have custody of a child,

22 and father is trying to get custody and his own mother comes

23 in and testifies to the Court, "My son should not have

24 custody.  Custody should go to the mother," unless there's

25 some evidence that father and his own mother had a bad

1  relationship, don't you agree that a neutral person might give

2  her testimony more weight because she's testifying against a

3  natural bias?

4          MR. WELCH:  Your Honor, I'm sorry.  I didn't hear

5  the question.  Could I get it read back.

6          MS. REEDY:  I can repeat it.

7          THE COURT:  Just reask.

8  BY MS. REEDY:

9  Q   My question is and -- my question is that -- I posed a

10 hypothetical that if you have a custody battle and there's a

11 father and a mother fighting for custody of their child, and

12 the father's own mother comes in and she testifies to the

13 Court, "Do not give my son custody.  The children would be

14 better off with the mother," unless father can show some bad

15 relationship and bad motive from his mother, don't you agree

16 that that mother's testimony would be very convincing to a

17 Court because she's testifying against a natural bias?

18         MR. WELCH:  Your Honor, I'm going to object.  I

19 don't understand -- I guess I don't understand the question,

20 but this witness is a DePauw University employee.  She is not

21 a social counselor.  She is not a trained lawyer or a judge;

22 and she's being asked to evaluate a hypothetical that is

23 pretty technical, and I don't think she's qualified to answer

24 it.

25         THE COURT:  I agree.  Sustained.  Next question.

1  BY MS. REEDY:

2  Q   In this case, were you aware that Emily Curnow -- am I

3  mispronouncing that?

4  A   Yeah, Curnow.

5  Q   Curnow.  Were you aware that Emily Curnow was Jillian's

6  roommate and in her sorority?

7  A   Yes.  I believe that was in her statement.

8  Q   And her statement also stated that she did not know Ben

9  before December the 6th, 2013?  She had no previous

10 relationship with Ben King?

11 A   I believe that's right.

12 Q   And were you aware that Ms. Curnow called Ms. Balser while

13 she was in Mr. King's room and talked to her at 1:39 a.m. or a

14 time nearby?

15 A   Right.

16 Q   And you've discussed that conversation with Ms. Curnow,

17 correct?  And did Ms. Curnow tell you that Jillian did not

18 sound intoxicated at that time?

19       MR. WELCH:  Your Honor, I apologize for objecting;

20 but all of this is in the record that's before the Court.  The

21 testimony of Emily Curnow at the hearing, her statement, is

22 all before the Court; and we're now asking the witness to

23 re-cover that.  So I think it's before Your Honor, and there's

24 no point in replowing this ground.

25       THE COURT:  I kind of agree.  Are there other issues

1  relative to this witness's testimony?  And I mean Emily --

2          MS. REEDY:  Curnow --

3          THE COURT:  Her testimony that you wish to bring up?

4  I agree with Mr. Welch.  Everything else is in the record.

5          MS. REEDY:  Yes, Your Honor.  And I'm not bringing

6  it up to bring it to the Court's attention.  I would just like

7  to ask the witness specifically her evaluation of that

8  testimony.  She was in a position to decide if the board made

9  a correct credibility determination, and I would just -- I

10 have some follow-up questions about her evaluation of the

11 testimony.

12         THE COURT:  Reask then, please.

13 BY MS. REEDY:

14 Q   Did Ms. Curnow tell you -- and you stated that you called

15 her into your office after the appeal was submitted to discuss

16 the case with her personally, correct?

17 A   Yes.  Specifically, I wanted to know the name of a person

18 that she mentioned in her testimony in the hearing.  I

19 couldn't understand the name.

20 Q   You also discussed the telephone call with her again,

21 correct?

22 A   I did.

23 Q   And she had -- it's in the record.  She testified that she

24 didn't think Jillian was that intoxicated, that she had seen

25 her much more intoxicated on previous occasions, and that she

BABINGTON - DIRECT/REEDY                    59

1  was acting typical for herself in a party setting?

2  A    I believe Emily did testify to that.

3  Q    And when she spoke with you privately in your office while

4  you were evaluating that appeal, did she reiterate those same

5  sentiments?

6  A    I don't know that we got into it in that much detail in my

7  office.  My concern with her statement -- I don't know that

8  she even made a judgment about whether she thought Emily was

9  too drunk at the time of the phone call.  She said that Emily

10 indicated to her that she was fine with staying, but she also

11 indicated that there was a whole lot of background noise.

12         And so Emily had the sense and I was concerned about

13 that because if they were just in Ben's room with just the two

14 of them, I couldn't figure out where that background noise was

15 coming from.  So I think that was a bit of a confusing part of

16 that whole phone conversation and where exactly that took

17 place and when.

18 Q    And you were aware that Exhibit G to Defendant's A7, the

19 text messages -- that the next morning before Jillian had

20 reported this to anyone, before she went to the hospital,

21 before Ben -- this was even on his radar screen, they're

22 texting back and forth; and Ben's statement to her was, "We

23 came up to my room, took a shot of Fireball.  Then your

24 friend, Emily, called; and you said you didn't need a ride or

25 something.  And then we laid down and tried to have sex, but

1   it never actually happened."

2          So Ben also placed that phone call in his room before

3   any of this happened?

4   A    Yeah.  And one of the questions I was asking Emily on that

5   day when I asked her who the witness name was that she had

6   mentioned was, "Are you sure you heard other noise?  Are you

7   sure" -- and she maintains that she did, that it was a party

8   setting, that it wasn't a quiet space.

9   Q    Didn't she actually tell you that she didn't think that

10  she could distinguish between the two, between it being in his

11  room with the music on or being in the basement with other

12  people around?  When you called her into your office, she said

13  she really couldn't have distinguished between the two?

14  A    I don't believe she told me that.  I think she thought it

15  was a party setting.  I think she speculated that, oh, maybe

16  it was a stereo someplace; but she thought she heard other

17  voices.

18  Q    In her testimony, she said they were discussing that phone

19  call.  On page 9, almost at the very bottom -- and that was --

20  and she does mention -- she heard people in the background.

21  She assumed it was a group of people.  At the bottom -- or she

22  says, "It was a brief but normal conversation"; and then she

23  says, "That was pretty much the extent of it, but there wasn't

24  anything in her speech or whatnot that would tip me off to her

25  being extremely intoxicated."

BABINGTON - DIRECT/REEDY                    61

1        How do you -- do you agree that Emily really would

2   be -- let me strike that.  Let me ask another question.

3        Were you aware that Emily herself was not intoxicated

4   that night?

5   A    I believe Emily testified to that.

6   Q    That she was not intoxicated?

7   A    Yeah, at a 2 or something.  I'm not really sure what.

8   Q    A 1 to 2?  And some of the other witnesses, particularly

9   the track student, the other sorority sisters, they testified

10  they were very intoxicated that night as well, correct?

11  A    They did.

12  Q    So with Emily, we have a sober witness, roommate,

13  experience being with her in party settings, experiencing her

14  drink alcohol, the last person to talk to her while she was

15  with Mr. King.  With all of those factors, do you agree that

16  credibility wise, she should be a pretty strong witness?

17           MR. WELCH:  Your Honor, I'm going to object.  This

18  witness is the witness who processed the appeal.  There's a

19  detailed letter to plaintiff that resolves the appeal.  This

20  witness obviously made the determinations that she made.

21           Counsel is preaching credibility to the witness, and

22  the witness has already resolved that in her mind.  So, again,

23  we're plowing old ground here of what's already in the record;

24  and I'll object to that basis.

25           THE COURT:  Ms. Reedy, it looks like this is all

1   stuff -- you can argue that, clearly, either in a post-trial

2   submission or final argument; but it's in the record already,

3   is it not?

4          MS. REEDY:  It is in the record, Your Honor; but

5   this witness had the responsibility of reviewing the evidence

6   and deciding to either reopen the investigation and do more

7   work, overturn the sanction or affirm the sanction.  I think

8   it's relevant that there were issues here; and I would like to

9   know -- if I may ask another question -- strike the last

10  question and ask another question.

11          I think it's relevant to know how she resolved that

12  credibility issue.  Why was it that this witness was not seen

13  to be credible?  I think it's very relevant to why we're here.

14  She had the last ability to do this, and she chose to affirm

15  that he was responsible.

16          MR. WELCH:  Your Honor, the evidence of that is in

17  the witness's written determination on the appeal.

18          THE COURT:  I kind of think so too.  Now, if you

19  want to ask her why she didn't, I think that's okay; but then

20  let's move on.

21          MS. REEDY:  Sure.

22  BY MS. REEDY:

23  Q   You heard the question.  Why, with all of those factors,

24  was she not given more credibility in this process?

25  A   There were many factors in this hearing.  It wasn't just

1  Emily Curnow.  There was how much alcohol Jillian had had to

2  drink throughout the night.  There was other witness

3  testimonies.  There was Emily's testimony.  There were so many

4  different factors that I don't know that Emily was the one

5  deciding factor.  I think everything played into it in the

6  hearing board's mind; and as I assess the hearing board's

7  judgment, I thought they had made a valid decision of

8  responsibility.

9  Q   Was there any way to reconcile Emily's testimony with your

10 decision?

11 A   I'm not even sure what you're asking.

12         MR. WELCH:  I'm going to object.  It's clear she did

13 that.  She wrote the decision on appeal.  She resolved it in

14 her mind and expressed it in that letter.

15         THE COURT:  I kind of agree.  Sustained.

16         MS. REEDY:  I'll move on, Your Honor.

17 BY MS. REEDY:

18 Q   When you heard the heard the hearing board's -- read the

19 transcript or heard the audio recording, did you recognize

20 that the board only asked Captain Shrewsbury about two issues,

21 one being her attempt to interview Mr. King and two being an

22 inconsistency in Emily's testimony?  Did you notice that, that

23 they didn't go into anything else except those two issues?

24 A   Yes.  They had a lot of information already in terms of

25 the hearing board packet, the investigation packet.

1  Q    And you agree that the hearing -- and the inconsistency in

2  Emily's testimony was that when she first met with Captain

3  Shrewsbury, she stated that she first saw Jillian at the

4  fraternity party; but then later on when she did her written

5  statement, she recalled that she had actually been with her

6  earlier in the day?

7  A    Right.

8  Q    And that was the inconsistency that the board was

9  concerned with?

10  A    Right.

11  Q    Did you also read in our brief -- Mr. King's appeal on

12  pages -- so this is Defendant's Exhibit A7, pages 16, 17 and

13  18, where Mr. King presented numerous inconsistencies between

14  Jillian's own statements, her written and verbal statements,

15  between her statements and other witness statements, and her

16  statements and her own medical records.  Were you aware that

17  there were so many inconsistencies?

18  A    I think that in any case where a student is very, very

19  intoxicated, there's going to be those inconsistencies because

20  memory comes back at various times.  That's what I took that

21  to be.  At one point, she remembers something that she hadn't

22  remembered before, also quite common in sexual assault victims

23  who start to remember things later on.

24  Q    Okay.  So her memory was enough to discount the three

25  pages of inconsistencies that we raised to you?

1          MR. WELCH:  Your Honor, again --

2          THE COURT:  Sustained.

3    BY MS. REEDY:

4    Q    Do you find it unusual that the board asked about

5    inconsistencies in Ben's statement, inconsistencies in Emily's

6    statement, and no other inconsistencies between any other

7    witnesses?

8    A    I guess I can't speak to what the board was thinking at

9    the time or what they had before them or the conversations

10   they heard.  I don't know that I found that unusual.

11   Q    Did you find it concerning when you were deciding if you

12   needed to reopen this investigation?

13   A    No.

14   Q    Do you recall telling Emily that -- when you met with her

15   privately in your office that there was a chunk of time right

16   before Jillian and Ben went upstairs to his room that you

17   could not account for?

18   A    That was one of the concerning things, I think, about this

19   case is that people -- no one saw the two of them together.

20   On appeal, that's what I was trying to determine, if there was

21   someone who may have seen the two of them together who could

22   attest to her state of being at the time of the incident or

23   even Ben's state of being at the time of the incident or their

24   behavior together.

25   Q    And Ben had testified that there were nearly 30 people in

1  the room when he went down and started talking to her?

2  A   Right.

3  Q   And you didn't talk to any of those 30 people?

4  A   Well, some of them, I think, were witnesses who were

5  investigated.

6  Q   But they didn't recall seeing --

7  A   No.

8  Q   They didn't have any relevant information?

9  A   No.

10 Q   Do you agree that that chunk of time when Ben came into

11 the basement and met up with Emily and together they climbed

12 the stairs to his room -- do you agree that that is a very

13 significant time period in this case?

14 A   I was very interested in that when I was looking at the

15 appeal.

16 Q   And despite your conversation with Emily, you were not

17 able to really resolve that, correct?

18 A   No, but I tried.  I mean, I called -- I spoke to a

19 person -- the person that Emily had identified in the hearing.

20 I spoke with him to try to -- Emily had indicated they had a

21 text exchange late at night.  So I was interested to know

22 whether this witness had some knowledge and had seen them

23 together before the incident.

24      MS. REEDY:  Your Honor, if I could have just one

25 moment, please.

BABINGTON - DIRECT/REEDY                    67

1          THE COURT:  You may.  In fact, let's just take about

2    a 10-minute recess.

3          COURT CLERK:  Please rise.

4          Court stands in recess.

5     (A recess was taken.)

6          THE COURT:  Next question, please.

7          MS. REEDY:  Thank you, Your Honor.

8    BY MS. REEDY:

9    Q   Did you review Sarah Ryan's statement from December 16th,

10   2013?

11   A   Yes.

12   Q   Was this a document that was before the hearing board?

13   A   I don't know, actually.

14   Q   Okay.  Should this document -- it states at the bottom --

15   and this will be DePauw's Exhibit A2, Your Honor.  It states

16   at the bottom that it was submitted by Sarah Ryan.  Do you

17   recall who that would have been submitted to?

18   A   That may have been the document that was submitted to me.

19   I'm not sure.  I don't have it in front of me, and I don't

20   know what you're referring to.

21          MS. REEDY:  Is there a certain button, Your Honor,

22   that I'm supposed to push?  I can't quite get the whole thing

23   on here, but I think --

24   BY MS. REEDY:

25   Q   Do you recall seeing this document?

BABINGTON - DIRECT/REEDY                    68

1   A    I do recall having seen this document.

2   Q    Do you know if that was submitted to yourself or to public

3   safety?

4   A    I don't know specifically.  It may have been submitted to

5   me at some point.

6   Q    Should it have been a part of Ben's -- the investigation

7   filed that Ben was allowed to review?

8   A    I don't know, and I don't know that it wasn't.

9   Q    I would just represent to you that we did not receive this

10  until it was attached to the brief.  It was a document we had

11  never seen; but Sarah Ryan was Jillian's advisor throughout

12  this process, correct?

13  A    Right.

14  Q    And she submitted a statement to you where she identified

15  Megan Daw.  Who is Megan Daw?

16  A    She is our assistant track coach.

17  Q    She said, "On Sunday, December the 8th, 2013, I received a

18  call from Megan Daw asking for assistance regarding a student

19  she was working with who had been to the Putnam County

20  Hospital Emergency Room --

21          COURT REPORTER:  Excuse me.  Could you slow down,

22  please?

23          MS. REEDY:  I'm sorry.

24          "I received a call from Megan Daw asking for

25  assistance regarding a student she was working with who had

BABINGTON - DIRECT/REEDY                    69

1   been to the Putnam County Hospital Emergency Room for a SANE

2   exam the previous night.  She had confided in Megan that she

3   had been sexually assaulted and went to the ER for a rape

4   kit."

5           Do you know if Megan Daw was ever interviewed as a

6   part of the investigation?

7   A   I don't believe that she was.

8   Q   Who is Sharon Crary?

9   A   Sharon Crary is a professor at DePauw.

10  Q   A professor?

11  A   Yes.

12  Q   Because the document also refers to Jillian's advisor on

13  December 9th receiving an e-mail in the early morning from

14  Sharon Crary requesting a time to meet with -- I assume

15  "Jillian" is what's blacked out.  After meeting with Jillian

16  that morning, exchanging a few e-mails, setting up a time for

17  her to meet with Angie Nally and talking with Jillian again

18  today, I have learned the following things."

19          Do you know if Sharon Crary or those e-mails were ever

20  made a part of the investigation?

21  A   I don't know.

22  Q   Okay.  You also admit in your appeal decision that more

23  questions could have been asked of the witnesses; is that

24  correct?

25  A   Yes.

1  Q   Were there any specific questions that you think were

2  omitted?

3  A   I don't know that I can recall what I thought at the time.

4  I mean, when I listened to the whole audiotape, there were

5  questions that I would have asked; but I don't know that it

6  diminished the outcome of the hearing.  I think there's always

7  questions you can ask if you look at something later.

8  Q   Do you agree in this case, the board seemed sort of oddly

9  preoccupied with asking all of the witnesses whether there was

10 Everclear in the cider instead of asking other questions?

11 A   I think that was -- Everclear is an alcohol that has a

12 really high alcohol content.  So I think that that was part of

13 the hearing board's attempt to try and discern the

14 intoxication level, incapacitation level of Jillian.

15 Q   Do you understand that eight weeks passed before any

16 independent witnesses were interviewed in this case?

17 A   Yep.

18 Q   Do you think it is fair to Mr. King to allow witnesses'

19 memories to fade in that time before conducting an

20 investigation?

21 A   I think that that's what we have to do in some of these

22 cases.

23 Q   Why do you believe that you have to do that?

24 A   Because our process is set up so that a student who has

25 been through a particular incident can come and seek resources

BABINGTON - DIRECT/REEDY                    71

1   and seek to understand the process, and it's when that person

2   either feels ready to go forward with the process that an

3   investigation will start.  Or if I determined or public safety

4   determined there was a threat to other students or to that

5   student, an investigation would start immediately or actions

6   would be taken immediately.

7   Q   Are you familiar with the "Dear Colleague" letter issued

8   by the Office of Civil Rights on April 4th, 2011?

9   A   I am.

10  Q   I would expect you to be as a dean of a university in this

11  country probably very familiar with that document.

12  A   Yes.

13  Q   And do you understand that the "Dear Colleague" letter

14  instructed universities that regardless of whether the

15  harassed student files a complaint under the student's

16  grievance procedures or otherwise request action, that a

17  school that knows or reasonably should know about possible

18  harassment must promptly investigate to determine what

19  occurred?

20  A   Right.  Since the "Dear Colleague" letter, there have been

21  actual statutes and other things put into place --

22  Q   There have been statutes put into place?

23  A   I probably used the wrong word but more law around this.

24  The "Dear Colleague" letter isn't law.  It's an advisory that

25  the law is coming and there have been some other things; and

1  that's one of the items that's nuanced in this whole

2  conversation about what an investigation means.

3          And so in this case, that's what Dorian Shager was

4  doing was satisfying what we felt the Title IX -- whatever it

5  is, was saying, is that you have to at least look into

6  something, which is why he asked Ben to come see him.

7  Q   So is it your opinion that there has been some sort of

8  guidance issued or law passed since April of 2011 that negates

9  your responsibility to promptly investigate a hearing,

10 regardless if the victim wishes for you to do so?

11 A   No.  I think there's just been more language that starts

12 to clarify what that actually means.

13 Q   Do you agree that in that eight-week period, witness

14 testimony undeniably would become less reliable because of the

15 passage of time?

16 A   That probably is true.

17 Q   Especially in a case when we have a large portion of our

18 witnesses admitting they were highly intoxicated that night?

19 A   Right.

20 Q   Do you admit that Ben was given a packet of procedures

21 prior to the hearing that stated that he would be able to

22 submit a written impact statement if he was found responsible?

23 A   Yes.

24 Q   And he was -- the procedures he was provided stated that

25 if the board found him responsible, he would essentially then

1  be given the opportunity to present a written impact statement

2  that the finding would have on him, correct?

3  A   Right.

4  Q   Was Ben given a right to do that written impact statement?

5  A   That was a typo in those procedures that were given.  Had

6  Ben submitted a statement, it would have probably gone into

7  the hearing and into the sentencing, despite the fact that it

8  was a typo.

9  Q   Well, the typo, though, were procedures given to Ben prior

10  to the hearing; and he didn't find out that it was a typo

11  until after the appeal process was over?

12  A   Yes.  But --

13  Q   So Ben was previously told, "If we find you responsible,

14  then we're going to allow you to do a written impact

15  statement"; and instead, the hearing board recessed briefly to

16  deliberate, called him back into the room and expelled him.

17  Is that accurate?

18  A   Yes.  If he had a statement and he had submitted it, they

19  would have looked at it because it was our fault that there

20  was a typo.

21  Q   But they wouldn't have looked at it after he was already

22  found responsible.  That opportunity wasn't given to him.

23  Once he was found responsible, the sanction of expulsion

24  followed immediately.  It was issued that same meeting,

25  correct?

1  A    Right.

2  Q    And you stated that Dorian Shager is the Title IX

3  coordinator?

4  A    He was, yes.

5  Q    He was?  He's no longer in that role?

6       And as the Title IX coordinator, Dorian had full

7  responsibility for the investigation.  According to the Office

8  of Civil Rights in the "Dear Colleague" letter, he's the go-to

9  person.  He's responsible for ensuring that the investigation

10 and hearing is conducted as it's supposed to be conducted,

11 correct?

12 A    As these -- as Title IX and how it relates to campuses is

13 starting to spill out, those things are still actually being

14 determined in terms of what role Title IX coordinators play.

15 Q    But as of the time of this case, it was Dorian's

16 responsibility to oversee the investigation, the hearing, the

17 whole process?

18 A    It's his responsibility to oversee the climate at DePauw.

19 Q    Okay.  Who is -- and Dorian Shager was the first person

20 Ben was asked to speak to.  I believe it was the end of

21 December --

22 A    December 18th, I think.

23 Q    And who is Dorian Shager married to?

24 A    Sarah Ryan.

25 Q    Who was Jillian's advisor throughout this process?

BABINGTON - DIRECT/REEDY                    75

1   A    Right.

2   Q    And is it your understanding that Sarah Ryan met with

3   Jillian extensively throughout this process?

4   A    She's a SASA.  So that would have been her role.

5   Q    What was Cara Setchell's role?  I think you said earlier

6   she was sort of the organizer and the person making sure this

7   all moves forward?

8   A    Shepherds the process through, yes.

9   Q    Okay.  And who is Cara married to?

10  A    Steve Setchell.

11  Q    Is he the VP of Alumni Affairs or something to that

12  effect?

13  A    He -- I don't know what his exact title is.  Assistant

14  vice president for alumni and development or something like

15  that.

16  Q    Okay.  To your knowledge, was he involved in accepting the

17  large donation from Jillian's family, R. David and Suzanne

18  Hoover?

19  A    Not to my knowledge.

20         MR. WELCH:  Your Honor, I'm going to object to that

21  question.  It misstates what the record is here, if there is

22  any record, with respect to where this donation that they want

23  to talk about came from.  It didn't come from Jillian's

24  family.  It came from David Hoover.  So if we're going to talk

25  about it, we ought to talk about it in an accurate way.

1        THE COURT:  I'm aware of the issue.  I think it

2   appeared in the reply brief.  So I'm aware of the scenario.

3   Unless there are specific questions, I'm aware of that.

4   BY MS. REEDY:

5   Q   I'll ask, were you aware of Jillian's -- any relationship

6   Jillian had with R. David and Suzanne Hoover?

7   A   I was aware of that at some point.  I don't know at what

8   point.

9   Q   What is your awareness today, that they do have a familial

10  relationship?

11  A   I believe that David Hoover is Jillian's uncle; great

12  uncle maybe.

13  Q   To your knowledge, how much money did he donate to DePauw

14  University?

15  A   I don't know the exact amount.

16  Q   Is it approximately 25 to 29 million?

17  A   Yes.

18  Q   That range?

19  A   Yes.

20  Q   Is there currently being constructed on campus a hall in

21  his honor?

22  A   A dining hall, yes.

23  Q   And at the time of this investigation -- and we submitted

24  this with Mr. King's appeal.  At the time of this

25  investigation, I believe when Mr. Drummy came to DePauw campus

BABINGTON - DIRECT/REEDY                77

1  to sit down and go through all the documents, the front page

2  of *The DePauw* magazine -- newspaper was Hoover Hall.  So it

3  was a current issue at this time?

4  A   I don't know that to be true.

5  Q   All of the hearing board members, do they fall under the

6  Student Life umbrella?

7  A   No, not necessarily.

8  Q   Who would not be under that umbrella?

9  A   I don't -- who are the hearing board members?  Julia

10  Sutherlin was the chair.  She does have a role in Student

11  Life.

12  Q   If you give me one moment, I can grab it.  Gregory Dillon

13  and Myrna Hernandez?

14  A   In this instance, all three of those people do work in

15  Student Life in different capacities.

16  Q   Are there offices -- how close are their offices located?

17  A   Julia's office is in the Union Building, and Myrna and

18  Greg's are in Anderson Street Hall.

19  Q   Did you give anyone's a copy of Ben's appeal?

20  A   Our attorneys.

21  Q   Did you provide a copy of the appeal to Jillian?

22  A   No.

23  Q   Do you know if anyone from DePauw did?

24  A   I allowed Jillian to look through the appeal because -- in

25  our policy, there is a stipulation that allows the responding

1   party to have input into an appeal.  So I reviewed parts of

2   that with her, but I did not give her a copy of it.

3   Q    When did you meet with Jillian to discuss the appeal?

4   A    Sometime after I got it and before I delivered my

5   response.

6   Q    Did she have the opportunity to give you her opinions on

7   how you should handle the appeal?

8   A    That's part of the stipulation of our policy.  She has

9   that opportunity --

10  Q    What was her position?

11  A    You know, she didn't really -- I think she was frustrated

12  by some of the things that were in the appeal, as you would be

13  if you didn't believe them to be true.  I don't think she

14  really gave me an opinion one way or the other.  At that

15  point, I don't think that I had shared with her what I was

16  going to do with the appeal.

17  Q    At what point did you share with her what you were going

18  to do?

19  A    I did share with her what my decision was right before I

20  submitted the appeal to Ben.

21  Q    So if the decision was already leaked to Ben before it

22  came from you, it was likely because you had already told

23  Jillian your decision?

24  A    I don't know that to be true.  It's possible.

25         MS. REEDY:  If I can just have one moment, Your

1    Honor.

2          Your Honor, at this time I don't have any further

3    questions for this witness.

4          THE COURT:  Very well.  Your witness, Mr. Welch.

5          MR. WELCH:  Thank you, Your Honor.

6                      **CROSS-EXAMINATION**

7    BY MR. WELCH:

8    Q   Mrs. Babington, I think what I'll do is go back and start

9    at the top of your direct examination and work through some of

10   the questions that you were asked to clarify a bit.

11         You were asked about DePauw's policy regarding sexual

12   misconduct.  You were asked questions about how you determine

13   whether someone is incapacitated or not or whether there has

14   been consent or not.  Do you remember those questions?

15   A   Yes.

16   Q   If I may, let me put on the screen here --

17         MR. WELCH:  Your Honor, can you see that?

18         THE COURT:  Yes.

19   BY MR. WELCH:

20   Q   Mrs. Babington, can you see that document?

21   A   Yes.

22   Q   I'm going to represent to you that that's page 37 of

23   the -- of DePauw's policy.  At the top of that page, there's a

24   header.  It says "Statement On Consent."  Do you see that?

25   A   I can't actually see the header, but I can see most of the

1   page.

2   Q    You're right.  You can't.  You can now see the header?

3   A    I can.

4   Q    You were asked about how you make decisions on consent.

5   What role does this policy play in your analysis of consent?

6   A    Well -- I mean, this policy is central to any decisions we

7   would be making where consent is at issue.

8   Q    All right.  You also -- so you would look at this policy

9   periodically or look at this statement on consent if you

10  were -- if consent was an issue?

11  A    Right.

12  Q    The last paragraph before the header "powers of the

13  associate dean of students" talks about incapacitation?

14  A    Right.

15  Q    I guess I have the same question of you.  Is that a

16  statement to which you would refer when you are thinking about

17  incapacitation?

18  A    Right, absolutely.

19  Q    Can you tell the Court how long this statement on consent

20  and this provision on incapacitation has been in DePauw's

21  policy?

22  A    I probably can't tell you specifically, but it's been in

23  our policy for I would guess over ten years.

24  Q    And you have been responsible for, if you will,

25  administering the sexual misconduct process during that time?

1   A    Yes.

2   Q    And along with the Title IX coordinator?

3   A    Yes.

4   Q    You were also asked some questions on direct about contact

5   with Jillian's father?

6   A    Yes.

7   Q    You did have contact with her father?

8   A    I did.

9   Q    Is it unusual for you to have calls from parents -- either

10  parents of male students or parents of female students when

11  there are violations of the sexual misconduct policy at issue?

12  A    It's pretty common.

13  Q    Would it be more uncommon for you to not have calls?

14  A    Yes, I would say so.

15  Q    So did you consider it at all unusual that you were having

16  a call -- and more than one call with Jillian's father?

17  A    No.  It seemed like part of the job.

18  Q    Sort of a necessary evil?

19  A    Yes.

20  Q    Did you have any conversations with Ben's father?

21  A    I did not.

22  Q    Is that because he didn't call you or is that because you

23  refused to talk to him?

24  A    No.  He didn't call me.

25  Q    Counsel spent a fair amount of time talking to you about

1   the alcohol at issue in this matter.

2   A    Um-hum.

3   Q    Was there ever a question in your mind as to whether or

4   not Ben King consented to the conduct that's involved in this

5   case?

6   A    No, there was not.

7   Q    Why wasn't there?

8   A    Because in his -- beginning with his text messages, he

9   articulated what happened.  He articulated to Dorian Shager

10  what happened.  He was the one who had the explanation for the

11  behavior.

12  Q    So you understood that he consented to the conduct?

13  A    Yes.

14  Q    What role does alcohol play in the question of consent?

15  A    Well, again, you can't give consent if you're

16  incapacitated from alcohol, from drugs, from other things.

17  Q    So the purpose of looking at the question of alcohol and

18  alcohol consumption is what as it relates to consent?

19  A    Is to determine a level of incapacitation where someone

20  would be unable to give consent.

21  Q    That was not a question as far as Ben's conduct was

22  concerned here, correct?

23  A    No, no.

24  Q    You were asked questions about the issuance of the Miranda

25  warning to Ben when he came in to speak with Captain

1  Shrewsbury?  Do you remember those questions?

2  A   Yes.

3  Q   You referenced DePauw's -- I'm going to use the term

4  "agreement."  I'm not sure that you used it but DePauw's

5  agreement with the prosecutor of Putnam County.  Would you

6  tell the Court what the parameters of that agreement are?

7  A   The prosecutor in Putnam County, in part in response to

8  this national conversation about sexual assault, has asked

9  that any case we have is forwarded to him for review; and he

10  has also actually asked that before the case is completed,

11  that our director of public safety have a conversation with

12  him so he can determine if there are things that he might want

13  investigated that she hadn't thought of.

14  Q   Is it standard protocol for DePauw public safety officers

15  to videotape a statement and to issue a Miranda warning before

16  that statement is taken to someone who is -- who might be

17  accused of a crime?

18  A   Yes.

19  Q   Why is that?

20  A   I assume that it's so that if there is some evidence that

21  needs to get submitted to the prosecutor, that it would be

22  legal and that it would have been done in the correct way so

23  that it could be submitted to the prosecutor for review.

24  Q   So let me ask you a bit of a hypothetical.  If the witness

25  or if the student who might be subject to criminal prosecution

*BABINGTON - CROSS/WELCH*                    84

1  was a female and the student was to be interviewed, would that

2  student be issued a Miranda warning before the interview by

3  public safety?

4  A   Yes.

5  Q   I'm not sure you were asked this question on direct, but

6  it sort of relates to the statistical analysis that you were

7  asked about.  Has DePauw ever had a complaint from a male that

8  raises a question of whether or not the sexual misconduct

9  policy has been violated since you have been at DePauw?

10 A   Yes.

11 Q   And can you tell us what happened in that matter?

12 A   Well, most recently, there was a complaint by a male that

13 he may have been inappropriately touched by another male; and

14 upon investigation, both parties agreed that something did

15 happen, but neither party -- the complaining party at that

16 point did not want anything to go forward.  So it didn't go

17 forward to a hearing board, but it was looked into.

18 Q   Any others that you can recall?

19 A   You know, through the years, there have been a couple

20 others.  Long ago, there was a male student who thought he had

21 been assaulted.  He was confused about some things and didn't

22 know what had happened.  He actually went to the hospital for

23 a sexual assault exam.  Again, he couldn't name a person that

24 had done this to him.  The exam didn't show anything.  So

25 there were some other things going on with that.  So that did

1  not go to a hearing.  There wasn't a student to accuse or a

2  person to accuse.

3  Q    You were asked a question about why Jillian was not issued

4  a Miranda warning and videotaped in her interview by Captain

5  Shrewsbury.  To the extent that you know, why was that?

6  A    I assume because she wasn't the person being accused of

7  anything; and I don't know whether she was videotaped or

8  audiotaped or not, actually.

9  Q    You were asked some questions about Ben King's

10 participation in the investigation that DePauw conducted.  I

11 believe your testimony was that he declined to sit for the

12 interview, correct?

13 A    Right.

14 Q    He was asked for a written statement and declined to

15 provide that, correct?

16 A    Yes.

17 Q    He was asked to provide the identity of witnesses and did

18 do that, correct?

19 A    For the hearing board chair, I believe, yes.

20 Q    Do you know at what point in the process did he finally

21 identify some witnesses?

22 A    I don't know, but I believe that was part of the reason

23 that the hearing was delayed a few days was so that at least

24 one of those witnesses could be interviewed.  So I'm assuming

25 it was fairly late in the process.

1  Q    A couple of days in front of the hearing?

2  A    Right.  Right.

3  Q    Mrs. Babington, you know that there's a complaint in this

4  case that DePauw delayed its investigation, do you not?

5  A    Right.

6  Q    I would like to talk to you about that just a bit.  The

7  period of time that passed here between DePauw's first

8  knowledge of the incident and the start of DePauw's

9  investigation was approximately December 8 to January 22.

10 Would you agree with that?

11 A    Yes.

12 Q    Would you tell the Court what happens as far as DePauw's

13 calendar is concerned between December 8 and January 22?

14 A    Well, shortly after December 8th, the winter holiday or

15 the winter break starts; and then during the month of January

16 is what we call winter term where about two-thirds of our

17 students are away from campus.

18 Q    So from some point mid-December to essentially late in

19 January, the campus is not as active as it is otherwise?

20 A    Right.

21 Q    Can you -- do you know approximately how many students are

22 off campus during the winter term?

23 A    Well, there are --

24 Q    Excuse me for interrupting.  Not the number but a

25 percentage of students who are off campus during winter term?

1   A    It's about two-thirds of the campus or more that are gone

2   for winter term.

3   Q    My understanding is that DePauw started the investigation

4   once it learned that Jillian wanted to pursue a charge under

5   the sexual misconduct policy; is that right?

6   A    That is correct.

7   Q    Why would DePauw wait that period of time?

8   A    Well, I mean, besides the holiday break and the winter

9   break --

10  Q    Right?

11  A    She did not indicate until January 22nd that she wanted to

12  pursue further investigation.

13  Q    What purpose does it serve in your mind to allow a victim

14  to have some input into when an investigation would start?

15  A    You know, I think that as an educational institution, we

16  want to work with our students; and I think that she needed

17  some time to get comfortable with the thought of what this

18  would entail and what this would look like.  And so she was

19  using that time period of the break and the winter term to get

20  comfortable with what a process might look like.

21  Q    Is there any relationship with allowing a student to do

22  that and the -- DePauw's obligation under Title IX to give

23  victims a confidential way to report?

24  A    Sure.  That's part of, you know, what she was looking into

25  on December 8th is, you know, what this actually meant.  What

1  resources did we have available to her?  Who could she talk

2  to?  How could she understand?  We have quite an elaborate

3  process, and we want our students to report confidentially if

4  they're not ready to go forward with a hearing; and we do that

5  so that we can, again, examine our climate.

6       If a couple students come and report confidentially

7  and they are identifying the same student who was a

8  perpetrator, then we would be concerned about that.

9  Q   Has that happened at DePauw?

10  A   It has happened, yes.

11  Q   Would you, Mrs. Babington, tell the Court -- you were

12  asked a question on direct that elicited a response from you

13  about what the hearing board has in front of it as the hearing

14  board starts the hearing.  Would you just review for the Court

15  what the hearing board does have as the hearing gets started?

16  A   They have an investigative packet of materials that would

17  include statements, an initial investigation report, any other

18  evidence that there may be in the hearing, in the case.

19  Witness statements are a part of that.  That's pretty much

20  what they have when they review.  We call that the

21  investigative packet, all of those things together.

22  Q   Why is it that statements are submitted to the board

23  before the hearing starts?

24  A   I think it's so that the hearing board members are

25  prepared for what they're going to hear in a hearing.  It also

1  allows them to get to a point of some familiarity with the

2  case so they come in prepared with what questions they might

3  want to ask to further understand what happened that day, that

4  evening in that incident.

5  Q   You were asked -- strike that.

6        You were asked, Mrs. Babington, on direct about a

7  medical document.  It's entitled -- it's a paper that's

8  entitled *Psychiatry and Behavioral Science; Jurisprudence*.

9  It's Exhibit L to Exhibit A7 in the record.  Do you remember

10  those questions?

11  A   Yes.

12  Q   If I can, I'm going to put this on the screen.

13        MR. WELCH:  Your Honor, can you see the paragraph

14  under the header "Conclusion"?

15        THE COURT:  Yes.

16  BY MR. WELCH:

17  Q   Mrs. Babington, can you see that paragraph?

18  A   Yes.

19  Q   What it says is that, "In summary, there is no objective

20  or scientific method to verify the presence of an alcoholic

21  blackout while it is occurring or to confirm its presence

22  retrospectively.  Even if such a method were available, valid

23  and reliable, an alcohol blackout would not negate mens rea,

24  as the experimental studies review here report that only

25  short-term memory is impaired and other cognitive functions --

1   planning, attention, long-term memory -- required to form

2   criminal intent are not impaired.  This should disqualify a

3   claim of alcohol blackout under Daubert and Federal Rule of

4   Evidence 702."  Did you by any chance see that paragraph as a

5   part of your review on appeal?

6   A   I did.

7   Q   Mrs. Babington, you were asked questions on direct about

8   what I'm going to call the David Hoover issue?

9   A   Right.

10  Q   I would like to be as specific as we can be on this issue.

11  At the time you were processing the appeal, did you know that

12  David Hoover was somehow related to Jillian's family?

13  A   I think that by that time, I knew that David Hoover was

14  related to her.

15  Q   And so in that time frame would have been subsequent to

16  the hearing on February 24?

17  A   Right.

18  Q   And then sometime into March?

19  A   Right.

20  Q   That also means that you didn't know that before?

21  A   I did not.

22  Q   Did Mr. Hoover's relationship to DePauw have any impact on

23  your decision on this appeal?

24  A   It did not.

25  Q   Did the fact that Mr. King was a male have any impact on

1  your decision on this appeal?

2  A    It did not.

3          MR. WELCH:  Your Honor, if I could have just one

4  minute.

5          THE COURT:  You may.

6      *(A discussion was held off the record.)*

7          MR. WELCH:  One moment, Your Honor.

8          Thank you, Your Honor.

9  BY MR. WELCH:

10 Q    Mrs. Babington, you were asked questions about

11 communications with Dr. Casey?

12 A    Right.

13 Q    I don't know that he was identified for the Court; and the

14 Court may know it, but tell the Court who Dr. Casey is?

15 A    He's the president of the university.

16 Q    Dr. Casey's been at the university for how long?

17 A    Six years, I believe.

18 Q    Is it unusual for you to communicate with Dr. Casey about

19 student disciplinary matters at DePauw?

20 A    It's not unusual, especially when there are sort of

21 extenuating circumstances.  That's the time that I would

22 mostly communicate with him about student disciplinary issues.

23 Q    When you say "extenuating circumstances," what do you

24 mean?

25 A    I mean that if attorneys are involved or if parents call

*BABINGTON - REDIRECT/THE COURT*                    92

1  and I suspect that they may be calling his office next, those

2  are certainly times that I would notify him.

3  Q   To your knowledge, when were lawyers involved for Ben King

4  in this matter?

5  A   Well, I thought that there was a different law firm who

6  was first representing Ben even before the hearing.  I think

7  that someone had some communication with an attorney from a

8  different law firm, but I don't know the details of that; but

9  I think that was before the hearing.

10  Q   Your first knowledge of counsel who is his current counsel

11  today is when you got the appeal?

12  A   No.  I think that they were at the hearing as well, this

13  current counsel; but I think that even before that, there was

14  a different attorney who was talking with someone on our

15  staff.

16  Q   Did President Casey ever tell you how this matter ought to

17  be decided or come out?

18  A   Absolutely not.

19          MR. WELCH:  I think that's all I have, Your Honor.

20          THE COURT:  Before we have or at least before the

21  Court turns to plaintiff for redirect, I have a couple

22  questions.

                        **EXAMINATION**

24  BY THE COURT:

25  Q   Ms. Reedy asked you as part of your presentation your

1   analysis of the consent, the incapacitation issue.  Does it

2   make any difference in that analysis as to who is determined

3   to be the instigator?

4   A   Yes.

5   Q   So -- now, I've read the transcript and at least

6   Mr. King's testimony of what he recalls, and it would

7   appear -- and you can take exception to that -- that she was,

8   I guess, as much involved with instigating the contact as he

9   was.  Clearly, I think there is some part of his testimony

10  that would indicate that she might have been more so involved

11  with that.  So did you look at that and say who is the real

12  instigator here before you even got to the consent issue?

13  A   Yes.  I made the determination of who the instigator was

14  based on the fact that it happened in Ben's fraternity house,

15  that he said he invited her up to his room.  So that's where I

16  saw the behavior starting.

17  Q   So you're saying the initiation of instituting or

18  initiating this process began because it was at his residence,

19  along with many others, obviously?

20  A   And because he invited her to his room.

21  Q   All right.  And was there any discussion or any testimony

22  about the purpose -- the stated purpose of going up to the

23  room?

24  A   I think there was testimony that said that it would be

25  quieter there; but there was also testimony to say that by

1    that time, the party had died out, and so there wasn't a

2    need -- it was quiet where they were.

3    Q    So after they get to the room, was there any testimony

4    that he initiated any type -- well, not he initiated --

5    started that process after they got to the room?

6    A    I think the only testimony that there is in the room is

7    Ben's because she doesn't have any memory of that.

8    Q    So if you believe Ben, it would appear, at least arguably,

9    that she was the initiator, the instigator of the sexual

10   contact that happened.  Did you reach that analysis and that

11   conclusion?

12   A    I think that definitely that weighed into what I was

13   thinking.  I think that by that time, enough witnesses had

14   testified about her alcohol consumption, that even if she was

15   instigating, that she wasn't able to do that with an

16   informed -- with informed consent.

17   Q    So again, what's the difference between being an

18   instigator and giving consent in your analysis?

19   A    I think -- I mean, I see what you're saying.  I just don't

20   think she was -- I think I had determined by that time that

21   she couldn't give consent and that he was the instigator and

22   that -- in that it was him who invited her to his room.

23   Q    Okay.

24   A    And that he was aware of what was going on and she was

25   not.

1  Q    So you're saying there is a similarity between instigating

2  and consenting to the instigation?

3  A    Right.

4  Q    Is that part of a policy that you referred to or -- I know

5  Mr. Welch referred you to a certain portion of the policy

6  concerning consent, but I guess I'm troubled by the

7  instigation and whether that requires that same type of

8  incapacity.

9  A    In my mind, it would.  I mean, the consent policy talks

10 about clear -- I don't have it in front of me still but clear,

11 visible signs of giving consent; and she didn't do that.

12 Q    In my mind -- and again, I need to do some more research,

13 but it would seem to me that the consent would require someone

14 else to initiate or instigate the contact.  Maybe that's a

15 little naive way of looking at it, but you don't look at it

16 only that way.  You say that even the instigator must have the

17 capacity to consent --

18 A    Right.

19 Q    -- to that sexually aggressive behavior?

20 A    I would say.

21        THE COURT:  Okay.  Redirect, Ms. Reedy?

22        MS. REEDY:  Yes, Your Honor.

23        THE COURT:  While you're walking up, there was no

24 other evidence that happened after they reached that room

25 other than through Mr. King; is that right, until the next

1  morning.  And I think then she kind of had some bits and

2  pieces.

3         THE WITNESS:  Yes.  Ben did have a conversation with

4  some friends right after the incident and told them what

5  happened, which is sort of another version of the story.

6         THE COURT:  Very well.

7         Ms. Reedy?

8         MS. REEDY:  If I may follow up on that.

9                    **REDIRECT EXAMINATION**

10 BY MS. REEDY:

11 Q   There was evidence as to something that happened in the

12 room because Ben's text message -- or Ben's text message the

13 next morning connected the telephone call from Emily Curnow to

14 Jillian while in his room?  He stated that, "We took a shot of

15 Fireball; and then Emily texted you, and you said you didn't

16 need a ride."

17        So there was a witness who testified that she had

18 verbal communication with Emily, and she did not sound -- or

19 Jillian and she did not sound intoxicated during that

20 conversation, correct?

21 A   Right.

22 Q   And the friends that he went to their room after the

23 sexual encounter were not called as witnesses, correct?

24 A   No.  I talked with one of them on the appeal.

25 Q   Did you record that conversation in any way?

1  A    No, but I have a statement from that student.

2  Q    Did you present that with the rest of the documentation to

3  Mr. King's attorneys?

4  A    No.

5  Q    Okay.  I quoted something that you responded to the

6  Court's question.  Your quote was, "Even if she was

7  instigating, she couldn't have given informed consent."

8  A    Um-hum.

9  Q    But when I asked you earlier what about Mr. King's

10 consent, your response essentially was that it didn't matter

11 because he was the instigator, correct?

12 A    I don't know if that was my response, but I had determined

13 on appeal based on everything I saw that Ben's alcohol level

14 wasn't in question based on his own testimony.

15 Q    His testimony in the documents was he was drunk and that

16 he was as drunk as Jillian?

17 A    In the hearing, he placed himself at a 4.

18        MS. REEDY:  Your Honor, if I could grab the

19 transcripts for a moment.

20 BY MS. REEDY:

21 Q    On page 21, he testifies, placing himself on a scale of 1

22 to 10 as a 4, which also happens to be the number that Emily

23 Curnow placed Jillian that night, a 4 out of 10.  Do you find

24 difficulty with asking college students two to three months

25 after the fact to place themselves on a scale of 1 to 10 and

1   to place another individual who they saw periodically

2   throughout the night on a scale of 1 to 10 as to level of

3   intoxication?  Do you find that to be subjective and

4   unreliable?

5   A    Probably, but he also articulated that he had been to

6   Marvin's by that time; and it was later in the evening and

7   could articulate, you know, that he had -- that he was not

8   that intoxicated.

9   Q    He also, though, indicated that he had had four to five

10  mixed drinks that had -- and I don't know if it was in this

11  testimony or in his interview with Shrewsbury -- one to two

12  shots each.  So that could potentially take him to 10 shots of

13  alcohol, and then he had a shot of whiskey with Jillian in his

14  room.  So that could potentially take him to 11 shots of

15  alcohol of hard liquor.

16       And when he's asked on page 22, "So when you were

17  interacting with Jillian, what did you see her consume?"  He

18  says, "Nothing."  And then the question is, "From your

19  interactions, how drunk would you say she was on a scale of 1

20  to 10?"  He says, "Like a 3 or 4, like me."

21       So it's very subjective, isn't it, to say -- to wash

22  away the question of his consent because in this one moment,

23  he gave himself a 4, when previous statements were, "I was

24  pretty drunk" is what he texted Emily the next morning before

25  he knew anything was going on.  Dorian Shager, he said, "I was

1    too drunk to get it up."  It seems to me that you're giving

2    the victim -- the alleged victim more consideration -- if the

3    alleged victim has consumed alcohol, then the question becomes

4    can she consent.  And even if she had consumed alcohol -- even

5    if she was the instigator, even if she was asking him to have

6    sex, undressing herself, you very seriously analyze consent,

7    and you want to determine if she was too intoxicated; but when

8    you have an alleged male perpetrator, if he's the instigator,

9    he doesn't get that same level of strict scrutiny as to his

10   level of intoxication.  Do you agree?

11   A    I don't believe Ben said that he was too drunk to give

12   consent.  I don't believe he ever indicated that he felt like

13   he was not the instigator, that he felt that he was being put

14   upon, that he felt like he couldn't give consent.  I don't

15   believe he ever said that.

16   Q    But it's really a policy standard, isn't it?  If the

17   evidence was that Ben was very intoxicated and the next day he

18   told you "I consented," doesn't -- if he's incapacitated, if

19   he's having so much alcohol that according to DePauw's policy,

20   he cannot consent to sexual activity, even if he says he

21   consented like he says that Jillian said, doesn't his

22   incapacitation negate that consent?

23            MR. WELCH:  Your Honor, I'm going to object.  This

24   is a great speech; but the witness has answered innumerable

25   questions here about her intoxication analysis, both from me,

*BABINGTON - REDIRECT/REEDY*                    100

1   from counsel, from the Court.

2           THE COURT:  I think the question was kind of

3   convoluted.  Why don't you reask, and we'll see if Mr. Welch

4   has an objection to that.

5   BY MS. REEDY:

6   Q   So my question to you is -- and you've confirmed this, I

7   believe, with the Court in your answers -- that even if

8   Jillian as the alleged victim is the instigator, that her

9   consent can be negated by intoxication.  You agree with that?

10  A   Yes.

11  Q   So even if Jillian would have gotten up at this hearing

12  and testified, "I wanted to have sex with Ben King," if the

13  evidence showed that she was too incapacitated to consent, the

14  incapacitation negates that consent.  Do you agree?

15          MR. WELCH:  Your Honor, calls for speculation on the

16  witness's part.  That isn't what the record is.

17          THE COURT:  I think that would be part of her

18  analysis and follows up on the Court's question.

19          You may answer if you know.

20  A   I think the question seems illogical to me.  I don't know

21  that Jillian would get up and say, "I wanted to have sex."

22  BY MS. REEDY:

23  Q   Okay.

24  A   Also, again, weighing a number of things, you know, you

25  have some sense of saying there's times when I should believe

1  Ben in his testimony and then there's times when I shouldn't.

2  Q    But the question comes down to you're willing to negate

3  Jillian's consent by intoxication, correct?

4  A    Right.

5  Q    And you're not willing to negate Ben's admitted consent by

6  possible intoxication as well?

7  A    Yeah, it was never a factor that came up in the hearing.

8  It was never anything Ben said.

9  Q    Exactly.

10  A    There was no reason to even speculate that he was not

11  giving consent.  He never said that.

12  Q    Well, it wouldn't have been speculation had Charlene

13  Shrewsbury interviewed witnesses on that issue, correct?  It

14  didn't come up because it wasn't a focus.

15         MR. WELCH:  Objection, Your Honor.

16         THE COURT:  Sustained.  Next question.

17  BY MS. REEDY:

18  Q    You testified that you were aware of the -- Jillian's

19  connection with the Hoover family while this appeal was

20  pending?

21  A    I think I testified that I was aware.

22  Q    You became aware while it was pending?

23  A    Right.

24  Q    How did you become aware?

25  A    References had been made in the president's office that

1   Jillian was related to someone.  I never asked who.  I wasn't

2   interested.  And then at some point, it -- the name was said,

3   and then that's when I realized who.

4   Q    Who made the reference?

5   A    Either the president or the president's assistant.

6   Q    What's the president's assistant's name?

7   A    Betsy Demmings.

8   Q    Betsy?

9   A    Demmings, D-E-M-M-I-N-G-S.

10  Q    When were you in the president's office discussing this

11  case?

12  A    As I've already said, I was keeping him updated when

13  parents were calling or when I knew attorneys were involved.

14  Q    And what possible relevance could it be that President

15  Casey or his assistant would mention to you in the context of

16  discussing a pending appeal that she was -- that she had a

17  relationship with someone?  How was that even relevant?

18  A    I don't even remember the context.

19  Q    But it came up in that context, correct?

20  A    Somehow, yes.

21  Q    Somehow.  And you don't recall which of them said that?

22  A    I don't.  I was not interested.  I didn't want to know.  I

23  didn't need to know.  I had no reason to ask who that was.

24  Q    But they somehow thought it was relevant to the

25  discussion.

1      MR. WELCH:  Your Honor, I'm going to object --

2      THE COURT:  Sustained.

3  BY MS. REEDY:

4  Q   At that point, did you think that perhaps you needed to

5  refer this appeal outside of DePauw to a neutral entity that

6  would not be biased by any relationships of Jillian?

7      MR. WELCH:  Objection, Your Honor.  The question

8  assumes that there was some bias related to Mr. Hoover, and

9  it's not been demonstrated.

10      MS. REEDY:  I'm asking her if she thought that, if

11  she thought it was necessary.

12      THE COURT:  Sustained.  Next question.

13  BY MS. REEDY:

14  Q   Would you agree that you having that knowledge created an

15  appearance of bias?

16  A   I don't know.  You know, DePauw's a small community.  Lots

17  of people have connections.  I think it's my job on appeal to

18  look at the material that's in front of me and discard

19  material that doesn't matter, and that's what I did.

20  Q   Did you ever talk to the Hoovers?

21  A   No.

22  Q   Do you know if the president, his assistant or anyone in

23  his office had communication with the Hoovers?

24  A   I have no knowledge of that.

25  Q   It's interesting the conclusion that DePauw's counsel put

1  up on the screen of the article.  You acknowledged that you

2  were aware of that conclusion in that article?

3  A    Yes.

4  Q    The conclusion is essentially saying that mens rea is not

5  negated because it's only short-term memory that's impaired.

6  So do you understand that to mean that if a person is having

7  one of these alcohol blackouts and they commit a crime, they

8  can still be held responsible for that crime during that time

9  period?

10  A    That's my understanding.

11  Q    So if Jillian was having an alcohol blackout while she was

12  instigating or consenting to sexual contact with Ben, then her

13  mens rea should also be in play, and that consent should not

14  be negated because it's only short-term memory?

15  A    I don't know.  I also think it's interesting that it talks

16  about longer-term memory, and we have a woman here who made a

17  very conscious decision that she was not going to have sex

18  before she was married.  So I'm a little -- I can see that

19  working both ways.

20  Q    What role did that have, that Jillian's devotion to

21  viraginity was -- how much of an impact did that have on you?

22  A    On me?  I don't know that it had any impact on me.

23  Q    Do you think it made her more credible?

24  A    I don't know that I would say that.

25  Q    Did you have any prior complaints about Ben King?

1   A    No.

2   Q    Any prior disciplinary problems with Ben?

3   A    No.

4   Q    You've mentioned and it's been mentioned in the pleadings

5   that he was silent and did not give a statement to Charlene

6   Shrewsbury.  Do you find that to be an indication of guilt in

7   his silence?

8   A    No.

9   Q    The delay in the interviews, were you unable to call

10  students during the Christmas holiday or the winter break?

11  Was there some reason that they couldn't -- even though they

12  were off campus, they couldn't have been communicated with?

13  A    It depends.  Many of our students go abroad.  So there

14  could have been reasons that we couldn't have contacted.

15  Q    Was the effort made?

16  A    No, because Jillian had not indicated she wanted to

17  proceed with a charge at that point or an investigation at

18  that point.

19  Q    That was the real factor, not a break or a holiday.  It

20  was truly Jillian's choice that she wasn't ready?

21  A    I think all of that played into the delay and the reason

22  why Jillian didn't earlier indicate that she was ready.

23  Q    Would you agree that Jillian received substantial

24  resources from DePauw in helping her through this process?

25  A    All of our sexual assault victims do.

1  Q   And was Ben was provided with the same extensive

2  resources?

3  A   I believe he was offered numerous resources.

4  Q   Can you tell us what those were?

5  A   Yes.  He was offered a person who could be his advisor

6  through the hearing.  I think counseling was spoken to him

7  about.  I sent a note to his faculty with regard to his

8  classes or Cara Setchell did.  Then we also made some

9  accommodations when he was allowed to come back to campus

10  where I sent a note basically asking for him to be excused

11  from a whole week of classes while the --

12  Q   But that's after the fact, right?  I mean while this is

13  going on before the hearing.

14      You said he was offered an advisor.  He was never told

15  this individual person is specially trained and you should use

16  him.  It was more along the lines of, if you don't have

17  anybody else, this guy said he would do it?

18  A   It's my understanding that he was advised that this person

19  had experience.

20  Q   Okay.  And you mentioned that you thought our law firm was

21  at the hearing, and that was simply not correct.  We were not

22  involved in this case until afterwards; and to my knowledge,

23  there was no lawyer at the hearing.  Do you have any reason to

24  believe he had a lawyer there?

25  A   I don't know.  I guess I just don't know the answer.  I

1  know there was a lawyer involved before that.

2  Q    Is it your understanding of the policy that at this time,

3  lawyers were not permitted to be involved in hearings?

4  A    Lawyers could not be in hearings, but we've had numerous

5  cases where lawyers sit outside the room; and the hearing will

6  stop, and a student can go and consult with them.

7  Q    During the hearing?

8  A    Yes.

9  Q    Did the university within the past five years receive a

10  large grant for campus violence?

11  A    It's the second grant that we have received in the past 12

12  years.

13  Q    How much are those grants, approximately?

14  A    About $300,000.

15  Q    As a part of the reporting for those grants, do you have

16  to report the outcomes for these allegations?

17  A    I believe we do, yes.

18  Q    And you do have to report that the students are found

19  responsible?

20  A    I think we report -- yes.  Yeah.

21  Q    Does that have an effect on your grant applications?

22  A    It does not.

23  Q    And the purpose of the grant is to protect females on

24  campus from domestic -- or from violence on campus; is that

25  correct?

1  A   The grant is a violence against women grant, but schools

2  use the grants for all different purposes.  The first time

3  around, we used it to ensure that our sexual assault responses

4  were in place.  We had SANE examiners licensed and trained.

5  We trained hearing boards with those dollars.

6        This most recent one, our emphasis has been on

7  bystander intervention, training students to intervene in

8  these kinds of situations if they see something happening.

9  Q   If Ben would have admitted to sexually assaulting Jillian

10 when he met with Dorian Shager, would it still have been left

11 up to Jillian if she wanted him punished or would the

12 university have taken action to punish him to remove him from

13 campus because of a safety issue?

14        MR. WELCH:  Your Honor, I'm going to object.  It

15 calls for speculation on the part of the witness based on what

16 might happen based on a certain set of facts.

17        THE COURT:  Kind of seems like it to me too.

18        MS. REEDY:  Your Honor, it goes to their policies

19 and their practices in handling these cases.  She's been in

20 this role for 15 years.  I guess I could ask her.

21 BY MS. REEDY:

22 Q   Have you ever had that happen --

23        THE COURT:  I'm going to sustain the objection to

24 that question.

25

1   BY MS. REEDY:

2   Q    Have you ever had the occasion where a student has

3   admitted to the assault and the victim did not want the

4   student to be punished?

5   A    I'm not sure.

6   Q    Is campus safety a pretty significant issue for you in

7   these cases?

8   A    Excuse me?  I'm sorry.  I didn't hear you.

9   Q    Campus safety, is that a pretty significant issue?

10  A    On DePauw's campus?

11  Q    Yes.

12  A    I'm not exactly sure what you mean --

13  Q    Processing these cases in a way -- is that a concern for

14  you when you receive a complaint like this, that there's been

15  a sexual assault?  In addition to the victim's wishes, do you

16  also have a concern for taking action to protect campus

17  safety, for protecting other students?

18  A    Absolutely, yes.

19  Q    Have you ever went against the wishes of a victim and took

20  actions against a perpetrator?

21  A    Yes.

22  Q    How many times has that happened?

23  A    You know, I don't know.

24  Q    You recall it happening though?

25  A    I do recall it happening, yes.

1  Q   So this most recent case that was a male on male -- you

2  say most recently.  When did that happen?

3  A   That was not this past year but the year before, I

4  believe.

5  Q   So in that case, you had an admission that a male had

6  assaulted another male; but you did not remove him from campus

7  when it was a male who was the victim?

8  A   It was not an assault.  It was inappropriate touching, and

9  it was -- both parties agreed that they didn't want to pursue

10  this any further; and I didn't perceive that that person was a

11  threat to campus.

12       This year I did remove somebody from campus who I did

13  perceive to be a threat to others on campus.  I did an interim

14  suspension.

15       MS. REEDY:  We don't have any further questions,

16  Your Honor.

17       THE COURT:  Recross, Mr. Welch.

18       MR. WELCH:  Thank you, Your Honor.

19                   **RECROSS-EXAMINATION**

20  BY MR. WELCH:

21  Q   Mrs. Babington, on redirect, you testified, I think, that

22  Ben's intoxication level was not an issue.  Why was it not an

23  issue in your mind?

24  A   At least on appeal, his own testimony in the hearing

25  indicated that he was not overly intoxicated.

1  Q   What impact did intoxication have on his ability to

2  consent to the conduct in your mind?

3  A   I think that if he says himself that he wasn't too

4  intoxicated, then he was able to consent to the behavior.

5  Q   You were asked some questions about the grant money that

6  DePauw has received, and you said it was a part of a violence

7  against women's grant?

8  A   Right.

9  Q   And there have been two grants?

10 A   Yes.

11 Q   You talked about some training that has been done.  Could

12 you describe for the Court what you mean by training and the

13 use of that money?

14 A   The money was used to train police officers in sexual

15 assault investigations.  The money was used to train hearing

16 board members in how to conduct these hearings, appropriate

17 questions to ask, what kinds of information to look for, how

18 to understand the components of consent.

19       We train sexual assault nurse examiners because we had

20 situations where our students were going out to the local

21 hospital, and the doctor who was on call was opening up the

22 rape kit and reading the instructions; and that didn't seem

23 like that was serving our students very well.  So we can do

24 those exams on campus.

25 Q   Who is it that does this training that you've been talking

1   about?  Is it within DePauw or is it outside consultants?

2   A   No.  We have numerous outside consultants come in each

3   year to work with our hearing boards and to work with our

4   staff on these issues.

5   Q   You said that the value of the two grants combined was

6   $300,000?

7   A   No, I think each one was 300,000.

8   Q   Has DePauw expended those funds?

9   A   Yes.  I think at the end of September this year, we will

10  be finished with our second grant.

11          MR. WELCH:  Thank you, Your Honor.

12          THE COURT:  Oh, here I go again.  I'm a little hung

13  up on this.

14                          **EXAMINATION**

15  BY THE COURT:

16  Q   In another context, a male student gets intoxicated to the

17  point of incapacitation --

18  A   Right.

19  Q   -- and assaults a fellow student.  Now, is his case

20  considered the fact that he did not have the capacity to

21  consent to the assault?

22  A   To doing the assault?

23  Q   Yeah.

24  A   No.

25  Q   In other words, he's the aggressor.

1   A    Right.   I think he would be held responsible.

2   Q    He would be held responsible?

3   A    Right.

4   Q    Even though he's intoxicated to the point of

5   incapacitation?

6   A    Right.

7           THE COURT:   Okay.  All right.  Anything further from

8   this witness, plaintiff, defendant?

9           MR. WELCH:   Nothing, Your Honor.

10          THE COURT:   You may step down.  Thank you very much.

11   *(Witness excused.)*

12          THE COURT:   All right.  It's a little after 12.  I

13   would like to break for lunch.

14          I would like to see counsel in chambers, please.

15   *(A lunch recess was taken.)*

16

17

18

19

20

21

22

23

24

25

114

1                **A F T E R N O O N   S E S S I O N**

2            THE COURT:  Be seated, please.  Plaintiff, you may

3    call your next witness.

4            MS. REEDY:  Yes, Your Honor.  We call Emily Curnow.

5            THE COURT:  Raise your right hand, please.

6        *(Witness sworn.)*

7            THE COURT:  You may inquire.

8            **EMILY CURNOW, PLAINTIFF'S WITNESS, SWORN**

9                      **DIRECT EXAMINATION**

10   BY MS. REEDY:

11   Q    Can you please state your name for the record?

12   A    Emily Curnow.

13   Q    Emily, where do you -- you don't have to given me your

14   address, but what city and state do you currently reside in?

15   A    Fishers, Indiana.

16   Q    Are you a recent graduate from DePauw University?

17   A    Yes, I am.

18   Q    When did you graduate?

19   A    In May of 2014.

20   Q    What was your major?

21   A    I was a math major and a Spanish minor.

22   Q    What are you doing now?

23   A    I am currently in grad school getting my license to teach

24   high school math.

25   Q    Where are you attending your grad school?

1    A    Butler University.

2    Q    What was your relationship with Jillian Balser in December

3    of 2013?

4    A    We were friends, sorority sisters and roommates.

5    Q    Okay.  And how long had you known Jillian at that time?

6    A    Since the fall of 2010.

7    Q    Would that have been your freshman year at DePauw?

8    A    Yes, it was.

9    Q    How long had you been living with her as a roommate?

10   A    In December, it would have been four months.

11   Q    Over the course of your time at DePauw, did you attend a

12   lot of parties with Jillian?

13   A    I would say a fair amount, yes.

14   Q    And had you been around her when she was drinking alcohol?

15   A    Yes.

16          MS. CHRISTENSEN:  Your Honor, we have to object to

17   this line of questioning.  It's completely irrelevant as to

18   what happened in DePauw's investigation and hearing procedure.

19          THE COURT:  Overruled.

20   BY MS. REEDY:

21   Q    Did you know Ben King before December the 6th, 2013?

22   A    No, I did not.

23   Q    Emily, how would you compare Jillian's level of

24   intoxication on the night in question with prior occasions

25   when you had witnessed her drinking alcohol?

1          MS. CHRISTENSEN:  Your Honor, again, we object to

2    this question.  The question asks for an answer that's already

3    been answered in the hearing transcript that's in the

4    evidence.

5          THE COURT:  I agree.  Sustained as to that question.

6    BY MS. REEDY:

7    Q   There's been testimony today that you had a

8    conversation -- that you had called Jillian while she was in

9    Ben's room; is that correct?

10   A   Correct.

11   Q   As a part of your sorority, is there sort of an unstated

12   policy that you won't leave each other behind if someone is

13   overly intoxicated?

14   A   It's partly our sorority but partly just my nature.  I

15   don't want to leave a friend behind.

16   Q   So if you're at a party and you notice a friend or a

17   sorority sister becoming overly intoxicated, what would you

18   do?

19   A   I would try to get him or her home as quickly as I could

20   and make sure that he or she was okay.  But otherwise, make

21   sure that if I couldn't help, get him or her in the hands of

22   somebody that could help.

23   Q   Would you allow a friend in that state to go into a room

24   with a male?

25   A   Not if I was aware of it, no.

CURNOW - DIRECT/REEDY                    117

1  Q   And after -- at the time that Mr. King filed his appeal,

2  did Cindy Babington call you in to discuss your opinions in

3  the case?

4  A   Yes.

5  Q   During that conversation, was one of the issues that came

6  up your telephone call to Jillian while she was in Ben's room?

7  A   Yes.

8  Q   And was she asking you questions to try to determine if

9  Jillian was in Ben's room or if he was -- if she was somewhere

10 else in the house with other people?

11 A   Yes.

12 Q   Did you tell her if you could come to a conclusion on that

13 issue?

14 A   I did.  I told her that I couldn't come to a 100 percent

15 positive conclusion but that I was under the impression that

16 she was in Ben's room.

17 Q   You were under the impression that she was in Ben's room?

18 A   Yes.

19 Q   Had you talked to Jillian after this happened about that

20 phone conversation?

21 A   Could you clarify when I would have talked to Jillian?

22 Q   Sure.  After -- so after Jillian comes back the next

23 morning and the report is made and this whole investigation

24 process kicks off, after that point, had you ever discussed

25 your telephone conversation with Jillian?

1  A    Yes.

2  Q    And based on that conversation, did you have an

3  impression?  Did that help with your impression of where she

4  was?

5  A    No.

6  Q    After the alleged incident, approximately eight weeks

7  passed before you were contacted or any of your friends from

8  the sorority were contacted; is that correct?

9  A    Correct.

10  Q    During this eight-week time period, did Jillian frequently

11  discuss what occurred?

12  A    There was a portion of the time period that we were

13  actually away from campus at winter term, and I didn't talk to

14  her very frequently during that time; but once we returned to

15  campus, yes, she did talk about it fairly frequently.

16  Q    Did she talk about it with other people and other

17  witnesses around?

18  A    Yes.

19  Q    And -- well, I can ask you.  Did her statements affect

20  your testimony?

21  A    No, they did not.  She did ask me questions that tried to

22  make me answer in certain ways or I guess phrase my testimony

23  in certain ways; but no, it did not change the way that my

24  testimony was written or spoken.

25  Q    In fact, did Jillian actually tell you before the

1   hearing -- let me take a step back.

2          After you talked to Captain Shrewsbury and submitted

3   your written statement, was Jillian upset with you because of

4   your testimony?

5   A   Not at that time, no.

6   Q   Not at that point she wasn't?

7   A   No.

8   Q   At what point before the hearing did she become upset with

9   what you had told Captain Shrewsbury?

10  A   She confronted me a day prior to the hearing and said that

11  she had gotten to read through all of the witnesses'

12  statements and was upset by my testimony.

13         MR. WELCH:  If the witness could keep her voice up

14  at the end of her questions.

15         THE COURT:  You might want to pull that microphone a

16  little closer.

17  BY MS. REEDY:

18  Q   Is it true that the day before the hearing, she actually

19  told you that she was going to ask you certain questions at

20  the hearing; and she wanted you to answer those questions a

21  certain way?

22  A   Yes.

23  Q   And the way that she wanted you to answer those questions,

24  was it to minimize your knowledge of what had happened?

25  A   I wouldn't say that it was to minimize.  It was just to

1  answer in a way that would have been a little more favorable

2  to Jillian than my initial testimony.

3  Q   Did you tell her if you were going to do that or not?

4  A   I did not.

5  Q   You didn't tell her?

6  A   No.

7  Q   I know you didn't at the hearing; but prior to the

8  hearing, did you tell her you were not going to or did you not

9  answer?

10  A   I didn't say how I was going to answer.

11  Q   Were you present while Jillian was talking about the case

12  with other witnesses in the case?

13  A   Occasionally, yes.

14  Q   Did you previously state that Jillian's constant

15  discussion of what had happened had an impact on people

16  wanting to be around her?

17  A   Yes.

18  Q   Can you tell me a little bit about that?

19  A   People, I think, were hesitant to be around her because

20  they weren't sure how to respond to her.  We wanted to make

21  sure that she was okay, but it's also a very taboo and

22  sensitive subject that I think a lot of people didn't want to

23  just be talking about at the lunch table or something like

24  that, which is when it was sometimes brought up.

25  Q   So in casual settings, Jillian would bring it up?

CURNOW - DIRECT/REEDY                    121

1  A   Yes.

2  Q   During that time, did you also notice Jillian having a lot

3  of meetings and leaving to go meet with individuals?

4         MS. CHRISTENSEN:  Your Honor, it's unclear what the

5  relevance of this is to DePauw's process, DePauw's

6  investigation and DePauw's hearing.  We object on that basis.

7         MS. REEDY:  Your Honor, the relevance to what the

8  witness is about to testify to is the frequency with which

9  Jillian was having contact with the DePauw employees involved

10 in the investigation.

11        THE COURT:  And that goes to show?

12        MS. REEDY:  That goes toward her -- it being a

13 constant thing she was involved in, working on, meeting with

14 her advisor very frequently, to the support and involvement

15 that Jillian had in this investigation as opposed to Mr. King.

16        THE COURT:  Let's move on.  I think that's enough in

17 the record that the Court can glean.

18 BY MS. REEDY:

19 Q   How did you react when you -- who informed you of Ben's

20 expulsion?

21 A   I believe that I heard it from a friend; but to be honest,

22 I do not remember for certain.

23 Q   And how did you react to that?

24 A   I was extremely upset.  I started crying.  I was just

25 overwhelmed by the whole process and the events that had

1  occurred.

2  Q   Why did you cry?

3  A   I guess I was very overwhelmed and was caught off guard at

4  the severity of the outcome.

5          MS. REEDY:   Your Honor, if I could have just one

6  moment.

7          THE COURT:   You may.

8  BY MS. REEDY:

9  Q   In your discussions with Cindy Babington, did you

10  reiterate to her what you had seen, what you had observed with

11  Jillian?

12  A   Yes.

13  Q   Did you tell her your opinions on Jillian being much more

14  intoxicated on previous occasions?

15  A   I believe that was in the conversation, but I don't

16  remember for sure.

17  Q   Did you talk to her about your opinions on whether Jillian

18  could consent or would know what was going on around her?

19  A   I believe so.

20          MS. REEDY:   Your Honor, I don't think I have any

21  further questions at this time.

22          Thank you, Emily.

23          THE COURT:   Your witness, Ms. Christensen.

24          MS. CHRISTENSEN:   Thank you, Your Honor.

25

1      **CROSS-EXAMINATION**

2    BY MS. CHRISTENSEN:

3    Q    Ms. Curnow, I have just a few questions for you this

4    afternoon.  How many times have you spoken with counsel for

5    Mr. King?

6    A    Probably five or six.

7    Q    When was the first time you were contacted by Mr. King's

8    counsel?

9    A    Prior to the appeal.

10   Q    Have you ever participated in any meetings with Mr. King

11   and his counsel present?

12   A    No, I have not.

13   Q    When was the first time you were contacted by counsel for

14   DePauw?

15   A    For DePauw?  Two days ago.

16   Q    When was the first time you spoke with counsel for DePauw?

17   A    This morning.

18   Q    From the involvement that you had in the investigation and

19   the hearing process, did you perceive any bias against Ben

20   because of his gender?

21   A    Not on my end, no.

22            MS. CHRISTENSEN:  We have no further questions at

23   this time, Your Honor.

24            THE COURT:  On those issues, Ms. Reedy?

25

**REDIRECT EXAMINATION**

1

2  BY MS. REEDY:

3  Q    You testified that you didn't perceive bias on your end.

4  But you also testified that you cried when you got the result.

5  Did it have to do with your opinion on the amount of evidence

6  against this student?  Concrete evidence I think is perhaps a

7  word you've used in the past during our admitted

8  conversations?

9  A    Yes.

10 Q    And if DePauw had contacted you before yesterday and

11 reached out to you before this morning, would you have been

12 more than willing to speak with them and tell them everything

13 you told me?

14 A    Yes.

15 Q    And did you tell Cindy Babington everything that you've

16 told me today?

17 A    As far as I know, yes.

18        MS. REEDY:  Nothing further, Your Honor.

19        MS. CHRISTENSEN:  Just one more question, Your

20 Honor, please.

21                      **RECROSS-EXAMINATION**

22 BY MS. CHRISTENSEN:

23 Q    When you had conversations with Jillian before the hearing

24 and she asked you about your testimony and tried to coach you,

25 did you end up changing your testimony as a result of that?

1   A   No, I did not.

2          MS. CHRISTENSEN:  Thank you.

3          THE COURT:  Very well.  May this witness be excused?

4          MS. REEDY:  Yes, Your Honor.

5          THE COURT:  You may step down.  Thank you very much.

6      *(Witness excused.)*

7          THE COURT:  Plaintiff, you may call your next

8   witness.

9          MR. DRUMMY:  We call Tom King.

10         MS. CHRISTENSEN:  Would you raise your right hand?

11     *(Witness sworn.)*

12         THE COURT:  Mr. Drummy, you may inquire.

13         MR. DRUMMY:  Thank you, Judge.

14         **THOMAS B. KING, PLAINTIFF'S WITNESS, SWORN**

15                    **DIRECT EXAMINATION**

16  BY MR. DRUMMY:

17  Q   Mr. King, would you state your full name for the record?

18  A   Thomas B. King.

19  Q   You are Ben King's father?

20  A   I am.

21  Q   Seated back in the courtroom is your wife, Cammie, Ben's

22  mom?

23  A   Yes.

24  Q   Next to your wife Cammie is Ben's brother, Tom; is that

25  right?

THOMAS B. KING - DIRECT/DRUMMY                126

```
 1  A    Yes, Ben's youngest brother, Thomas.

 2  Q    And actually behind them are Holly's mom and dad.

 3       How did you -- tell us what you do for a living.

 4  A    My wife and I own residential homes, apartments,

 5  commercial buildings.  We lease.  We've been involved in

 6  several businesses with our family.  We're electrical

 7  contractors.  We sold that business in '96.  We've always been

 8  in the construction-type industry, and that just kind of moved

 9  into rental and commercial leasing.

10  Q    So you've been an independent businessman pretty much your

11  work life?

12  A    Yes.

13  Q    Okay.  Do you have other children besides Ben and Tom?

14  A    I'm sorry?

15  Q    Do you have other children besides Ben and Tom?

16  A    Yes, our oldest son, Justin, he's 27.  He graduated from

17  Marian University.  He's now back at Indiana State pursuing

18  another degree.

19  Q    How was it that Ben came to go to DePauw?

20  A    Ben was at Indiana State, and he was playing football

21  there.  His younger brother, Thomas, was recruited by DePauw

22  to play football.  Once Thomas went to DePauw -- or Ben knew

23  that he was going to go there, they thought it would be neat

24  to play together there; and we contacted the football office,

25  and Ben was at Indiana State playing football.  It's a D1.  So
```

1  he could go down to DePauw, D3 level, and not sit out a year.

2  They were very interested in him coming.  So he transferred

3  there.

4  Q   What year did he transfer to DePauw?

5  A   It would have been his sophomore year.  We both thought

6  that -- my wife and I, it was a great academic place and very

7  well respected.

8  Q   In your experience as an independent businessman, does the

9  place where somebody graduates make a difference in who you

10 might hire?

11 A   I think so, yes.

12 Q   What about their disciplinary experience at college?  When

13 you're interviewing a person to hire and they have a serious

14 disciplinary matter on their record, is that something that

15 you as a businessman would consider adversely with regard to

16 whether or not to hire them?

17 A   Yes, it would be.

18 Q   What about a college student that has an unexplained gap

19 in his or her transcript?

20 A   Everyone's different; but in my experience, if I have the

21 resumé in front of me and there's a gap, you know, I'm going

22 to tend to think, you know, maybe they're not serious; and I

23 would tend to hire someone where there was no gap.

24 Q   What about a conviction or a finding of sexual assault?

25 A   I don't know.  I think that would be very hard to get

1  around.  That would be very difficult to hire someone to work

2  and put myself and other people in that situation.  It would

3  be very difficult.

4  Q   For example, the buildings that you manage, if you hired a

5  handyman or a handywoman with a sexual assault conviction or

6  even a sexual assault charge -- or would you do it?  Would you

7  hire somebody like that?

8  A   I would not.

9  Q   So when you first learned about this charge that the

10  university was making, did you deem it as a serious charge and

11  one with consequences that would be impossible to repair?

12  A   I deemed it very serious.

13  Q   So when did you first learn about this situation?

14  A   It would have been in late December -- I take that back.

15  It was actually when Ben was taken to -- I don't know the

16  exact date -- when he was called over to campus security.

17  Q   So he was called to campus security.  Were you as the

18  parent advised before that happened?

19  A   No.

20  Q   Had it already happened when you learned of it?

21  A   Yes.

22  Q   So DePauw called your son over to campus security, and he

23  can talk about that; but I take it they told him he was under

24  suspicion for sexual assault?

25  A   My understanding, he was called over, read his rights.

1  They wanted to take a statement on video, and he opted not to

2  do that at that time and had told him it would be turned over

3  to the prosecutor's office.

4  Q   Do you think that had somewhat -- from your point of view,

5  when you learned that, that they read him his rights and

6  wanted to take a video statement, and anything he said would

7  be turned over to the prosecutor's office and in the words of

8  Miranda, can and will be used against you in a court of law,

9  did that have a chilling effect on how you would look at this

10  situation?

11  A   It had a profound effect --

12            MR. WELCH:  I'm going to object to that question.

13  It's not relevant how this witness would look at that

14  situation.

15            THE COURT:  Sustained.

16            MR. DRUMMY:  I think maybe I can try to tie it in.

17  BY MR. DRUMMY:

18  Q   What did you do as soon as you learned that these criminal

19  charges were threatened?

20  A   I spoke with my wife about it.  I mean, we were both very

21  upset.  We were more worried about the criminal charges, I

22  think, at first response.  Called a criminal attorney and went

23  from there.

24  Q   All right.  I'm not going to ask you what that criminal

25  attorney told you, but did you and Ben follow his advice with

1  regard to what role you would play in this investigation?

2  A   Right.   Once Ben called and said, "I was called over, read

3  my rights and wanted to take a video statement," I was, like,

4  "You just lay low.   Don't say anything until we talk to an

5  attorney and see what we need to do."

6  Q   All right.   And did that attorney -- were you led to

7  believe that if you didn't follow that criminal attorney's

8  advice, there could be serious consequences?

9  A   Yes.

10  Q   Now, you heard this morning that Cindy Babington said that

11  you were allowed to bring a lawyer to the hearing and have him

12  sit outside in the hallway and provide you with advice.

13  A   That's the opposite of what I was told.

14  Q   Who told you what about a lawyer and -- who told you and

15  what did they tell you about your ability to have a lawyer

16  present even in the same building as that hearing?

17  A   Ben and I had a meeting with Cara Setchell.   It was

18  probably like a twenty to thirty-minute.   Our attorney at that

19  time had already called her.   I asked if he could come.   She

20  said, "No.   He cannot come at all."   I said, "Not even be

21  there?"   No.   He called and asked if he could be there, and he

22  was told no.

23        I called and asked her if I could; and I was allowed

24  to come, but I couldn't go into the hearing.

25  Q   And where did they put you during the hearing?

THOMAS B. KING - DIRECT/DRUMMY          131

A    When I came in, I was taken to the -- what I would call

like a little holding room in the campus police security

office.

Q    Did you see where they put Jillian when she came?

A    They were all across the hall in the dean's office.

Q    In the dean's office?

A    Yes.

Q    No attorney allowed in the building.  No attorney allowed

at the hearing.  You were not allowed to be present at the

hearing?

A    I stayed in the -- I had to sit in the security office.

Q    Didn't get to hear any of the testimony?

A    No, none.

Q    Did Cara Setchell tell you anything before the hearing

about -- that made you think that she had prejudged what was

going to happen at that hearing?

A    When Ben and I met with her, I had several questions for

her.  I asked, "How did this all come about?  How did we get

to this point?"  She said, "Well, at this point, there's been

enough evidence brought against him that they think he could

be guilty and there will be a hearing."

          I said, "Well, how does that work?"  She told me it

would be a three-person panel made up of a student, a faculty

member and a staff member.  Then later, we found out that it

was three staff members, all from the department of Student

1  Life.

2  Q   No faculty member, no student?

3  A   No.  She did offer Ben counseling as far as if he was

4  having trouble coping with it, not an advisor.  She said, "Do

5  you have a teacher" -- excuse me -- "or a professor that

6  you're close to, you know, a student, you know, a mentor?"

7       He contacted the football team, and he has never heard

8  back from them since the day he told them he was -- that this

9  was going on.

10  Q   His football career ended with this?

11  A   Correct.

12  Q   Okay.  So she offered counseling, like, if he was

13  emotionally upset about this?

14  A   Yes, yes.

15  Q   And then what was said to you in these meetings about

16  having an advisor to assist him?

17  A   I said -- my words were, "Well, who is looking out for

18  Ben?  I mean, Ben's a DePauw student also.  Who's looking out

19  for him?"

20       She said, you know, "You can get an advisor, someone

21  here" -- I do not remember a specific name -- "from this

22  department.  He can get one of his fellow students or a

23  faculty member or a staff member from somewhere else on

24  campus."  It had to be an employee or student of campus.

25  Q   Did you know at that time that Jillian had the head guru

1  of sexual assault as her advisor?

2  A    No, I did not.

3  Q    Did Cara Setchell tell you anything about the training or

4  experience that you needed to have in an advisor?

5  A    I asked her -- I said, "I'm confused here who's -- again,

6  how we got to this point."  She told me that they had all had

7  been to seminars, had training.  My question was, "Does anyone

8  here have a law degree?"  Her response, I think, was, "No."

9       Ben said, you know, "One of my fraternity brothers,

10  he's a senior, like a straight A student.  He's going to be an

11  attorney.  His dad is a prosecutor," I believe, in Vermillion

12  County "and I'm thinking about using him."  She said, "That

13  would be fine if that's who you think."

14       The big thing then was I said -- she said, "We can do

15  this next week, have the hearing."  And my immediate response

16  was, "We're going to need more time than that," because I just

17  had to go to the security office and look over the 37-page

18  file.

19  Q    Let me ask you about that.  When you went to the security

20  office, did they make a copy of the file for you?

21  A    No.  I was welcome to sit there and read it and hand-write

22  out everything if I had the time to do that, but I could not

23  make a photocopy or they would not make -- I guess I couldn't

24  make them.  They couldn't make them.  I had to sit there in

25  the security office.

THOMAS B. KING - DIRECT/DRUMMY                134

1   Q    So you have to look through this entire investigative file

2   as a layperson --

3   A    Yes.

4   Q    -- and decide what was important and what was not and make

5   your own notes about it?

6   A    Right.

7   Q    Do you know from speaking with anyone how they handled

8   that when your lawyer -- your current lawyer asked to look at

9   the file?

10  A    It was handled the same way.

11  Q    Same way.  No copy?

12  A    No copy.  You have to stay right here.  And Ben had to be

13  present with me.  I couldn't just come back and look at it

14  myself.

15  Q    Could a lawyer be present with you?

16  A    No, no.

17  Q    Okay.  So then -- okay, so Ben picks one of his fraternity

18  brothers to be his advisor in this process.  Let me ask you

19  this.  Does Ben have any training or experience as to how to

20  defend himself in a case where the educational death sentence

21  might be a penalty?

22  A    Absolutely not.

23  Q    So then -- did you ask for more time to prepare?

24  A    I asked Cara for more time.  Ben said -- she goes, "Well,

25  we really need to move on with this."  Ben replied that Dean

1  Shager had told him you would be allowed to get more time.  My

2  response was, you know, "This has been going on all this time,

3  and we just kind of got this dropped in our lap.  We really

4  need more than three or four days here to prepare for this."

5  Q   Eight weeks of no activity at all by the university.

6  Eight weeks with never calling a witness on the telephone.  As

7  far as you know, are there telephone lines between the United

8  States and Europe as students are studying abroad?

9           MR. WELCH:  Your Honor, I'm going to object to the

10  question.  We all know there are telephone lines.

11           THE COURT:  Next question.

12  BY MR. DRUMMY:

13  Q   Okay.  So when you asked for more time, what happened?

14  A   She said no.  We were denied that.

15  Q   So then at some point in time, was there a decision made

16  to not use the student advisor and use somebody else?

17  A   Yes.  After we spoke to the attorney, he said, you know,

18  "I really think you need an adult in there."

19  Q   This is Joe Etling, your criminal attorney?

20  A   Yes.

21  Q   Joe said, "I don't think you ought to have a student"?

22  A   "I don't think you should go in there for a student."

23           "They won't let me go.  I've already called and asked.

24  They will not let me go."

25           Ben said, "I contacted the football; but I'm not

1   getting any reply back from them."  I said, "I have a college

2   classmate from Indiana State that is -- I'm not sure if he's a

3   professor or faculty.  I don't know that but works there.  I

4   haven't spoken to him in a number of years, but I can call

5   him, and Joe Etling -- he said, "I think you better do that.

6   I just don't think he should go in with just a student."

7   Q    So this friend of yours from high school is Bill Tobin?

8   A    Yes.

9   Q    He's in economics at DePauw?

10  A    Yes.

11  Q    And did Bill Tobin have any experience in how to defend or

12  represent a sexual assault charge?

13  A    I sent him an e-mail and I called him.  He responded.  He

14  said, "I'm happy to help; but I'll be honest with you, I've

15  got no training in any of this and nor have I ever been to one

16  of these hearings."  The time constraint -- I didn't know, you

17  know.

18  Q    You asked for additional time, and you couldn't have it?

19  A    Right.

20  Q    You heard about the $600,000 of training money that had

21  been granted to DePauw?  This morning you heard about that?

22  A    Yes, sir.

23  Q    But Bill Tobin told you he had no training as a result of

24  that?

25  A    Right.

THOMAS B. KING - DIRECT/DRUMMY                137

1  Q   You still didn't know that Jillian's advisor -- at that

2  time, you still didn't know her advisor was the head person

3  for sexual assault?

4  A   No.

5  Q   Now, did Bill Tobin give you any advice or Ben advice

6  about whether or not to ask questions at the hearing?

7  A   Yes.  Bill thought, you know, it would be better if we

8  just went in, pretty much remained silent and let the process

9  run out.

10 Q   So you read the transcript.  Was a single questioned asked

11 on Ben's behalf at the hearing?

12 A   No.

13 Q   Did you talk to Bill Tobin after the hearing?

14 A   Yes.

15 Q   Was he shocked at the result?

16 A   He was shocked.  He was absolutely shocked.

17 Q   Okay.  So then after this happened, you -- what did you do

18 as soon as you found out that Ben was expelled?

19 A   Well, they came back into the room where I was, said what

20 happened.  He said, "They expelled me.  I've got three or four

21 days to write an appeal.  I can stay here while the appeal is

22 going on."

23 Q   And did you look into how an appeal was to be written?

24 A   Yes.

25 Q   Were you told that it had to be written by the student?

 1  A    Yes.

 2  Q    Not by the lawyer?

 3  A    By the student.

 4  Q    What did you do?

 5  A    Again, Cara said the appeal -- they were looking for an

 6  apology, why you were sorry.

 7  Q    They thought if he was contrite, that they would reduce

 8  the sanction?

 9  A    Yes.

10  Q    So then what did you do?

11  A    Contacted Joe Etling, criminal attorney.  At that point,

12  he advised me, "You need to get someone that's in more of a

13  civil matter.  This isn't my field."  Called your office.

14  Q    And then did you learn things after the fact of the

15  hearing that you didn't know before relative to this entire

16  situation?

17  A    Yes.

18  Q    Can you tell us what some of those were?

19  A    Well, we --

20  Q    Maybe we should talk about Dorian.  Did you find out who

21  Dorian, the first person who talked to Ben's wife was [sic]?

22  A    Yes.  I mean, throughout this whole -- the beginning of

23  the process, Ben had met with Dorian Shager.  Ben said, "He's

24  coming off as, like, my friend.  I'm here for you," da, da,

25  da, da, da.  "Then I find out that Dorian's wife is the other

1  person's counsel, advisor."

2  Q   She's Jillian's adviser throughout this whole process?

3  A   Yeah, which seemed to be a conflict of interest to me

4  since they're married.

5  Q   Did it strike you at least as -- did it raise an inference

6  in your mind about how impartial they were?

7  A   Yes, it did.

8  Q   Did it appear to you to be an appearance of impropriety?

9  A   Yes.

10  Q   You heard this morning, for example, that there was a

11  discussion in the president's office about the

12  25 million-dollar donation -- donor while Cindy Babington was

13  in there discussing the appeal.  How did you feel about that

14  when you heard about that for the first time this morning?

15  A   I didn't feel very good about that.

16  Q   Raise an appearance of impropriety to you?

17  A   Yes.  I found out that -- then all my communication was

18  with Cara Setchell; and then I found out that her husband was

19  director or vice president of alumni affairs.  That did not

20  make me feel good.  I felt the whole time that something

21  wasn't right.  It just didn't seem right.

22  Q   Did you know anything about this giant donation and the

23  new building on campus in Jillian's uncle's name?

24  A   No.  I knew about the new building, but I didn't know the

25  connection.

1  Q   Would you have felt better if the university recused

2  itself and hired perhaps an independent someone to evaluate

3  this case?

4  A   Yes, I would have.

5  Q   Do you know, was that request made on your behalf as soon

6  as the hearing was over to reopen the hearing, talk to all the

7  witnesses, reconsider?

8  A   Yes.  Our attorneys requested that.

9  Q   And it was denied?

10  A   It was denied.

11  Q   The same day it was asked?

12  A   Yes.

13  Q   You heard about the $600,000 in training, and a lot of

14  that was directed to the public safety office to learn how to

15  investigate these cases?

16  A   Um-hum.

17  Q   How do you feel about an investigation where the only

18  witnesses that were contacted were witnesses mentioned by the

19  complainant and not by the defendant?

20        MR. WELCH:  Your Honor, I'm going to object.  I

21  don't think this witness has got a basis on which to comment

22  about the investigation that DePauw conducted.

23        MR. DRUMMY:  Judge, I think a layperson can comment

24  on that.  I don't think that requires expertise to know you

25  need to listen to both sides of a story to come up with a fair

1    result.

2            THE COURT:  I'm not sure it has much evidentiary

3    value, however.  Next question.

4            MR. DRUMMY:  Okay.

5    BY MR. DRUMMY:

6    Q    Anything else you learned afterwards that you didn't know

7    before?

8    A    I mean, the biggest one was then they called and said

9    that -- I think Jillian's uncle was former president of the

10   Board of Trustees and that he made a large donation to the

11   school.

12   Q    All right.  So let's talk about how this has impacted Ben.

13   He was expelled/suspended.  We came back to court before, and

14   we didn't have to have the hearing; but we came back to court,

15   and he was allowed to go back for -- to finish that semester.

16   A    Right.

17   Q    But he couldn't be on campus other than for his classes.

18   A    Right.

19   Q    He couldn't live in his fraternity house.  He couldn't

20   socialize.  DePauw is a noncommuting campus; is that right?

21   A    Correct.

22   Q    Everybody there has to live on campus?

23   A    Yes.

24   Q    So --

25   A    I think you even have to live on campus-owned property.

THOMAS B. KING - DIRECT/DRUMMY                     142

1   Q   College-owned property?

2   A   Yes.

3   Q   How did that affect his grades that semester?

4   A   It was the worst semester he had grade wise.

5   Q   I think he had about a 2.3, and he had always had a 3.0

6   before that?

7   A   Um-hum.

8   Q   He had to give up his part-time job?

9   A   Yes.  He had a job on campus.  Had to give that up because

10  he was not allowed to be on campus in between classes.  As

11  soon as a class was over, he had to leave and go hang out

12  somewhere in Greencastle until his next class started.

13  Q   Couldn't use the library?

14  A   Could not use the library.

15  Q   Any of the other college resources?

16  A   No.

17  Q   What's it cost a semester to go to DePauw?

18  A   I believe it's close to 56,000, in that range.

19  Q   For a semester or a year?

20  A   For a year.

21  Q   And your family -- did you guys pay his tuition?

22  A   Yes.

23  Q   You thought that that was -- obviously, that's a lot more

24  than Indiana State?

25  A   We thought it was a good investment.

THOMAS B. KING - DIRECT/DRUMMY                143

1   Q    You thought it was a good investment in his future?

2   A    He would receive a better education, degree; and then he

3   could go on to a graduate school if he graduated from DePauw.

4   Q    What are Ben's plans?  What have been his plans for a long

5   time after he finishes college?

6            MR. WELCH:  Your Honor, I'm going to object.  I

7   think the question is better posed to Mr. King, the plaintiff,

8   what his plans are rather than his father.

9            THE COURT:  Maybe so. I don't think it's otherwise

10  improper though.

11           You may answer, if you know.

12  BY MR. DRUMMY:

13  Q    As his dad, do you know his plans?

14  A    He wants to go to Logan Chiropractic School in St. Louis

15  and become a chiropractor after graduation, undergraduate.

16  Q    If he's not allowed to finish his education at DePauw, if

17  he's required to go somewhere else, are the same classes

18  available, for example, at Indiana State University?

19  A    No.  We checked -- Ben's a kinesiology major at DePauw.

20  Indiana State has a kinesiology department, a degree.  They

21  just don't quite mesh up.  They don't line up right.  You're a

22  liberal arts college enrolling back into a state school is

23  what we were told.  He can but it's a two-year process.  It

24  would take him an additional two years just to finish his

25  degree if he had to go to Indiana State.

THOMAS B. KING - DIRECT/DRUMMY                144

1   Q    Do chiropractors have moral fitness for practice

2   requirements?

3   A    Yes.

4             MR. WELCH:   Your Honor, I'm going to object.   This

5   gentleman probably doesn't know the answer to that question.

6             THE COURT:   Why don't you ask a foundational

7   question.

8   BY MR. DRUMMY:

9   Q    How do you know that?

10  A    How do I know that?  A very good friend of our family just

11  got out.  I have several -- Dr. Price is a really good friend

12  of ours and two other doctors in our town.  One just graduated

13  from Logan.  He did not -- he passed all the tests; but when

14  he went to take his interview for the board, the state boards,

15  he had had a DUI in his past; and he thought that was going to

16  prevent him from getting his license.

17  Q    So that could concerns you as well?

18  A    Greatly.

19  Q    How has this affected Ben in the past and how do you

20  expect it to affect him in the future?  I mean, your family's

21  had to -- we talked about damages.  Your family's had to pay

22  two lawyers?

23  A    It's been expensive.

24  Q    You've had to file a federal lawsuit?

25  A    Yes.

1   Q   If we Google Ben King's name today, what pops up,

2   number one?

3            MR. WELCH:  Your Honor, I'm going to object.  What

4   is on Google is on Google.  If they wanted to bring it, they

5   should present it to the Court rather than having the witness

6   say what's on Google.

7            THE COURT:  You can say what's on Google.

8   BY MR. DRUMMY:

9   Q   What pops up on Google?

10  A   He was expelled from DePauw for sexual assault.

11  Q   Football is done?

12  A   Football is done, as far as I know.  As far as I know.

13  Q   No further contact?

14  A   No.

15  Q   Obviously, if he doesn't go back to DePauw, he doesn't get

16  to play football?

17  A   No.

18  Q   Fraternity, his relationships there?

19  A   He can't have any contact with them at this point.

20  Q   His college friends?

21  A   No.  As far as I know, he can't have any contact with

22  those folks other than when he walks -- last semester when he

23  would finish up to walk into the class.

24  Q   Did he have to drop a class in the spring too because of

25  the time he missed for all this?

THOMAS B. KING - DIRECT/DRUMMY                    146

1  A   Yes, he did.

2  Q   Did you observe how all this pending during that semester

3  affected him?

4  A   He just -- he kind of withdrew.  Ben has lost probably 20

5  some pounds.  You know, he feels like -- I think he feels that

6  way, like he was wronged; and he doesn't know -- what was a

7  bright future, he's really concerned about it.  His mother and

8  I both are.

9  Q   You've read all the statements and read the transcript in

10 this case?

11 A   Yes.

12 Q   Do you remember what happened when you first hired me and

13 we requested time, another week, to work on the appeal because

14 I was going to be in California?

15 A   It was denied.

16 Q   Denied.  How did that make you feel?

17 A   Not very well.  Again, I come back to I couldn't

18 understand why the other side had so long to think about all

19 this and prepare.  They weren't rushed and why we were given

20 really not even a week, you know, when you take the weekend

21 out of it.  It just did not seem right.  Unjust.

22         MR. DRUMMY:  Those are all the questions I have.

23 Thank you.

24         THE COURT:  Thank you, Mr. Drummy.

25         Your witness, Mr. Welch.

*THOMAS B. KING - CROSS/WELCH*                    147

1         MR. WELCH:  Thank you, Judge.

2                   **CROSS-EXAMINATION**

3    BY MR. WELCH:

4    Q    Mr. King, my name is Brian Welch.

5    A    Nice to meet you, sir.

6    Q    Nice to meet you.  You come at this whole situation from

7    the perspective that Ben was wrongly accused, wrongly found

8    responsible, wrongly sanctioned; and the change of the

9    sanction on appeal didn't make any difference, right?

10   A    That's funny you say that because that's what Cara

11   Setchell told me when I asked her questions in her office,

12   that I was his dad and that would be my feelings.  But no, I

13   come at it as looking at it, it did not seem fair to me as a

14   person.

15   Q    I got that.  But -- so let's -- maybe we should break it

16   down.  You come at this from the perspective that Ben was

17   wrongly accused?

18   A    Yes.

19   Q    You come at it from the perspective that Ben was wrongly

20   found responsible?

21   A    I think the evidence would show that.  I believe the

22   evidence shows that he was wrongly found of that.

23   Q    I understand that.  But again, your perspective is that he

24   was wrongly found responsible --

25   A    Well, my perspective is from the evidence I read.

1   Q    I understand, but that's your perspective?

2   A    Yes.

3   Q    You come at it from the perspective that the appeal was

4   not dealt with appropriately, correct?

5   A    Correct.

6   Q    So let me change the facts on you just a bit.  Would you

7   grant me that there are conflicting facts in the record?

8   A    On both parts?

9   Q    Yes.

10  A    Sure.

11  Q    Would you grant me that the panel that has to decide the

12  issue had conflicting facts in front of them?

13  A    I'll grant you they were all from the same department and

14  probably didn't have a very wide scope of thinking.  I'll

15  grant you that.

16  Q    That wasn't my question.  My question was didn't the panel

17  have conflicting facts in front of them at the time they heard

18  the matter?

19  A    If they didn't have all the facts, I guess they would be

20  conflicting.

21  Q    Well, I don't think we need to hedge it here.  It seems to

22  me that you -- you said you took a look at the documents in

23  the public safety office, right?

24  A    Um-hum.

25  Q    You were able to sit there and look at them?

1    A    Right.

2    Q    And those documents all went to the panel for

3    consideration, and there were conflicting facts in those

4    documents?

5    A    Yes.

6    Q    And the panel's job was to resolve those conflicts, and

7    the panel resolved them against your son.  Is that a yes?

8    A    Yes, sir.

9    Q    And that was, in fact, the panel's job, correct?

10   A    I'm not an expert on what the panel was to do.  I only

11   spent 20 minutes in the dean's office over this thing.

12   Q    Do you have any reason to think, Mr. King, that the

13   opportunity to review the material that was in the public

14   safety office in terms of the ability to carry it away from

15   the public safety office was any different for you and Ben

16   than anybody else that would be involved in the process?

17   A    I don't know.  I don't know anybody else that's ever been

18   involved so I don't know.  My answer is I don't know.

19   Q    So if the policy at DePauw says that participants in a

20   student disciplinary matter, whether it's sexual misconduct or

21   it's something else -- says that the parties are not able to

22   carry the paper away from the office, then that's what you

23   encountered?

24   A    The only problem with that, sir, is that, first, I was

25   told I couldn't look at it.  Then I was told, "Oh, I guess

1  it's okay if Ben's with you."  So I'm not true there's a real

2  strong policy there.  That's my problem.  I don't know that

3  there's a real strong policy.

4  Q    Well, I won't --

5  A    If there is, I was not given it; and I asked for it.  I

6  was not given a policy about -- I was told what I could do.  I

7  was not given a policy.  Do you have one?  I would be happy to

8  look at it.

9  Q    There is a policy.

10  A    I was not given that policy.  It was not given to me.  I

11  was told.

12  Q    Sorry.  Are you finished?

13  A    Yes, sir.

14  Q    Let me change the facts on you a bit.  I know in your mind

15  Ben was not responsible for what he was found responsible for,

16  correct?

17  A    Can you reword -- I'm not sure I can --

18  Q    It's not a very good question.  Sorry.

19       In your mind, Ben was not responsible for violating

20  the sexual misconduct policy?

21  A    Yes, correct.

22  Q    What if he had violated the sexual misconduct policy in

23  your mind?  What would you expect DePauw to have done?

24  A    Punish him.

25  Q    And if he had violated the policy, do you think that the

1  punishment that he wound up with at the end of the appeal was

2  appropriate, that is, a two-semester suspension?

3  A    If that's the standard.  Again, I don't know -- is that

4  the norm?  I don't know.  I agree he should be punished if --

5  if it was true and he was found, I agree, yes, he should be

6  punished.  I don't know what the punishment is.  I don't know

7  what the normal punishment for that is.  I don't know.

8  Q    So we have agreement that if he did violate the policy, he

9  should be punished?

10  A    Sure.

11  Q    And the policy provides for a range of punishment?

12  A    Um-hum.

13  Q    Right?

14  A    Right.

15  Q    Do you have any reason to think that the punishment that

16  was ultimately delivered was not within the range of

17  punishment in the policy?

18  A    I believe it was not within the range.  I believe it was

19  pretty severe when they originally gave him the educational

20  death sentence.

21  Q    But the end result, because this is a complete process, is

22  the hearing and the sanction, if there's a finding of

23  responsibility -- hang on, let me finish my question.  And

24  then there's an appeal; and at the end of the appeal, he was

25  sanctioned for suspension for two semesters, correct?

1  A   That's not totally true.  Second semester, he was going to

2  have to come back and do several interviews.  He wasn't

3  guaranteed admittance.  I don't know if he could come back or

4  not.  He had to go through an all new reapply, readmissions

5  and do interviews is what was told to us.

6  Q   You're talking about the readmission policy at DePauw.

7  I'm still talking about the sanction.

8  A   Well, that was his sanction.  That was part of his

9  sanction.  You sit out one semester; and then second semester,

10  you're not automatically -- even though you were a student,

11  you have to go through interviews to get back in.

12  Q   You have to reapply.  Do you have any reason to think that

13  that isn't the case with respect to any student, regardless of

14  the conduct involved, who is suspended, that that isn't the

15  policy at DePauw with respect to anybody coming back from

16  suspension?

17  A   I don't know that.

18  Q   You don't have any reason to think that?

19  A   I can't answer that question if that's the norm at DePauw.

20  I don't know.  I don't know.

21  Q   You testified on direct that Ben decided to go to DePauw

22  after Tom was --

23  A   After Thomas --

24  Q   -- was recruited and went to DePauw?

25  A   Yes, sir.

1   Q   And you said on a couple of occasions that he was playing

2   football at --

3   A   He was playing at Indiana State.

4   Q   If you will let me finish my questions and then you can

5   answer them.  I'll give you plenty of time, okay?

6        He was playing football at Indiana State, you said?

7   A   Yes.

8   Q   And he was a freshman there; is that right?

9   A   Yes.

10  Q   There's something that I've seen somewhere -- and I'm just

11  looking to confirm what I saw -- that he was red-shirted when

12  he was at Indiana State; is that right?

13  A   Yes.

14  Q   Now, my understanding means that if he's red-shirted, he

15  can practice but he can't play?  Is that the way it worked at

16  Indiana State?

17  A   Yes, for that season.

18  Q   So when you say he was playing football, you meant he was

19  practicing at Indiana State because he was red shirted?

20  A   Right.

21  Q   He wasn't playing in any games?

22  A   No.  He dressed for the games.  He was on the team.  He

23  was at every practice, every team function.

24  Q   But he was red shirted.  Am I right about that?

25  A   Yes.

1  Q    And that means that he can't play in the games, correct?

2  A    Correct.

3  Q    So as a freshman at Indiana State, he was practicing

4  football, but he couldn't play in the games?

5  A    Correct.

6  Q    And Indiana State's a D1 program?

7  A    Yes, sir.

8  Q    When he then transferred to DePauw, he came in as a

9  sophomore?

10 A    Yes.

11 Q    And he was able to play immediately on the DePauw football

12 team?

13 A    Yes.

14 Q    And he has attended DePauw now for three complete years?

15 A    Yes.

16 Q    So he's essentially had -- as we stand here today, he's

17 had four years of college?

18 A    Yes.

19 Q    And despite having four years of college, he is still shy

20 a certain number of credits to graduate from DePauw?

21 A    Yes.

22 Q    Do you know if he had stayed at Indiana State, would he

23 also be shy of being able to graduate after four years?

24 A    Yes.

25 Q    And why is that?

1  A   Because he was red shirted so he could have four years of

2  eligibility on the football team.

3  Q   So he was planning on -- at least as a freshman in

4  college, he was planning on spending five years in college?

5  A   Yes.

6  Q   And the point of that was to be able to play football?

7  A   To get a degree.  Football was secondary.  He went to

8  college to get a degree.

9  Q   You said you first learned in late December that there was

10 an issue?

11 A   Um-hum.

12 Q   You learned that because Ben called you?

13 A   Yeah.  I think I said I'm not sure of that date.  I just

14 remember that's when he called me.

15 Q   But you did say that your memory is that he called you

16 after he had been called into campus security?

17 A   Yes, sir.

18 Q   And he had already declined to be interviewed by campus

19 security; is that right, when you talked to him?

20 A   Yes.

21 Q   And it's at that point that you picked up the phone and

22 called a criminal lawyer?

23 A   It was probably the next day.

24 Q   Did you consult with that lawyer throughout the process

25 until you started consulting with Mr. Drummy's firm?

1   A    No.

2   Q    No?

3   A    Not the whole time.

4   Q    You would pick up the phone and call this lawyer as you

5   needed?

6   A    Well, I called him, yes.  He wasn't at my disposal.  You

7   know how that works.

8   Q    People have to be able to return phone calls?

9   A    Right.

10  Q    I get it.

11       How many times did you meet with Cara Setchell?

12  A    Once.

13  Q    Did she ever refuse to meet with you?

14  A    No.

15  Q    You said that she spent some time explaining the process

16  to you, what the hearing process would be like?

17  A    Yes.  I think she explained that she was in charge of the

18  process.

19  Q    And isn't it a fact that she suggested at least two

20  advisors that Ben could consider using?

21  A    I do not recall that, sir.  She did not suggest them to me

22  at that meeting that he and I were at.

23  Q    But if she had suggested them to Ben, you just might not

24  know about that?

25  A    True.

1  Q   When you talked to Cara Setchell about an advisor, did you

2  ask her to provide you with the names of any advisors?

3  A   I think she brought it up, and she said, "He'll need to

4  get an advisor."  Again, it has to be someone that's either a

5  faculty member, professor, or student.

6  Q   Did you have any sense that that policy -- it has to be a

7  faculty member, a student or a staff member -- in terms of the

8  advisors was any different for Ben than it was for anybody

9  else?

10  A   No.

11  Q   You talked a little bit about his meetings with Dorian

12  Shager.  Did you meet with Dorian Shager?

13  A   No, I did not, sir.

14  Q   So you weren't present for any of the conversations that

15  Ben had with Dorian?

16  A   No, sir.

17  Q   You were asked a question by counsel on direct about the

18  appeal process and the amount of time that was allowed to

19  submit the appeal.  There was a statement by counsel about his

20  traveling to California.  Do you remember those questions?

21  A   Yes, sir.

22  Q   Do you know that it is a fact that DePauw did, in fact,

23  give your counsel an additional week -- and it might have

24  slipped to ten days, but I'm not going to represent that -- to

25  file the appeal on Ben's behalf?

1  A    Yes.

2  Q    And it was the second request for more time that DePauw

3  said, "We can't do that," correct?

4  A    Correct.

5  Q    Let's talk just a little bit about the academic side of

6  this.  You said that Ben had -- that Ben's grades in this past

7  spring were lower than they had been?

8  A    I believe so.

9  Q    Do you remember what they were?

10  A    I think he had a 2.6 his last semester.

11  Q    Are you aware that Ben's cumulative grade point is 2.8?

12  A    Yes.

13  Q    You talked a little bit with counsel about the -- if he

14  has to go to another school.  Do you recall those questions?

15  A    Yes, sir.

16  Q    Has anybody said to you or to Ben, to your knowledge, that

17  he's not permitted to come back to DePauw?

18  A    I think -- I don't think he's permitted right now.  That's

19  my understanding.

20  Q    I mean at the end of his suspension.  I'm sorry.  It's a

21  bad question.

22       Has anybody said to you or Ben, to your knowledge,

23  that when his suspension is over, he will not be permitted to

24  come back to DePauw?

25  A    I think that's an open-ended question because we covered

1   that before because they will not guarantee that he can come

2   back after he serves the two semester suspension.  They won't

3   guarantee that.

4   Q   Isn't it a fact that they have said to you and to Ben that

5   he has to go through the readmission process?

6   A   That's not -- what was explained to me was -- no, it

7   wasn't readmission process.  They wanted to talk to him to see

8   what he had learned and what -- over this whole thing.  They

9   keep throwing out why is he sorry.  But no guarantee has ever

10  been given to my family that if he serves a two-semester

11  suspension, he can come back to DePauw.  That has never been

12  offered to us.

13  Q   I understand that.  I think what's been offered -- and I'm

14  just wanting to be sure that we're on the same page.

15  A   Okay.

16  Q   -- is that what he has been offered is that he will need

17  to go through the readmission process, and that process would

18  involve an interview.  Do you know it to be any different?

19  A   No.  But I know that's not a guarantee.

20  Q   I would agree with that.

21  A   Okay.  We're in agreement.

22  Q   So as we sit here today, there's no guarantee either way.

23  He hasn't been told he can't back come.  He hasn't been told

24  he can come back.  So it's very possible that at the end of

25  the suspension, he could finish his career at DePauw if he

1  wanted to?

2  A   Again, I can speculate on that.  I mean, I can say I

3  assume if he goes and he has two good semesters and isn't in

4  trouble, they let him come back.  I don't know.  I'm not the

5  power to be at DePauw.  I don't know how you expect me to

6  answer that.  I don't know how I would know that.  I don't

7  know how he would know that.

8  Q   Do you know, Mr. King, whether or not the rules of

9  procedure that were in place for the hearing of this matter at

10 DePauw were any different for Ben than they were for Jillian?

11 A   No, I don't know any different.

12 Q   So it's not your testimony that you thought that somehow,

13 the procedures were different for Ben than they were for

14 Jillian?

15 A   I'm not sure I understand what you mean by "procedure."

16 What procedures?  Are we talking about everything or a

17 specific procedure, just that night at the hearing?

18 Q   You talked about the hearing and how you weren't permitted

19 to be in the room, right?

20 A   Correct.

21 Q   Do you know it to have been any different for Jillian than

22 it was for Ben on that point?

23 A   I don't know if Jillian had anyone with her or not other

24 than people from DePauw.  I don't know if her parents were

25 there.  I don't know if she had legal counsel.  I don't know.

1  Q    So you don't know whether it was any different or not?

2  A    No.

3              MR. WELCH:  Your Honor, if I may have just a second.

4              THE COURT:  You may.

5              MR. WELCH:  Your Honor, nothing further.

6              THE COURT:  Very well.  Redirect, Mr. Drummy?

7              MR. DRUMMY:  Thank you, Judge.

8                     **REDIRECT EXAMINATION**

9  BY MR. DRUMMY:

10 Q    Mr. King, you were asked if the procedures were the same

11 for Ben as they were for Jillian, right?

12 A    Yes.

13 Q    Jillian was allowed to submit an impact statement before

14 the board ruled, was she not?

15 A    Yes, she was.

16 Q    Was Ben allowed to submit an impact statement?

17 A    No, he was not.

18 Q    Was there an -- did this decision have an impact on Ben?

19 A    I would say it had a big impact on Ben's life.

20 Q    You were asked about his grades?

21 A    Um-hum.

22 Q    First semester at DePauw, 3.0.  Second semester at DePauw,

23 3.0.  Third semester at DePauw, 3.0.  Fourth semester at

24 DePauw, 2.41.  Next semester at DePauw, 3.07.  His cumulative

25 grade point before this incident was 3.07.  His current

1  cumulative grade point is 2.79.  That last semester was a

2  2.33.  That's the worst semester he had.

3  A   Right.

4  Q   You were asked about the penalty.  The penalty was

5  expulsion, true?

6  A   True.

7  Q   Then you hired a lawyer?

8  A   Yes.

9  Q   Your lawyer filed, like, a 30-page appeal pointing out a

10  number of discrepancies, true?

11  A   True.

12  Q   Then the penalty was changed to suspension for two

13  semesters -- two full semesters, true?

14  A   True.

15  Q   And Ben would have to reapply, true?

16  A   True.

17  Q   Now, how much confidence did you have after what you had

18  observed from DePauw about whether or not Ben would be able to

19  get back in if he reapplied?

20  A   I didn't have any confidence he would get back in.

21      MR. WELCH:  I don't think his confidence in DePauw's

22  process about readmission is relevant.  He's not the student;

23  and what his view of what the readmission process might look

24  like in the future is just pure speculation.  We will object

25  on that basis.

*THOMAS B. KING - REDIRECT/DRUMMY*                     163

1        THE COURT:  Well, I think you kind of ventured down

2   that path, Mr. Welch.  I'm going to allow some latitude.  I'm

3   not sure your objection is not otherwise well taken, but I do

4   think you kind of opened the door on that.

5   BY MR. DRUMMY:

6   Q    Did you have any confidence that he would get back in?

7   A    No, I did not have confidence he would get back in.

8   Q    Did DePauw ever stipulate or promise that he could get

9   back in?

10  A    No, they did not.

11  Q    You were asked a little bit about the procedure and what

12  you expected of it.  Did you expect DePauw to do a thorough

13  investigation?

14  A    Yes, I did.

15  Q    Did you expect them to talk to all the witnesses that

16  might have had important information or evidence?

17  A    Yes.

18  Q    Did you expect them to do that investigation in a timely

19  fashion while memories were still fresh?

20  A    Yes, I did.

21  Q    Did you expect the hearing board to be impartial?

22  A    I thought that it was going to be impartial or that it

23  would be impartial, I was told.

24  Q    Did you expect the appeal to be impartial and not to be

25  interfered with by the president's office?

1  A    Yes, I did.

2  Q    Or by the influence of an influential alumni?

3  A    Yes, I did.

4          MR. DRUMMY:  That's all I have.

5                      **RECROSS-EXAMINATION**

6  BY MR. WELCH:

7  Q    Mr. King, should I understand that your statement in

8  response to your counsel's question about your expectation of

9  the hearing board to be fair, that that was your expectation,

10 your belief is that the hearing board was not fair; is that

11 right?

12 A    Right.

13 Q    And that belief is based on the fact that Ben was found

14 responsible?

15 A    No.

16 Q    What's it based on?

17 A    That Dean Setchell told me it would be made up of three

18 different people from three different areas:  A student, a

19 staff member and a faculty member.  We got three staff members

20 all from the same department.  In my mind, maybe not yours,

21 that doesn't seem like a very good cross-section of the

22 university.  I feel like we got them all from the same

23 department.  They all worked together.  That to me in my

24 world's not a good cross-section.

25 Q    So it's the composition of the hearing board?

1  A   Is your question did I think the hearing board was unfair?

2  My answer is yes.

3  Q   Correct, and you just identified why.  If I understand the

4  answer to the why question, it's because you thought that the

5  hearing board should have been selected from a more diverse

6  group of the DePauw -- of the people who are eligible to be on

7  the hearing board?

8  A   I didn't think that.  I was told that by DePauw.  I didn't

9  dream that up.  They told me that.

10 Q   No, no.  I get it.  I mean, I understand that's what you

11 said.  But that's your reason is that you were told it was

12 going to be made up of certain people, and it turned out to be

13 made up of other people?

14 A   That's a reason, yes.

15 Q   I sort of have the same question with respect to the

16 appeal.  Your counsel said you expected the appeal to not be

17 interfered with by the president's office.  What evidence do

18 you have that the appeal was interfered with by the

19 president's office?

20 A   None.

21        MR. WELCH:  That's all I have, Your Honor.

22        THE COURT:  Very well.  You may step down.

23        MR. DRUMMY:  Your Honor, can I just have two quick

24 follow-up questions that were brought up --

25        THE COURT:  Quickly.

1        MR. DRUMMY:  I will be quick.  I promise.

2                **FURTHER REDIRECT EXAMINATION**

3   BY MR. DRUMMY:

4   Q   Tom, with regard to the last question, were you here this

5   morning when you heard Cindy Babington testify that either the

6   president or someone else -- and/or someone else in his office

7   mentioned the giant donation by Mr. Hudson while she was

8   processing the appeal?

9        MR. WELCH:  Your Honor, it's been asked and

10  answered.  I'll object.

11        THE COURT:  I think he can answer yes or no.

12  A   I heard this morning that it was told to her by the

13  president and by the president's chief of staff in the

14  president's office.

15  BY MR. DRUMMY:

16  Q   In your opinion, did that impact your opinion about the

17  impartiality?

18  A   In my opinion, I would believe that would manipulate the

19  outcome, yes.

20  Q   You were asked about the process.  Do you think that the

21  university has an obligation to be sure that both of the

22  students in the hearing are represented by trained,

23  experienced, and competent advisors?

24  A   Yes.

25  Q   Did they give you any input about that?

BENJAMIN KING - DIRECT/DRUMMY                167

1          MR. WELCH:  Your Honor, I'm going to object.  I

2    think we're now outside the scope of our redirect.

3          THE COURT:  I think so, too.

4          MR. DRUMMY:  I'll withdraw the follow-up.  I

5    appreciate your patience, Judge.

6          THE COURT:  You may step down.

7      *(Witness excused.)*

8          THE COURT:  All right.  Plaintiff, you may call your

9    next witness.

10         MR. DRUMMY:  We'll call Ben King.

11     *(Witness sworn.)*

12         **BENJAMIN KING, PLAINTIFF'S WITNESS, SWORN**

13                **<u>DIRECT EXAMINATION</u>**

14   BY MR. DRUMMY:

15   Q   Will you state your full name for the record, please?

16   A   Benjamin Christopher King.

17   Q   Ben, how old are you?

18   A   Twenty-three.

19   Q   Where do you live?

20   A   Terre Haute, Indiana.

21   Q   Let's talk about the evening of this event.  What had you

22   done -- let me back up.  Was there a party at the fraternity

23   house that evening?

24   A   Yes.  It was probably one of the biggest parties we have

25   all year.  We call it Deltmas.

1  Q   Like for Delta Tau Delta and mas like Christmas, Deltmas?

2  A   Yes.

3  Q   What did you do at the party that evening?

4  A   Me and my brother brought a few dates up to my room.  Me

5  and him together got a half gallon of Fireball whiskey; and

6  that night we drank it, gave it out to the dates and later

7  on -- I mean, it was just a party.  We hung out and drank.

8  Then later on, I went to Marvin's and got back around one

9  o'clock.

10            MR. WELCH:  Counsel, excuse me.  Could the witness

11  bring the mic closer to him if he could.  Thank you.

12  BY MR. DRUMMY:

13  Q   Fireball whiskey, in case the Court's not familiar with

14  that concoction, is what?

15  A   It's flavored cinnamon.  It's decently strong whiskey.

16  It's a little spicey I guess.

17  Q   You had a half gallon of of that?

18  A   Um-hum.

19  Q   How much of that -- do you know exactly how much you

20  consumed over the course of the evening?

21  A   I don't know exactly.  I'm not for sure; but at the end of

22  the night, the next morning, there was only a fourth of the

23  bottle left.  But not all that was drank by me.

24  Q   Okay.  So had you ever heard the expression prior to the

25  investigation of this case asking people to describe on a 1 to

BENJAMIN KING - DIRECT/DRUMMY                169

1  10 rate how drunk they were?

2  A   No.  I kind of found the question a little odd because

3  that's nothing that ever comes up to me as a way to describe

4  my drunkenness.

5  Q   So what's 10 out of 10?

6         MR. WELCH:  Your Honor, I'm going to object at this

7  point.  I'm not sure what the relevance of this line of

8  questioning is.

9         MR. DRUMMY:  I'll actually --

10        MR. WELCH:  If I could just finish, counsel -- to

11  the question before the Court, which is DePauw's handling of

12  the sexual misconduct policy violation, how the hearing went

13  forward, the investigation.  That's what we're here to hear

14  today, I believe; and I don't think this is relevant, and I'll

15  object on that basis.

16        MR. DRUMMY:  Judge, I was going to withdraw my

17  question; but actually, I think it is relevant because Cindy

18  Babington testified at length this morning on her evaluation

19  on how drunk somebody needed to be to be incapacitated or

20  intoxicated.  She dwelled at length with the number of drinks

21  that people had; and she talked repeatedly about rating people

22  on a 1 to 10 rating, which I had never heard before this case

23  either.

24        THE COURT:  Overruled.

25        You may answer.

BENJAMIN KING - DIRECT/DRUMMY                    170

1   BY MR. DRUMMY:

2   Q   What do you think a 10 is?

3   A   You have to be going to the hospital, that's for sure.

4   You're puking.  Definitely -- pretty much just the ultimate

5   worst you can think of is how I took it.  You definitely don't

6   know where you are.  You're past blackout.  You need severe

7   help.

8   Q   So the next morning, did you -- during the night or during

9   the next morning, did you ever vomit or throw up?

10  A   No.

11  Q   Were you hung over the next morning?

12  A   Yes.

13  Q   Did Jillian ever vomit or throw up over the course of the

14  evening?

15  A   No.

16          MR. WELCH:  Your Honor, could I just have the record

17  show a continuing objection to this line of questioning?

18          THE COURT:  Sure.

19          MR. WELCH:  Thank you.

20  BY MR. DRUMMY:

21  Q   Now, there was discussion about the phone call that came

22  to your room -- let's back up.

23          You and your friends had gone out and had something to

24  eat at a local restaurant in Greencastle?

25  A   Yes.

1  Q   And then came back to the fraternity house for a bit more

2  of the Deltmas party?

3  A   Yes.

4  Q   Is it fair to say that pretty much everybody at the

5  Deltmas party was drunk?

6  A   Yes.  A girl that I went with to Marvin's described it as

7  a shit show was the actual words she used.

8  Q   Does -- this is on campus, right?

9  A   Yes.

10  Q   Does public safety come in and see what's going on with a

11  party where everybody's drunk?

12  A   At that time, no.  They did not.

13  Q   I assume some of these people, many of these people were

14  minors, under the age of 21?

15  A   Yes.

16  Q   No -- at that time, no sanction or control by the

17  university?

18        MR. WELCH:  Your Honor, I'm going to continue to

19  object here.

20        THE COURT:  I think this might be a little bit

21  beyond.  Sustained.  Next question.

22        MR. DRUMMY:  Okay.

23  BY MR. DRUMMY:

24  Q   Okay.  So you come back, and there was discussion about

25  this morning in the written policy and by Cindy Babington

BENJAMIN KING - DIRECT/DRUMMY          172

1  about factors that would lead you to believe that someone was

2  incapacitated.  One of those were verbal ability.  When you

3  spoke with Jillian, when you first saw her, when you came back

4  from Norman's, as you were going upstairs and after you got

5  upstairs, was her speech impaired any way?  Was it slurred?

6  Was it sloppy?  Was it inappropriate?

7  A   No.  She was perfectly coherent.

8       MR. WELCH:  I'm going to object.  This is all in the

9  transcript of the hearing and the evidence that's already

10 before the Court.  We're replowing -- this man's already

11 testified at the hearing as to what happened that night.

12 We're replowing old ground here.  I'll object on that basis.

13      MR. DRUMMY:  Sadly, it's not because these questions

14 were not asked at the hearing.  These important questions were

15 not asked, and Ms. Babington made it very clear that these

16 were important to her in her appeal; but she didn't ask them

17 either.

18      MR. WELCH:  Your Honor, what happened at the hearing

19 and what happened on appeal is already in the record.  It's

20 very clear what happened.  If it's not there, it's not there.

21 We don't need this witness to tell us what's not there.

22      THE COURT:  Well, I kind of agree.  It's in the

23 record what was not asked.  I think it's subject to argument

24 that you may certainly make; but whether or not we need to

25 spend the time with this witness saying that it's not in the

1   record, I'm not sure that's relevant.  So I'm going to sustain

2   the objection.

3          MR. DRUMMY:  Okay.  Okay.

4   BY MR. DRUMMY:

5   Q   How do you get from the place where you first see Jillian

6   to your room?

7   A   We walked together from the very bottom of the house to

8   the very top, and my room is in the very middle top part of

9   the house.

10  Q   And you've counted those steps?

11  A   It was 54.

12  Q   Fifty-four steps.  There was considerable question and

13  speculation this morning about how quiet it is in a fraternity

14  room at 1:30 in the morning on the night of Deltmas.  What can

15  you tell us about that?

16         MR. WELCH:  Again, all of this is in the record.

17  It's either there or --

18         THE COURT:  This was covered this morning.  So I

19  don't think -- on a limited basis, I think that's fair game.

20  Overruled as to that particular question.  I don't know if you

21  finished your question or not.

22  A   Can you repeat it, please?

23  BY MR. DRUMMY:

24  Q   How quiet is a fraternity room at 1:30 in the morning on

25  Deltmas night or probably any other Saturday night?

1   A   Even if half the people had left, every guy there brought

2   about three girls for themselves and other people that came

3   afterwards.  It's not like the music would have been turned

4   down at all.  So the music was still being very loud.  You

5   could hear it fine, and people were still over at the time.

6   Q   That call from Emily came to the room shortly after you

7   got there?

8   A   Yes.

9   Q   There's been considerable discussion about -- since I

10  guess we're not going to talk about the events of that

11  evening, there's been considerable discussion about your

12  failure to cooperate in the investigation.  You've heard that

13  today?

14  A   Yes.

15  Q   How did you feel when you were told that anything you said

16  can and will be used against you in a court of law?

17  A   It was shocking to me.  It really startled me because for

18  eight weeks, I hadn't heard anything from anyone.  The first

19  thing I get back from school is, well -- after winter term is

20  I get in there, and I have a camera in my face; and they're

21  telling me my rights.  There's just no way I could do it.

22  Q   So just looking at the timeline of all this, this

23  happens -- the event happens in early December; is that right?

24  A   Um-hum.

25  Q   Then the first official written notification of the

1  charges against you was on February 12th of 2014?

2  A   Um-hum.  Yes.

3  Q   Then on February 16, you request additional time from Cara

4  Setchell?

5  A   Yes.

6  Q   And on February 17th, the next day, you notified Cara that

7  you have picked your student advisor?

8  A   Um-hum.

9  Q   Did Cara ever tell you that picking a student to be your

10 advisor was a bad idea?

11 A   No.

12 Q   Did Cara ever tell you that you should pick an advisor

13 that had specialized training in this area and experience?

14 A   No.

15 Q   Then on -- in February, Cara suggests -- your student

16 advisor, you changed your mind about that; and Cara suggests

17 P.J. Mitchell in Fraternity Life?

18 A   Yes.  That was who she suggested because he deals with

19 fraternities.

20 Q   So did she tell you whether or not this person, P.J.

21 Mitchell, had any specialized training in sexual assault

22 defense?

23 A   No.  She just said he was a good person.  That was all she

24 said.

25 Q   Did you know this person?

1   A    I have never talked to him personally, but I had seen him

2   at events for my fraternity and talking to my fraternity

3   personally.

4   Q    How did you come about to pick Bill Tobin?

5   A    Well, I was having trouble finding someone.  I had never

6   really gotten that close to a teacher.  My dad is friends with

7   him.  He did a favor for my dad and helped me out a lot.

8   Q    And you told Cara Setchell that you were going to use Bill

9   Tobin?

10  A    Yes.

11  Q    Did she tell you that he had no training or experience in

12  this?

13  A    No.

14  Q    Had she told you that, what would you have done?

15  A    I think I would have rethought about who I picked because

16  I feel like I would rather have someone that's on campus who

17  is trained and able to prepare me to give me the best chance

18  so things such as me getting expelled did not happen.

19  Q    Did you know at that time that Jillian had a very

20  experienced and extensively and expensively trained expert in

21  sexual assault?

22  A    No, I did not.

23  Q    Did you feel that your university should help you -- if

24  the process was going to be fair, should help both sides on an

25  equal basis to present their case?

BENJAMIN KING - DIRECT/DRUMMY                    177

1          MR. WELCH:  Your Honor, I'm going to object.  I

2  think he's now leading the witness.

3          THE COURT:  I agree.  Sustained.

4  BY MR. DRUMMY:

5  Q   What did you think were the university's duties or

6  responsibility to you with regard to assisting you in this

7  regard?

8  A   I feel like it only would have been fair to give me

9  someone that had just as much quality.  I feel that -- there

10 should be -- if there's one, there should be two because in a

11 case, there's not just going to be one if that's going to

12 happen.  I feel like both sides should be equally represented,

13 which wasn't the case.

14 Q   If one side has F. Lee Bailey -- you ever hear of F. Lee

15 Bailey?

16 A   No.

17 Q   If one side has Johnny Cochran and the other side has

18 sombody who's terrible, then maybe the result's not gonna be

19 too good?

20         MR. WELCH:  Objection.  It's a speech.

21         THE COURT:  Next question.

22         MR. DRUMMY:  I'll withdraw it.  I'm sorry.

23 BY MR. DRUMMY:

24 Q   Did Bill Tobin give you some advice with regard to asking

25 questions during the hearing?

BENJAMIN KING - DIRECT/DRUMMY                178

1  A   He was advised by my lawyer not to let me ask any

2  questions or for him to not ask any questions throughout the

3  process.  I tried about three times to ask a question; but

4  each time, he kind of just looked at it on a piece of paper

5  and turned away.

6  Q   The university has a written policy that's in evidence as

7  Plaintiff's Exhibit No. 1 that talk about the rights of the

8  respondent; and in that case, that's you?

9           MS. REEDY:  That's in evidence as DePauw's A

10  something.

11  BY MR. DRUMMY:

12  Q   It talks about being treated respectfully, to have a

13  support person, to be promptly notified, to have a hearing, to

14  have adequate notice and time to prepare, the right to refuse

15  to answer some or all of the questions, to receive assistance

16  from university officials and staff with necessary

17  adjustments.

18  A   I think the one about time --

19           MR. WELCH:  Is there a question there, Your Honor?

20           THE COURT:  Not yet.

21           THE WITNESS:  I'm sorry.

22  BY MR. DRUMMY:

23  Q   Do you feel like the university complied with those

24  standards?

25  A   No.

BENJAMIN KING - DIRECT/DRUMMY                    179

1   Q    Did you have a discussion with anyone from DePauw about

2   having all the time you needed to prepare for the hearing?

3   A    Can you repeat it?  I'm sorry.

4   Q    Did you have a discussion with anyone from DePauw about

5   having necessary time to prepare for the hearing, being told

6   that you would have all the time?

7   A    Yes.  Dorian Shager told me and my mother that we would

8   have as much time as we needed, that we could have up to two

9   weeks if we needed.  When me and my dad went to Cara

10  Setchell's office a couple days, maybe a week later, she said

11  "No, that's not right.  I'm in charge of that, and that's not

12  possible."

13  Q    And that was on February 17th when the board refused your

14  request for an additional -- some additional time to prepare?

15  A    Yes.

16  Q    The hearing was held on February 24th.  Does that sound

17  right?

18  A    Yes.

19  Q    By my calculations, that's 12 days after you received

20  notice --

21  A    Um-hum.

22  Q    -- of this incident?

23  A    Yes.

24  Q    Did you feel like that was adequate time to prepare?

25  A    No.  I felt like there was no way I really could.  Every

1    day I was trying to find somebody new to be my advisor.  I

2    felt like that was my main thing to do.  I had to skip class

3    just so I could take notes and write them down every day

4    because I couldn't take the notes with me.  I would have to

5    take them with me and then write them down and take them out.

6    Q    So you're a full-time student?

7    A    Um-hum.

8    Q    You're not provided with copies of these statements and

9    accusations against you?

10   A    No.

11   Q    If you want to look at those, you have to go to public

12   safety and go in there and look at them and make notes?

13   A    Yes.

14   Q    How many different times did you have to do that?

15   A    I did it at least -- well, I had to do it every time

16   with -- my dad wanted to come, and he came twice.  I went at

17   least twice with my dad, and that was a very extensive period

18   of time.  One time I had to skip class with him.  I went in at

19   least four times by myself for at least a couple hours each

20   time just trying to write down everything I could because it

21   was about 40 pages.  I can only write so fast for so long.

22   Q    And you're trying to be a full-time student during this

23   entire process?

24   A    Yes.

25              MR. DRUMMY:  On the issue of cooperation, we would

1  offer Plaintiff's Exhibit 1.  I think it's what you guys have

2  are the e-mails.

3       *(A discussion was held off the record.)*

4          MR. WELCH:  Your Honor, I don't know that we have

5  any objection to this exhibit.  We were provided this last

6  night, and it is reported to be all of the e-mails between

7  Mr. King and anybody at DePauw concerning this matter; is that

8  right?

9          MS. REEDY:  I wouldn't say that it's all.  We're not

10  representing that it's every e-mail he had, but all of the

11  ones contained in this packet were between him and employees.

12  He no longer has access to his DePauw e-mail account, so he

13  wasn't able to go back and get them all; but these were the

14  ones we have of him communicating with DePauw employees.

15          MR. WELCH:  Could we just have a discussion here for

16  just a second?

17          MR. DRUMMY:  Sure.  We could probably -- we could

18  defer that maybe --

19          THE COURT:  How much more direct do you have of

20  Mr. King?

21          MR. DRUMMY:  I'm just about done with my questions

22  on procedure, and I'm going to have brief questions on harm

23  and then I'm done.  I would say no more than 15 minutes.

24          THE COURT:  I'm wondering if we could finish your

25  direct but for the discussion of the e-mails, take an

1  afternoon recess after that, and come back and do the e-mails.

2          MR. DRUMMY:  I just want to ask about the

3  February 16th e-mail as my last question relative to these.

4          MR. WELCH:  Your Honor, we have no objection to

5  Plaintiff's Exhibit 1.

6          MR. DRUMMY:  Just as kind of --

7          THE COURT:  Are you offering Plaintiff's 1?

8          MR. DRUMMY:  I am, Judge.

9          THE COURT:  Okay.  Very well.  Show that admitted

10  without objection.

11      *(Plaintiff's Exhibit 1 was received in evidence.)*

12          MR. DRUMMY:  Judge, just as a matter of

13  housekeeping, you'll notice on these e-mails there are e-mails

14  that Ben sent to university people, then he forwarded to me.

15  You'll see my assistant's name, Linda Coletti, on the top of

16  them.  Obviously, that was not all there at the time, but

17  you'll be able to figure that out obviously by looking at

18  dates.

19          THE COURT:  Very well.

20  BY MR. DRUMMY:

21  Q   I just want to ask you, Ben, back on February 16th and you

22  send an e-mail to Cara that says, "I am going to need more

23  time to prepare for this.  This is obviously a very important

24  situation.  If the hearing could be moved to the following

25  Thursday, the 27th, that would be very helpful."  Do you

BENJAMIN KING - DIRECT/DRUMMY                    183

1   remember that e-mail?

2   A   Yes.

3   Q   What was her reply to that?

4   A   She didn't give me the time.

5   Q   And the hearing was held on the 24th?

6   A   Um-hum.

7   Q   Okay.  So the hearing takes place.  You and Bill Tobin are

8   there in the hearing room.  Nobody else there on your behalf?

9   A   Yes.

10  Q   Your attorney's not allowed to be in the building?

11  A   No.

12  Q   Your dad sits in the holding room?

13  A   Yes.

14  Q   The board goes out to deliberate?

15  A   Yes.

16  Q   You have a policy that says you're going to be able to

17  submit an impact statement if they find that you violated the

18  policy?

19  A   Yes.

20  Q   They come out.  They don't ask for an impact statement.

21  They just issue their ruling that expels you?

22  A   Yes.

23  Q   So tell me how that impacted you physically, emotionally,

24  educationally, personally.

25  A   I mean, it affected everything, every aspect of my life.

1   After that, I really didn't know what to do.  I kind of just

2   sat there for a while and wasn't sure what to do.  Bill was

3   trying to talk to me and tell me to get up.  I just kind of

4   sat there for a while because I just didn't believe it.

5   Q    How old were you on that date?

6   A    What?

7   Q    How old were you on that date?

8   A    Twenty-two.  I didn't really know what to tell my friends.

9   I don't think they believed it either.  More importantly, I

10  felt like -- for a little while, I think I lost some friends

11  from that.  My grades suffered.  I had to miss a week of

12  school.  That was really hard.  Then traveling and driving

13  every day to school was really -- just having to get up --

14  because my classes were at seven and eight in the morning.  So

15  I would get up real early.  If there was bad weather, it

16  didn't matter.  I still had to drive.  I know it's only about

17  45 minutes but it's still -- getting up every day and going

18  back, it just got old after every day doing that.

19  Q    So you're suspended effective with the date of the

20  hearing, right?

21  A    Um-hum.

22  Q    You had three days to get off campus?

23  A    Yes.

24  Q    Your mom and dad hired lawyers?

25  A    Yes.

1  Q   We filed the appeal?

2  A   Um-hum.

3  Q   You're still suspended?

4  A   Yes.

5  Q   We filed for a preliminary injunction hearing.  You're

6  still suspended.

7  A   Yes.

8  Q   On the day of the hearing or the day before, there's an

9  agreement to let you go back?

10 A   Yes.

11 Q   You had missed how much school from the date of the

12 hearing to when you're allowed to go back?

13 A   I think it was -- I missed 14 days total that I was

14 suspended.  It was fortunately -- it was spring break and then

15 one week of school.

16 Q   Prohibited from being on campus for any reason?

17 A   Yes.

18 Q   Okay.  So then after you go back -- after you go back now,

19 your restrictions, what are they?

20 A   I can't be -- I have -- I can only go to my classes.  I

21 can't communicate with people from DePauw.  If I have to meet

22 with a group, I have to -- I had to text Holly, and then Holly

23 would have to communicate with DePauw's lawyers every time if

24 I had to meet with a group.

25         MR. WELCH:  Your Honor, if I could interject, this

1   is all in the court's record.  There's an agreed order between

2   the parties that sets all of this out.

3          MR. DRUMMY:  Okay.  I guess I will just him how that

4   impacted him.  It is in the record.  I don't think it saves

5   much time but that's fine.

6   BY MR. DRUMMY:

7   Q   Okay.  So you can't -- you have to move out of your

8   fraternity house?

9   A   Yes.  That was one of my favorite things about DePauw is

10  being a part of my fraternity and being with my brothers.  And

11  because of the situation, some of them who were friends with

12  Jillian for a while, I mean, we weren't close for a little

13  while.  It kind of sucked just because I felt like I lost some

14  friends, and now I haven't got to talk to them as much anymore

15  because I had to move out.  That was one of my main reasons

16  why I liked DePauw so much.

17  Q   The hearing officers actually labeled you as a predator,

18  said it wasn't safe to have you on campus because you were

19  likely to do this again.

20  A   I just can't believe that.  I'm not that type of person.

21  I've never been in trouble before in my life.  I think saying

22  that is wrong and doesn't speak well for who I am as a person.

23  Q   So your relationship with the fraternity brothers.  You've

24  got to commute every day.  There's some expense involved with

25  that?

1  A    Yes.

2  Q    Do you get back your money from the fraternity house or

3  the university?

4  A    No.

5  Q    So you're out the cost that semester of living in the

6  house, but you don't get to live in the house?

7  A    Yes.  I didn't get reimbursed at all.

8  Q    You talked about these student groups.  Is it a big thing

9  at DePauw, at least with your major -- tell us about your

10  major.  What is it and what did you do?

11  A    Kinesiology is my major.

12  Q    That's the study of physical bodies in motion?

13  A    Yes.  The thing that really makes it hard is I need to go

14  to school this fall because it's a two-seminar process.  So

15  the first part is research, and the second part is actually

16  performing the study.  So me going back in the spring would

17  not help me at all.  I would still have to go back the next

18  year.

19  Q    So even if you got to go back in the spring, you would

20  still have to come back the following spring?

21  A    I'm not sure because DePauw offers such little classes, I

22  don't think it's possible for them to just have the one class

23  for one person as a kinesiology major just so he can do

24  research.

25  Q    So the student groups are important to your major?

1  A    Yes.

2  Q    And learning what you need to know to be a good

3  chiropractor in the future?

4  A    Yes.

5  Q    Okay.  You're not allowed to go in the library?

6  A    No.

7  Q    Can't study on campus, can't study in the library?

8  A    No.  I had to go to McDonald's.

9         MR. WELCH:  Again, Your Honor, this is all in the

10  agreed order between the parties.

11         THE COURT:  I'm sure he's moving on from there.

12  BY MR. DRUMMY:

13  Q    Did all those things affect your grades this semester?

14  A    There's not a question at all.  Being on campus is a huge

15  factor because DePauw resources are great.  Going to the

16  library, going to places like Julian and study are much better

17  than me being at home where I don't have all those

18  opportunities and people who are also a major that I can go

19  and talk to if I have a question or a teacher instead of being

20  away from campus.  I was stuck at home.  There was no way I

21  could drive back when I was already driving once or maybe even

22  twice a day.

23  Q    If you wanted to be an online student, that's what you

24  would have been?

25  A    Yes.

1   Q   Do you know how this gap in your transcript -- this

2   potential gap, if you're not allowed to return to school as

3   scheduled in a few days, how this gap in your transcript will

4   affect your future avocation?  Do you want to go on to

5   chiropractic school; is that right?

6   A   Yes.  I don't think it's possible to do that if I have a

7   gap in my transcript.  I don't think that they would accept

8   me.

9   Q   And your dad testified about the fitness to practice

10  issue?

11  A   Yes.  I don't think someone that is labeled with what I'm

12  labeled as is possible to be a chiropractor and touching

13  people's bodies.  I don't think that that would be acceptable.

14  Q   A chiropractor's bread and butter is manipulating people's

15  body?

16  A   Yes.

17  Q   Most people don't want a convicted sexual assault person

18  manipulating their body?

19  A   No --

20          MR. WELCH:  Your Honor, he's leading the witness.

21  Can we let the witness testify, please.

22          MR. DRUMMY:  I think he said that.  I may be a

23  little more articulate --

24          THE COURT:  Next question.

25          MR. DRUMMY:  Okay.  Thank you, Judge.

BENJAMIN KING - DIRECT/DRUMMY          190

1   BY MR. DRUMMY:

2   Q   You had a part-time job on campus?

3   A   Yes.

4   Q   Done, gone?

5   A   True.

6   Q   Football?

7   A   Unfortunately, gone too.

8   Q   Done, gone.  Is there a stigma to being suspended from

9   school for sexual assault?

10  A   I mean, there's no question no matter what happens after

11  this that people will look at me differently.

12  Q   Are you frequently asked "What are you doing these days,

13  Ben?  When are you going to finish college?"

14  A   Frequently.  Every time I go to a friend's house, they

15  have to ask me what I'm doing.  Every time I have to tell

16  them, "Oh, I have one more year at DePauw"; but honestly, I

17  have no idea.  I have no idea what I'm doing.  It kind of just

18  sucks having no idea what's going to happen next.

19  Q   So you go over to your friend's house; and their mom or

20  dad says, "Well, Ben, how are things going at school?  When

21  are you going to graduate?"  You don't really have an answer?

22  A   No.  It's one of the most awkward things to go through.

23  Q   And if, in fact, your suspension becomes permanent for

24  sexual assault, that isn't a very good answer either, is it?

25          MR. WELCH:  Your Honor, he's still leading.

BENJAMIN KING - DIRECT/DRUMMY                    191

1          THE COURT:  Sustained.

2   BY MR. DRUMMY:

3   Q    Did -- you had to drop a class that semester?

4   A    Yes.  That was -- I was told to by my advisor because he

5   also believed that it was too much.  He thought it was the

6   best option for me.

7   Q    Your family's had to pay attorneys' fees?

8   A    A lot.

9   Q    You had to file a federal lawsuit?

10  A    Yes.

11  Q    Friends, colleagues, social acquaintances know about all

12  this?

13  A    Yes.

14  Q    Ask you about it all the time?

15  A    Yes.  It's something I don't really like to get open

16  about.

17  Q    Was there publicity in the DePauw newspaper about this?

18  A    Yes.  That kind of just made me feel really unwelcomed in

19  a way, just people knowing my business like that; and it was

20  completely out on the front page.  It really bothered me,

21  especially just, like, being with my group project.  Like, I

22  had to do it with them.  No one ever said anything to me about

23  it, but I knew it was there all the time.  I felt like people

24  in a way were, like, questionable even being around me, like,

25  if I was safe to be around; and that bothered me just because

1  I feel like there should never be that question about me as a

2  person.

3  Q   Did the university represent to you that this process was

4  confidential?

5  A   Yes.

6  Q   And so do you know who leaked it or who put it in the

7  newspaper?

8  A   I have no idea.

9  Q   It wasn't you?

10  A   Huh?

11  Q   It was not you?

12  A   No.

13  Q   You think your reputation's been damaged by this?

14  A   Without a doubt.

15  Q   Do you think people, especially females, who know about

16  this look at you differently than they did before?

17  A   I know I would.

18          MR. DRUMMY:  That's all I have.  Thank you.

19          THE COURT:  Before we get into cross, let's take the

20  afternoon recess.  We'll be in recess about 15 minutes.

21          MR. DRUMMY:  Thank you, Judge.

22          COURT CLERK:  Please rise.

23      (A recess was taken.)

24

25

**CROSS-EXAMINATION**

BY MR. WELCH:

1

2

3  Q    Good afternoon, Mr. King.  It might interest to know --

4  this is not a question.  It's a statement.  It might interest

5  to know I was a Delta at DePauw as well.

6  A    That's actually kind of neat.  Surprising.

7  Q    Let me start again maybe at the beginning of your

8  testimony and just go through it sort of in order.  You said

9  that someone that you went to Marvin's with late in the

10 evening of the night of the party described the event at the

11 Delt House as a shit show?

12 A    Yes.

13 Q    Can you tell me approximately how many people you think

14 were in the Delt House for this party that night?

15 A    I honestly can't, but it was -- every floor in the house

16 was packed on the first and second and the basement.  The

17 basement was completely full at one point.  The penthouse was

18 full.  Every big party room was completely full.  It had, I

19 don't know, 300 people.  I really don't have a good answer.

20 Q    But it wouldn't be an overstatement in your mind to say

21 that there were two or three hundred people at this party?

22 A    No.

23 Q    At one point early in your direct examination, I thought I

24 heard you say that you were off campus for winter term?

25 A    No, I was on campus.  I'm sorry.

1   Q    You said you came back to campus after winter term?

2   A    Yeah.  Well, I just meant as whenever, like, I finally

3   actually started school again, once actual classes started.

4   Q    What did you do for winter term for that period of time?

5   A    I just lived on campus, and I just worked my part-time

6   job.  That's all I did.

7   Q    Sorry.  What was that part-time job?

8   A    I worked in media staff services; and I worked on

9   projectors.  If a classroom had trouble with their projector,

10  I went and fixed it.

11  Q    Were you not required to pursue a course of study for that

12  term?

13  A    I planned on -- I already had taken two, and I was going

14  to take my third one next year.

15  Q    Did you read the sexual misconduct policy as a part of

16  your preparing for the hearing or at any point prior to the

17  hearing?

18  A    Dorian Shager showed it to me once.

19  Q    But you didn't read it?

20  A    No.

21  Q    Did he -- did Dorian discuss it with you?

22  A    Yes.

23  Q    Do you recall what the discussion was?

24  A    I mean, it was a while ago; but he pretty much was just

25  letting me know what the charges were against me.

1  Q    So did he or didn't he review DePauw's policy with you?

2  A    He reviewed it, but I didn't necessarily understand it.

3  Q    Did you have an opportunity to ask him questions?

4  A    Yes.  And I went back and asked him -- I began to

5  understand it the second time I went and asked him.

6  Q    So you talked about the policy with him on more than one

7  occasion; is that right?

8  A    Yes.

9  Q    It's a fact that you met with Mr. Shager four times prior

10 to the hearing?

11 A    I don't know exactly for sure but probably.  That sounds

12 correct.

13 Q    You're aware, are you not, that DePauw's policy

14 identifies, for example, who it is that can be on the panel

15 that hears the matter?

16 A    Can you repeat the question?

17 Q    Sure.  You're aware that DePauw's policy identifies who

18 the people are that could be selected to hear a sexual

19 misconduct matter?

20 A    Yes.

21 Q    Do you remember as you sit here today what the policy says

22 about that?

23 A    Honestly, I don't remember.

24 Q    Mr. King, if I could get you to look at the screen in

25 front of you under "Composition of the Board."

*BENJAMIN KING - CROSS/WELCH*                    196

1   A    Okay.

2   Q    Do you see that?

3   A    Yes.

4   Q    It says, "The board shall consist of seven administrative

5   staff members appointed by the associate dean of students to

6   terms of at least two years.  The seven-member makeup of the

7   board shall include at least two women and two men at all

8   times.  No member of the board may consider a case in which

9   the member would have a conflict of interest."  Do you see

10  that?

11  A    Yes.

12  Q    Were you aware of that as you were working your way

13  towards the hearing?

14  A    Yes.

15  Q    Let me also ask you to look at this page of DePauw's

16  policy, "Statement On The Rights of Complainants, Statement On

17  the Rights of Accused Students."

18  A    Okay.

19  Q    Did you review that prior to going to the hearing?

20  A    No.

21  Q    Is there any reason that you didn't review it prior to

22  going to the hearing?

23  A    I have honestly never seen it.

24  Q    I thought that the testimony was from your father that you

25  understood that you were to be able to submit an impact

1  statement as a part of the process?

2  A    Yes.

3  Q    Where did you learn that?

4  A    From my lawyer and my father.

5  Q    You didn't read that yourself?

6  A    No, because I felt like that was my lawyer's job.

7  Q    Speaking of your interaction with your lawyer -- and I

8  don't want you to tell me what your lawyers said, but I think

9  that you've already testified to it in some sense; but let me

10 ask the question.

11      I thought that you testified on direct that your

12 lawyer advised your advisor to not ask any questions during

13 the hearing; is that right?

14 A    Yes.

15 Q    And did you follow that advice?

16 A    Yes.  I didn't ask any questions.

17 Q    Who was that lawyer, if you know?

18 A    Joe Etling.

19 Q    That's the first lawyer that your father talked about?

20 A    Yes.

21 Q    Mr. King, I'm going to again put DePauw's policy up on the

22 screen and ask you to look under the header "B, Procedure."

23 A    Okay.

24 Q    Paragraph 2 of that procedure says, "If the complainant

25 elects to participate in the hearing, the charge shall be

Case 2:14-cv-00070-WTL-DKL   Document 64   Filed 09/11/14   Page 198 of 225 PageID #: 1250

1  heard by the panel selected by the associate dean of students.

2  If the complainant elects not to participate, the associate

3  dean will revisit the decision to bring a charge and decide

4  whether the university should proceed without the

5  complainant's participation.

6          "Upon receipt of the charge, the chair of the board

7  shall notify the accused student in writing of the filing of

8  the charge and of the hearing date when possible.  The hearing

9  date shall be set not more than 30 days from the date of the

10 notice to the accused student."

11         Did you see that language before you went to the

12 hearing?

13 A   Yes.

14 Q   The next paragraph, paragraph 3 -- no, strike that.

15         Mr. King, was there ever any question in your mind as

16 to whether or not you consented to the activity that you say

17 took place with Jillian on the night in question?

18 A   Can you reword it, please?

19 Q   I can try.  Was there ever any question in your mind that

20 you consented to the activity that you say you engaged in with

21 Jillian on December 6 late in the evening and early in the

22 morning of December 7?

23 A   I just believe it was mutual between the two of us.

24 Q   You consented to the activity?

25 A   Yes.

1  Q   You never said to anybody, "She took advantage of me"?

2  A   No.

3  Q   And it's fair to say that from your perspective, you knew

4  exactly what was going on that night; is that right?

5  A   Yes.

6  Q   Mr. King, there's been a couple of references to your

7  fully participating in the investigation.  I understand we've

8  covered the fact that you declined, as was your right, to be

9  interviewed on the video after you had been issued your

10 Miranda rights.  You were also asked, were you not, to provide

11 a written statement?

12 A   Yes.

13 Q   And you declined to do that, correct?

14 A   Yes, because I was given four options; and I chose to do a

15 verbal statement instead.

16 Q   The verbal statement that you're talking about is what,

17 the statement you gave at the hearing?

18 A   No, what I gave to Dorian; Dorian Shager.

19        MR. WELCH:  Your Honor, if I could have just a

20 second.

21        THE COURT:  You may.

22        MR. WELCH:  I apologize, Your Honor.  I'm having a

23 little exhibit trouble.  Let me get this pulled together.

24        I apologize, Your Honor.

25

1  BY MR. WELCH:

2  Q   Mr. King, I've got on the screen here a document labeled

3  "Title IX Inquiry Notes, Dorian Shager."  Is this the verbal

4  statement that you are talking about?

5  A   This is not.  That's his own words.

6  Q   So the verbal statement you're talking about is the

7  statement that you made to Dorian?

8  A   Yes, in his office with my mother.

9  Q   Was it made on December 18?

10 A   I honestly am not sure about the day.  I honestly don't

11 know.

12 Q   How about this.  Was it made --

13 A   It was not made in December.  So no, it was not.

14 Q   It was made in one of the subsequent meetings that you had

15 with him?

16 A   Yes, yes.

17         MR. WELCH:  Your Honor, I've just handed to counsel

18 an affidavit of Dorian Shager, which we have marked as

19 Exhibit J.  It is not an exhibit which was exchanged amongst

20 counsel because we were not at all sure we were going to need

21 this, but we had it prepared in any event.

22         Given Mr. King's answers to the questions, I would

23 like to tender the exhibit to the witness to see if he can

24 identify which of those statements in the exhibit to the

25 affidavit are the statement that he's referring to.

1          MR. DRUMMY:  Judge, we object.  We've never seen

2   these documents before today.  These are not statements.

3   These are written summaries by Dorian Shager.  They have not

4   been produced by the university as part of the record in this

5   case.

6          This witness testified that he gave a statement.  If

7   they have a recorded statement or a transcript of a recorded

8   statement, we would love to see it; but something put together

9   by this gentleman who is not here to be cross-examined that we

10  have not seen before today, we object vigorously.

11         MR. WELCH:  Your Honor, the witness has testified

12  that he gave a verbal statement to Dorian Shager as opposed to

13  giving a written statement.  This is part of the procedure.

14  He testified he was given some options.  I don't know what his

15  answers are going to be to whether or not these notes

16  accurately reflect his statement; but if they do accurately

17  reflect his statement, then it seems to me that it's a record

18  of his statement and it would come in.

19         THE COURT:  How's it come in?  Under what?

20         MR. WELCH:  If he adopts it as his statement, it's

21  not hearsay.  It's his statement.  As I say, I'm not sure what

22  the answer is going to be; but since he's answered the

23  question the way he's answered them -- he said he gave an oral

24  statement.  I put one up there, and he said that's not it.  So

25  I'm trying to find out which one it is.

1          What we're about here, Your Honor, is trying to

2   understand what the process was and was it fair.  Was DePauw

3   discharging its obligation?  And this is part of the process.

4   So I think it comes in -- if he says that's not my statement,

5   I suppose it doesn't come in.

6          MR. DRUMMY:  Judge, on the face of it, it's nobody's

7   statement.  It's not a statement.  It's some alleged summary

8   that for some reason was not provided to us until today by a

9   key player who was the person that this witness met with on

10  multiple occasions who, unbeknownst to this witness, was

11  married to the chief prosecutor in the case; and we haven't

12  seen it before today.  You know, it's not a statement.  Just

13  on the face of it, it's not a statement.

14         MR. WELCH:  Your Honor, there is no lead prosecutor

15  in this case.  So maybe we could back off that.

16         THE COURT:  Let's get back to the exhibit.  I'm just

17  not sure it comes in regardless.  It doesn't negate the

18  hearsay.  I'm looking for an exception in my mind.  I can't

19  see one.  If you can direct me there --

20         MR. WELCH:  I think I've already answered it, but

21  let me try one more time.  I think if he says, "This is my

22  statement," then it's not hearsay.  "This is what I said to

23  Mr. Shager."

24         THE COURT:  Offered for the truth.

25         MR. WELCH:  That's right.  Offered for the truth,

1  but it's his statement.  It's not Mr. Shager's statement.

2         Your Honor, if I may, my colleague suggests that

3  it's also -- it also could come in under an exception to the

4  hearsay rule, which is that it's a business record.

5  Mr. Shager was the Title IX coordinator.  He prepared -- he

6  met with this witness on -- he met with Mr. King on --

7         THE COURT:  I think that might be correct if he were

8  here to make those representations.

9         MR. WELCH:  Well, but isn't the -- the problem with

10  hearsay is it's an out-of-court -- it's an out-of-court

11  statement.

12         THE COURT:  Do we know when it was made?

13         MR. WELCH:  We do.  The affidavit -- Your Honor, I

14  apologize.  It might be helpful if you could see the document

15  rather than forcing you to make a decision without the

16  document in front of you.

17         The last paragraph of the affidavit says that -- it

18  says when it was -- on or about when it was made.

19         THE COURT:  I'm looking at 8036 A through E.

20         MR. WELCH:  Again, I think, Your Honor, the answer

21  to your question is it was prepared by Mr. Shager in his

22  capacity as the Title IX coordinator; and I think it satisfies

23  the exception under 8036.

24         THE COURT:  I just don't think you get there,

25  Mr. Welch.  I'm trying to stretch the threshold here a little

1   bit, and I just don't think I can do it.

2          MR. WELCH:  All right, Your Honor.

3          THE COURT:  I will exclude then Exhibit J.

4          MR. WELCH:  Thank you, Judge.

5   BY MR. WELCH:

6   Q   Mr. King, sorry for the delay there.  You were asked to

7   provide a written statement by Captain Shrewsbury, were you

8   not?

9   A   Yes.

10  Q   And you declined to do that?

11  A   Yes.

12  Q   You gave a verbal statement to Mr. Shager?

13  A   Yes.

14  Q   And you don't recall exactly when you gave it, but it was

15  not at your first meeting with him?

16  A   No.

17  Q   What did you -- what did you tell Mr. Shager in this

18  verbal statement?

19  A   That I felt like mainly that I was wrongly accused.  It

20  wasn't very long.  It was, like, a paragraph.

21  Q   Did you -- when you say it was a paragraph, did you

22  actually write it out or this is just what you said to him?

23  A   I had written it up before I went in there, yes.

24  Q   So you wrote it out.  You went in there, and you read it

25  to him?

1   A    Yes.

2   Q    Did you keep it then?

3   A    Yes.

4   Q    In the meeting that you -- you had a meeting with

5   Mr. Shager; and your mom was present for that meeting,

6   correct?

7   A    Yes.

8   Q    In that meeting, do you recall having a conversation with

9   Mr. Shager about witnesses that you could identify?

10  A    Yes.

11  Q    In that conversation, Mr. Shager told you that if you

12  would identify witnesses, DePauw would interview them, didn't

13  he?

14  A    Yes.

15  Q    You never provided him with any witnesses until a couple

16  of days before the hearing; is that right?

17  A    Yes.

18  Q    Let me ask about -- I think I confirmed this with your

19  father, but let me ask you because you were the one that was

20  doing it.  When you were playing football at Indiana State,

21  you redshirted?

22  A    Yes.

23  Q    And the reason for your redshirt was medical?  They wanted

24  you to get bigger?  What was the reason for the redshirt?

25  A    Probably wanted me to get bigger.  I wasn't playing my

1  freshman year.

2  Q   When you went to Indiana State, just out of curiosity, how

3  big were you?

4  A   I was around 200 pounds.

5  Q   And you're how tall?

6  A   Five ten, five eleven.

7  Q   And the position you played in high school?

8  A   Safety.

9  Q   Is that what you were going to play at Indiana State?

10 A   Yes.

11 Q   And I know just enough to be dangerous about redshirting.

12 I understand one of the reasons that people redshirt is

13 they're just not ready to step up to that level.  Is that the

14 situation with you?

15 A   I think it was more of a coach's decision.

16 Q   And did you think that the coach thought you weren't quite

17 ready for the level or was it something else?

18 A   Maybe that's what it is.  I'm not really sure.  We never

19 really discussed it between the two of us.

20 Q   Did you know when you went there that you were going to

21 redshirt?

22 A   It was talked about before, that he wanted me to

23 originally grayshirt before I went there, but I didn't want to

24 do that.

25 Q   I'm sorry.  I'm having a little --

1  A   Grayshirt.  Grayshirt.  It's another type of redshirt or

2  sitting out.

3  Q   What is a grayshirt?

4  A   You go to school there, but you're not technically

5  enrolled.  You take less hours than you -- so you're not

6  technically a student, but you go there; and then you can

7  possibly still get redshirted.  So you could play six years of

8  college.

9  Q   But you didn't choose that?

10 A   No.

11 Q   So you left Indiana State and went to DePauw?

12 A   Yes.

13 Q   You've been at DePauw for three full years now?

14 A   Yes.

15 Q   Including this past semester?

16 A   Yes.

17 Q   So you got four years of college --

18 A   Yes.

19 Q   -- finished.  Why is it that -- why is it that you still

20 have courses to complete?

21 A   Because I was a business major at ISU, and they only took

22 2.75 credits.  So there's no choice.  I wasn't even a

23 sophomore when I transferred to DePauw.

24 Q   So -- I'm sorry.  I'm sure you said it, but I didn't hear

25 it.  You had how many credits when you transferred?

1   A    2.75.

2   Q    For a full year's worth of school?

3   A    Yes.  I had completed 31 credit hours I think, maybe one

4   less than that.

5   Q    So are you telling me that what transferred was 2.75

6   credits?

7   A    Yes.

8   Q    When you got to DePauw as a sophomore, did you play?

9   A    Yes.  I mainly did special teams.

10  Q    You weren't starting at safety?

11  A    No.

12  Q    Did you -- what happened in year two at DePauw?

13  A    Second year, I moved to linebacker.

14  Q    What linebacker?

15  A    Outside.

16  Q    Did you start at outside?

17  A    No, I didn't.

18  Q    Still playing special teams?

19  A    Yeah.

20  Q    What about year three?

21  A    I started playing.  I was rotating and playing special

22  teams, but I pulled my hamstring twice during the year.

23  Q    So did you ever get to a starting position at DePauw so

24  far?

25  A    No.

1  Q   You talked a little bit, Mr. King, about the time that you

2  had to prepare for the hearing; and you talked about the fact

3  that DePauw declined to give you additional time to prepare.

4  A   Yes.

5  Q   It is a fact, however, that the hearing was moved from its

6  original setting on February 20 to the date it actually went

7  forward, on February 24, correct?

8  A   Correct.

9  Q   And the reason that it got moved is there was a scheduling

10 problem with your advisor?

11 A   Yes.

12 Q   And also, there were a couple of witnesses that the panel

13 chair asked to be interviewed; and they needed to get those

14 done, correct?

15 A   Correct.

16 Q   Let me talk to you a minute about the advisor process.

17 You had conversations with Cara Setchell about choosing an

18 advisor?

19 A   Yes.

20 Q   And you were told that you could have any advisor that you

21 wanted?

22 A   Yes.

23 Q   Isn't it the case that Mrs. Setchell identified two

24 advisors for you?  One was J.C. Lopez, and one was P.J.

25 Mitchell?

1   A    Yes.

2   Q    And you chose not to use Mr. Lopez, correct?

3   A    Correct.

4   Q    Were you told that Mr. Lopez was a member of the

5   seven-member board that hears these cases?

6   A    No, I was not.

7   Q    Why didn't you choose Mr. Lopez?

8   A    I've never talked to the guy -- the man in my life.   I

9   just didn't feel like it would be in my interest to have

10  somebody -- something that's going to affect my life that much

11  to have somebody I don't even know sit next to me.

12  Q    Did you ever talk to him about helping you out?

13  A    No.

14  Q    So you just decided that you wouldn't contact him?

15  A    I felt like it wasn't in my best interests.

16  Q    And you never did contact him?

17  A    I felt like that should have been told to me anyway by

18  Cara Setchell that he had that high a standard.

19  Q    But my question to you was you never contacted him?

20  A    No.

21  Q    We've talked a little bit and the Court is aware about the

22  agreed order that allowed you to come back to DePauw, and we

23  talked a little bit about -- or you talked a little bit on

24  direct about the number of days that you were not able to go

25  to school?

1   A    Yes.

2   Q    Part of that time was during spring break; is that

3   correct?

4   A    I mentioned that, yes.

5   Q    So how many days of class did you miss before you went

6   back to school?

7   A    One week.

8   Q    Were you able to make that week up?

9   A    Yeah.  It was hard but I did.

10  Q    Mr. King, has anyone said to you from DePauw that once

11  your suspension is over, you will not be permitted to come

12  back to DePauw?

13  A    No, but I haven't been told I would be allowed to come

14  back.

15  Q    I'm sorry?

16  A    I have not been told I would be allowed to come back

17  either.

18  Q    I understand that.  My question was no one has said to

19  you, "Mr. King, you can't come back to DePauw"?

20  A    No.

21  Q    What they have said to you is that you need to go through

22  a readmission process, correct?

23  A    Yes.

24  Q    There is also a suggestion in one of the briefs that's

25  been written on your behalf that you might not be able to

1  receive your DePauw degree.  Has anyone from DePauw told you

2  you can't get a DePauw degree?

3  A   No.

4  Q   So you've talked about the publicity surrounding this

5  event.  You talked about an article in *The DePauw* newspaper.

6  Isn't it the case that that article came out after you filed

7  that lawsuit?

8  A   I'm honestly not sure, but I had to go back and go to

9  court so I could go back to school.  It was required.

10  Q   And that happened after you filed this lawsuit?

11  A   I didn't know that.

12  Q   Have you had a chance to look at the transcript of the

13  hearing that took place?

14  A   Yes.

15  Q   Is there anything in the transcript that you think is not

16  an accurate report of what was said at the hearing?

17  A   I would have to look over it again.

18  Q   When you've looked at it, did you say to yourself, "That's

19  not right.  That's not what was said"?

20  A   There are definitely parts.  I believe I'm right, and I

21  feel like there's two sides to it; and I don't believe her

22  side.

23  Q   I understand that.  That's what we're here about.  My

24  question to you is as you reviewed the transcript of the

25  hearing or listened to the tape, was there anything in there

1   that you thought was not an accurate display of what was

2   actually said, regardless of whether you believed it or not or

3   agreed with it or not?

4   A   I didn't necessarily believe what her friends were saying.

5   I think her friends were not telling the truth.

6   Q   I understand that.  My question is did you think that what

7   the transcript reported they said reported it accurately?

8   A   Yes.

9   Q   You talked a little bit about the delay that might be

10  attendant to your suspension at DePauw.  The way the situation

11  exists today is that you could be delayed by a year if the

12  Court denies your motion; is that right?

13  A   I believe so.

14  Q   So rather than completing college in five years, as you

15  have chosen, you could complete college in six years; is that

16  right?

17  A   That's correct.

18  Q   Completing college in six years would, I suppose, delay an

19  application to graduate school?

20  A   Yes.

21  Q   Have you made application to any graduate schools?

22  A   No, not yet.

23            MR. WELCH:  Your Honor, if I can have just a minute.

24            THE COURT:  You may.

25            MR. WELCH:  Thank you.

1  BY MR. WELCH:

2  Q   Mr. King, we had had a little back and forth on the

3  statement that you said you read to Dorian Shager.  Do you

4  recall that?

5  A   Yes.

6  Q   The Court denied our offer of that document.  Do you

7  recall that?  My question is -- I'm going to hand you what's

8  in evidence as Exhibit E.  It is the written transcript of the

9  hearing.  My question to you is whether or not the statement

10 that's at the bottom of page 2 -- that your statement is the

11 same statement that you read to Mr. Shager.  Would you take a

12 look at Exhibit E, page 2, at the bottom and tell me if that

13 statement is the same statement that you would have read to

14 Mr. Shager?

15 A   No, it's not.  The statement I gave to Shager was much

16 shorter.

17 Q   Nevertheless, is the statement at the bottom of page 2 an

18 accurate reporting of what you said at that point in the

19 hearing?

20 A   Yes.

21 Q   Do you need to look at it?

22 A   I'm fine.  Yes.  It's accurate.

23          MR. WELCH:  Thank you, Judge.

24          THE COURT:  No further questions?

25          MR. DRUMMY:  Nothing questions, Your Honor.

1                        **EXAMINATION**

2   BY THE COURT:

3   Q    In response to Mr. Welch's questions, you indicated that

4   you had not applied; is that right?

5   A    Yes.

6   Q    When are applications due?  If you were otherwise

7   anticipating enrolling in either the summer or fall semester

8   of 2015, when will the applications be due?

9   A    I'm not sure.  I'm just a few credits away from being

10  eligible.  So I've contacted a few and maybe to see how far

11  away I am.  More importantly, I just need to get my credits

12  done before I really feel like I can focus on that.

13  Q    Have you done anything even preliminarily towards that as

14  far as finding out --

15  A    Yes.  I know exactly -- I need two science classes to be

16  accepted into Logan.

17  Q    Those would otherwise be available to you then the fall

18  semester of 2014 and the spring semester of 2015 at DePauw?

19  A    Yes.

20  Q    So let's say that happens.  My question to you is when

21  would the application be due if you are anticipating going to

22  graduate school then next summer or the fall?

23  A    I would be guessing I would need to look into that after

24  finding out if I do get to go back to DePauw.  I mean --

25  Q    Let's say that wasn't an issue.  When would the

1  applications be due?

2  A    I'm sure it would be sometime in May.

3  Q    You think they would be due May of next year for --

4  A    Maybe a little earlier than that.  It will for the fall

5  semester.  I'm sure that's when I would probably be attending.

6  Q    Mr. Welch showed you the policy; and as part of that

7  policy, there was a section on rights of the accused.  Did you

8  ever see that booklet or that pamphlet that Mr. Welch showed

9  you?

10  A    Yes.  I've seen it.

11  Q    Were you afforded a copy of it?

12  A    No.

13  Q    Who showed it to you?

14  A    Dorian Shager.

15  Q    Had you seen it or been aware of it before then?

16  A    No.

17  Q    It wasn't part of any kind of orientation program or the

18  subject of any bulletin by the university prior to that time?

19  A    Not that I know of.

20  Q    So -- and it was discussed with you by Mr. Shager?

21  A    Yes.

22  Q    But did he say take a copy of it, review it, anything like

23  that?  Did he offer you a copy?

24  A    No.  He just showed me in his book.

25  Q    He just showed you the book?

1  A   Yeah.  He showed me in the book and showed me -- like he

2  pointed to the part, like, this is what you're getting in

3  trouble for right here.

4  Q   What about your rights and the rest of that policy booklet

5  I'm going to call it?

6  A   No.

7  Q   He never offered it to you?

8  A   I never asked.

9  Q   Did you know when you went to the hearing what the

10 potential penalties or punishment could be as a result of a

11 true finding by the board?

12 A   Yes.

13           THE COURT:  Cross on the Court's questions?

14           MR. DRUMMY:  No, Your Honor.

15           MR. WELCH:  Your Honor, it's not really on your

16 questions.  We have asked and had brought over a copy of what

17 I would refer to as Mr. King's transcript.  It shows his

18 grades.  I thought it might be helpful for the Court, unless

19 counsel has an objection to it going in, that we could put it

20 in as an exhibit.  It's not off your questions, but it might

21 be helpful.

22           THE COURT:  Is that basically a summary of what

23 Mr. Drummy has already suggested?

24           MR. WELCH:  We think it's more accurate, Your Honor.

25           MS. REEDY:  One page of the transcript was already

1   admitted through the Kirkpatrick affidavit, a summary; but we

2   have not seen this document.

3            MR. DRUMMY:  What I read to him came from them.

4            THE COURT:  Mr. Drummy?

5            MR. DRUMMY:  I guess I really don't care.  It's kind

6   of interesting.  The one that we read from is the same, I

7   guess.  This has a lot of other extraneous information, his

8   religion and a lot of personal information.

9            I mean, that what I read from is what is attached to

10  their affidavit.  Nobody's disputing that it's accurate.  I

11  don't know why we need this one with all this other personal

12  extraneous information.

13           THE COURT:  Show admitted without objection.

14     *(Defendant's Exhibit L was received in evidence.)*

15           THE COURT:  All right.  You may step down.

16     *(Witness excused.)*

17           THE COURT:  Further witnesses from the plaintiff?

18           MS. REEDY:  No, Your Honor.

19           THE COURT:  Mr. Welch, Ms. Christensen, witnesses in

20  behalf of the defendant?

21           MR. WELCH:  I have a very short witness.  I would

22  like to bring Mrs. Babington back for a couple of questions on

23  the issue of harm.  And I've got three exhibits which counsel

24  objected to earlier in the day that we need to deal with.

25           THE COURT:  All right.  Very well.

1          Ms. Babington, I will not reswear you in as a

2    witness.  I simply admonish you that you remain under oath.

3          **BENJAMIN KING, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

4                       <u>**DIRECT EXAMINATION**</u>

5    BY MR. WELCH:

6    Q   Mrs. Babington, you are aware of what the legal question

7    is before the Court today; and that question is whether or not

8    the Court should order Mr. King back to school pending the

9    resolution of the rest of this lawsuit.  You are aware of

10   that?

11   A   Yes.

12   Q   I would like to talk to you just briefly about the impact

13   to DePauw of such an order.  Would you tell the Court what you

14   think about -- what you think the impact to DePauw would be of

15   his ordering Mr. King back to school at the end of this month?

16   A   I think it would have an impact on future cases.  I think

17   that -- there are several things that go into sanctioning.

18   Obviously, one thing that has been focused on here is whether

19   Ben would be a threat to other students, but there's also sort

20   of a punishment part of a sanction.  There's a deterrent part

21   of a sanction.  There's an educational part of a sanction.

22   Those are all things that we take into account when we

23   administer a sanction.

24          I think allowing Ben to come back would say to our

25   campus that you can be found responsible for sexual misconduct

*BABINGTON - CROSS/REEDY*                                    220

1   and continue in classes, and I think that would be a very

2   negative statement to our community.

3   Q   You talked about -- you used the word one of the issues in

4   sanctioning is whether or not the accused student is a threat.

5   A   Right.

6   Q   Have you seen anything since this whole matter has come up

7   to indicate that Ben King is a threat to the campus?

8   A   I have not.

9           MR. WELCH:  That's all I have, Your Honor.

10          THE COURT:  Very well.

11          Your witness, Ms. Reedy.

12          MS. REEDY:  Thank you, Your Honor.

13                      **CROSS-EXAMINATION**

14   BY MS. REEDY:

15   Q   Ms. Babington, you basically said it would send a message

16   to students on campus about what can happen if you're accused

17   of sexual assault or you commit sexual assault and you can

18   still continue going to classes; is that correct?

19   A   I said it would send a message that you can be found

20   responsible for sexual misconduct and continue in classes.

21   That seemed to be a negative message to the community.

22   Q   Could it also send a message to the basic requirements of

23   an investigation and hearing that is thorough, impartial and

24   complete?  Could it send a message to DePauw that those

25   elements are required in future hearings as opposed to what

1  happened in this case?

2  A   I think that what we're speaking of is Ben coming back to

3  campus this fall.  I don't think that question will have been

4  resolved by then.  This is a preliminary injunction.  So he

5  would be allowed to come back despite the fact that he's still

6  been found responsible for violating this policy.

7  Q   You also mentioned punishment and deterrent.  You had

8  stated in your affidavit -- and I don't have it in front of me

9  but to the effect that a large number of the students who are

10 suspended complete courses at another institution and transfer

11 them to DePauw when they return so that there's not as much of

12 an actual interruption.  So would you agree that really the

13 punishment that you're seeking is to keep him off your campus?

14 A   I think there is that component of a sanction, yes.

15 Q   Do you think that this could be an educational opportunity

16 for DePauw's new Title IX coordinator and the hearing board as

17 to proper procedures for handling these cases?

18 A   I think we learn from every case that we have.  I don't

19 know that this one is any different than that.  There probably

20 are things to learn, but I don't know that -- when I say an

21 educational sanction, I'm speaking more of toward the student

22 who's being sanctioned.

23 Q   But you agree that any harm to DePauw, there's also

24 possible benefits to DePauw to learn from this situation?

25 A   I think in any case there are -- can be benefits.

1          MS. REEDY:  Thank you.

2          THE COURT:  On those issues?

3          MR. WELCH:  None, Your Honor.

4          THE COURT:  Very well.  You may step down.

5      *(Witness excused.)*

6          THE COURT:  Anything further from the defendant,

7  Mr. Welch?

8          MR. WELCH:  Yes, Your Honor.  I have three

9  affidavits. which we have tendered to counsel.  They are the

10 affidavit of Myrna Hernandez, which has been marked as

11 Exhibit F; the affidavit of Gregory Dillon, which has been

12 marked as Exhibit G; and the affidavit of Julia Sutherlin,

13 S-U-T-H-E-R-L-I-N, which has been marked as Exhibit H.  Those

14 are affidavits, Your Honor, of the three panel members that

15 heard the charges against Mr. King; and they go to what I have

16 come to refer to as the David Hoover issue, which was raised

17 prominently by Mr. King in his reply brief, which we got this

18 past Monday.

19         What they are, Your Honor, is a statement as to the

20 knowledge --

21         MS. REEDY:  Your Honor, I apologize for

22 interrupting; but I would object to any references to what's

23 contained in these statements because they are hearsay.  I

24 would ask that Mr. Welch not put that before the Court until

25 the Court rules on what's in the affidavit.

1          MR. WELCH:  That wasn't my plan, Your Honor.  I just

2   wanted to say they are statements about their state of

3   knowledge regarding Mr. Hoover.

4          THE COURT:  Very well.

5          MS. REEDY:  And, Your Honor, we object for the same

6   reason that we objected to the Dorian Shager affidavit.  These

7   are hearsay affidavits on a very relevant issue in this case.

8   It's been an allegation that we've been making in this case

9   from the beginning.  DePauw was on notice we were going to be

10  bringing these issues up today.  They are employees of DePauw.

11  If they wanted them to testify as to their knowledge of these

12  issues, they had every opportunity to bring them to court to

13  do so.

14         THE COURT:  I'll take it under advisement.  Please

15  give the exhibits to Mrs. Ong.

16         Let me see counsel at the bench, please.

17     (A bench conference was held off the record.)

18         THE COURT:  All right.  The matter will be taken

19  under advisement.  Parties are requested to file post-trial

20  submissions by noon on Friday.  Friday will be the 15th of

21  August.  The Court will try to expedite a ruling.  The Court

22  knows and is aware that time is of the essence on both sides

23  and literally regardless of the way the Court rules.  I will

24  try to give this my full attention as soon after noon on

25  Friday as the Court and its calendar would allow.

224

1          Other than that, we will be adjourned for this

2   evening.   Thank you very much to counsel.

3          COURT CLERK:   Please rise.

4          *(The proceedings were adjourned at 4:31 p.m.)*

1          <u>CERTIFICATE OF COURT REPORTER</u>

2

3       I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct transcript from reported proceedings in the

5    above-entitled matter.

6

7

8     /s/ Cathy Jones                    September 10, 2014
     _____
9     CATHY JONES, RMR, RDR, FCRR
      Official Court Reporter
10    Southern District of Indiana
      Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25