**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| BENJAMIN KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.:  2:14-cv-0070-WTL-DKL |
| | ) | |
| DEPAUW UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEPAUW'S BRIEF IN SUPPORT OF ITS MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................................1

**STATEMENT OF UNDISPUTED FACTS**......................................................................3

    A.  DePauw's Sexual Misconduct Policy ........................................................................3

    B.  The Complaint .......................................................................................................**4**

    C.  The Investigation .................................................................................................**5**

    D.  The Hearing and the Panel's Decision.................................................................**6**

    E.  The Appeal..............................................................................................................**8**

    F.  This Action............................................................................................................**11**

**ARGUMENT**.................................................................................................................**11**

    **I.  Legal Standard** ................................................................................................**11**

    **II.  King's Title IX Claims Must Fail Because DePauw's Actions
        Were Not Motivated by Gender Bias** ..............................................................**12**

    A.  Erroneous Outcome ............................................................................................**13**

        1.  The Investigation Was Prompt Under the Circumstances ..................................**15**

            a.  Any Delay Does Not Demonstrate Gender Bias..........................................**15**

            b.  DePauw's Treatment of King During its Investigation Does Not Evidence
               Gender Bias...............................................................................................**16**

            c.  DePauw's Investigation Was Thorough; King's Intoxication Was Not an
               Issue .........................................................................................................**17**

        2.  Complaints about the Panel do not Demonstrate Bias.  DePauw's Panel is
           Entitled to a Presumption of Integrity..............................................................**19**

            a.  Relationships Among Student Life Staff Do Not
               Evidence Gender Bias................................................................................**20**

    b.  The Panel Had to Weigh Conflicting Evidence and Make Credibility Determinations ...............................................................................**20**

    c.  King Was Subject to the Same Procedure as J.B. During the Hearing..........**21**

    3.  DePauw's Policy Does Not Permit King to Submit an Impact Statement and He Was Not Prejudiced by This Policy..........................................................**21**

  B.  Deliberate Indifference.....................................................................................**22**

**III.  The Existence of a Contract Precludes The Promissory Estoppel Claim**...............**25**

**IV.  DePauw is Entitled to Summary Judgment on King's Intentional Infliction of Emotional Distress Claim Because the Evidence Shows that DePauw's Conduct was Neither Extreme nor Outrageous** ......................................................................**26**

  A.  DePauw's Conduct was not Extreme and Outrageous as a Matter of Law ...................**26**

  B.  There is no Evidence that DePauw Intended to Cause King Emotional Distress...........**28**

**V.  DePauw Is Entitled to Summary Judgment on King's Claim for Defamation; It Is Not Properly Pled, and Any Communications Were Privileged**.........................**29**

  A.  King Has Not Properly Pled Defamation.........................................................**29**

  B.  Statements by DePauw Employees About King's Conduct Are Privileged...................**30**

**VI.  The Court Should Retain Jurisdiction Over King's State Law Claims** ................**32**

**CONCLUSION** .........................................................................................................**33**

**DEPAUW'S BRIEF IN SUPPORT OF ITS MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

DePauw University ("DePauw") has moved the Court to enter summary judgment in its favor on Counts I and II, and V – VII of Plaintiff's Complaint.[1]  DePauw submits this brief in support of its Motion.

## INTRODUCTION

Plaintiff Benjamin King ("King") was suspended from DePauw after he was found responsible for violating DePauw's Sexual Misconduct Policy.  Specifically, King was found responsible for non-consensual sexual contact and sexual harassment stemming from an encounter with a female student, J.B., in December, 2013.  After an investigation and hearing, King was initially expelled from DePauw.  King appealed and the sanction was reduced to a two-semester suspension.  King filed suit, seeking preliminary and permanent injunctive relief and damages.  As a result of this Court's August 22, 2014 Order ("August 22 Order"), King is currently enrolled as a full time student without restriction.

King's Complaint contains seven Counts.  Counts I and II allege violations of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §1681-88 ("Title IX").  Those two federal claims are accompanied by state law claims for breach of contract, promissory estoppel, negligence, intentional infliction of emotional distress and defamation.  King generally alleges that he was falsely accused of sexual assault by J.B. and found responsible for conduct he contends was consensual by a process that was biased against him on account of his gender.

---

[1] On September 2, 2014 Plaintiff sought leave to amend his Complaint.  [Dkt. No. 62]  That Motion remains pending.  The Amended Complaint and the Original Complaint are not materially different as to DePauw.  Accordingly, DePauw seeks summary judgment as to Counts I-II and V-VII of the Amended Complaint should the Court grant Plaintiff's Motion.

DePauw seeks summary judgment on King's claims for Title IX violations, promissory estoppel, intentional infliction of emotional distress, and defamation.[2]

The touchstone question under Title IX is whether DePauw's handling of the charges discriminated against King on the basis of his gender.  Once it knew J.B. wanted DePauw to pursue an investigation, DePauw investigated the charge of sexual misconduct made by J.B.; determined that formal charges were warranted; recommended qualified advisors to assist each party; held a hearing conducted by three experienced staff members; resolved conflicting testimony; issued a decision; processed an appeal; and issued a modified decision after appeal. The undisputed evidence shows that DePauw followed its written policies in handling the allegations against King and that its policy, investigation, hearing, and sanction were not tainted by gender bias—thus King's Title IX claims must fail as a matter of law.

This Court is not legally permitted to retry DePauw's disciplinary proceeding or make a factual determination as to what happened between King and J.B.  Instead, the Court should determine whether DePauw's actions in the investigation and processing of J.B.'s allegation against King complied with Title IX and DePauw's written disciplinary policies.

King's claims for promissory estoppel, intentional infliction of emotional distress, and defamation are unsupported by the allegations in King's Complaint and must likewise fail as a matter of law.

---

[2] DePauw does not concede that it violated any contract with King or acted negligently in handling the allegations against King, but does not seek summary judgment on those counts of King's Complaint.

## STATEMENT OF UNDISPUTED FACTS[3]

**A. <u>DePauw's Sexual Misconduct Policy</u>.**

DePauw sets out expectations for student behavior in its Student Handbook.  The Handbook outlines conduct which can trigger DePauw's disciplinary process known as the "Community Standards Process" which includes DePauw's "Sexual Misconduct Policy."  (The "Sexual Misconduct Policy" or "Policy," Ex. A.)[4]

The Policy defines sexual misconduct broadly and addresses misconduct by community members of either gender.  (Ex. A at 36.)  For example, the term "non-consensual sexual contact" refers to "[p]hysical contact of a sexual nature by one person against the will of or without the consent of another."  (*Id.*)  Where the Policy makes reference to individuals through the use of personal pronouns, it employs gender-neutral alternatives.  For example, the definition of the term "rape" includes the phrase: "or takes advantage of him/her while he/she is incapacitated."  (*Id.*)  The Policy devotes nearly a page to the discussion of the term "consent," in recognition of the fact that the majority of sexual misconduct complaints involve the question of whether the complainant consented to the conduct at issue.  (*Id.*)  In part, the Policy states:

> Incapacitation is an important and specific concept.  A person who is incapacitated is incapable of recognizing what is going on around him/her.  An incapacitated person is not able to recognize the sexual nature or extent of the situation he/she is in.  To engage in sexual activity with a person one ***knows or should know*** is incapacitated is a violation of this policy.

(Ex. A at 37 (emphasis added).)

---

[3] Many of the facts outlined here were incorporated in the Court's August 22 Order.  [Dkt. 60]  DePauw restates them here and cites to the evidence submitted at the hearing.

[4] For ease of the reader, DePauw will provide the full name of an exhibit the first time it cites it and thereafter will refer to it by its label.  Contemporaneously with this filing, DePauw is providing a chart laying out all the exhibits as well as parallel citations to those exhibits that are already in the record.

If a report of sexual misconduct is made with or referred to the DePauw Public Safety Office, it is considered a formal complaint and will be investigated as such.  (Ex. A at 34.) Complaints proceed to hearing if the investigation reveals sufficient information to make a formal charge of misconduct.  (Ex. A at 38.)  If a student charged with sexual misconduct contests the charges, complaints of sexual misconduct are heard by a panel of three members (the "Panel") of a seven member Sexual Misconduct Hearing Board (the "Board").  (*Id*.)  The members of the Board receive periodic training by outside consultants to assist them in their roles. (Ex. B, Babington Aff. ¶14, Ex. A at 38.)

**B.  The Complaint.**

On December 8, 2013, J.B. confidentially reported that she thought that King sexually assaulted her at a party occurring late December 6 and early December 7, 2013.  (Ex. C, Sara Ryan Report.)  As acknowledged in the Court's August 22 Order, "the facts surrounding DePauw's handling of the complaint are largely undisputed."  [Dkt. 60, at 1]  J.B. alleged that she attended a party at King's fraternity, consumed alcohol, and woke up nude in King's bed. (Ex. C.) J.B. could not remember how she got there and denied having consented to any sexual activity.  (Ex. C.)  J.B. went to the hospital for an examination by a sexual assault nurse examiner ("SANE") on December 7, 2013.  (Ex. C.)  The SANE told J.B. that she observed vaginal tearing.  (Ex. C; Ex. D, excerpt from J.B. SANE Report.)  At the time DePauw received the confidential report on December 8, J.B. was not sure whether she wanted DePauw to undertake an investigation.  (Ex. C., Ex. B ¶7.)  This is typical for these types of matters.  (Ex. B ¶8.)  DePauw's Title IX Coordinator and Dean of Campus Life, Dorian Shager, interviewed King on December 18, 2013, to obtain his side of the story.  (Ex. B ¶9, Ex. E, Shager Notes of December 18, 2013 meeting.)

4

DePauw recessed for winter break from December 20, 2013 through January 6, 2014. (Ex. B ¶10.)  From January 6, 2014 through January 22, 2014, DePauw conducted its Extended Studies (formerly Winter Term) session.  (*Id.*)

On January 22, 2014, J.B. told DePauw that she wanted an investigation and would file a formal report with the Office of Public Safety.  (Ex. B ¶11.)  Charlene P. Shrewsbury, a captain with DePauw's Public Safety Department, interviewed J.B. at that time.  (Ex. B ¶11, Ex. F, Shrewsbury Aff. ¶5.)  Captain Shrewsbury is a sworn police officer in the State of Indiana. (Ex. F ¶2.)   That same day, per DePauw policy, Captain Shrewsbury issued "no contact" instructions to Plaintiff and to J.B. instructing that they were to avoid all contact with each other. (Ex. F ¶5.)

### C.  **The Investigation.**

DePauw then initiated its formal investigation.   As part of the investigation, J.B. submitted a written statement.  (Ex. G, Witness Statements at 1 - 7.)  Captain Shrewsbury asked King to come in for an interview.  (Ex. B ¶12, Ex. F ¶6.)  Because DePauw has an agreement with the Putnam County Prosecutor that it will forward the results of its investigations of sexual misconduct for review, Captain Shrewsbury, a sworn police officer, began the interview by advising King of his *Miranda* rights and informing him that the interview would be videotaped. (Ex. B ¶12, Ex. F ¶6.)  Plaintiff declined to be interviewed and did not otherwise provide any information or identify potential witnesses to Captain Shrewsbury.  (Ex. F ¶6, Ex. B ¶12.)  As a result, Mr. Shager submitted a summary of his December 18, 2013 interview of King, which King reviewed, to the investigation file.[5]  (Ex. B. ¶9, Ex. E.; Ex. H., Shager Notes of all King meetings.)

---

[5] The Hearing Panel did not receive Mr. Shager's summary of his three subsequent meetings with Mr. King.  (Ex. H.)

In addition to J.B. and her attempted interview of King, Captain Shrewsbury interviewed seven DePauw students, five of whom were identified by J.B. and two who were identified by the Chair of the Panel. (Ex. F ¶7, Exs. G & I, Shrewsbury interview notes.) Shrewsbury's investigation revealed that several witnesses described J.B. as visibly intoxicated. (Ex. G at 9 – 11, 13, Ex. I at 5, 9, 12.) They stated that she had moved as if she did not have complete control over her limbs, fallen in the fraternity, rolled around in the snow while giggling, and discussed taboo topics. (Ex. G at 9 – 11, 13, Ex. I at Ex. I at 5, 9, 12.) Per his interview with Mr. Shager, King admitted to sexual contact with J.B., including "fingering" her. (Exs. E, H.) King had also indicated to J.B. via text message on December 7 that the pair had "laid down and tried having sex." (Ex. J, King Text Messages.) DePauw's Assistant Dean of Student Life, Cara Setchell, determined that this information, if believed by a hearing Panel, would support charges of nonconsensual sexual contract and sexual harassment against King. (Ex. K, B. King Dep. at 147, 149-150.) On that basis, DePauw notified King by letter dated February 12, 2014 that it was charging him with nonconsensual sexual contact and sexual harassment. (Ex. B ¶13, Ex. L, Feb. 12, 2014 Letter.)

**D. <u>The Hearing and the Panel's Decision</u>.**

DePauw's Policy allows students to use advisors to assist them through the hearing process. (Ex. A at 38.) Students may also consult with counsel, but lawyers are not permitted in the hearing room itself. (*Id.*) Advisors are allowed to attend the hearing, but are not permitted to examine witnesses. (*Id.*) DePauw offers the names of advisors to students participating in sexual misconduct hearings. (Ex. B ¶15, Ex. K at 125.) Students can either use an advisor identified by DePauw or use an advisor of their own choosing. (Ex. B ¶15.) King was offered the names of two potential advisors, one of whom, J.C. Lopez, was a member of the Board not

sitting on the Panel.  (Ex. B ¶15.)  King never bothered to talk to either of these recommended advisors.   (Ex. M, Preliminary Injunction Hearing Transcript at 209-10, Ex. K at 125-26.) Instead, King first decided to use a student friend, and at the last minute used a friend of his father, Dr. William Tobin, DePauw's Director of Institutional Research, who had no training in sexual misconduct matters.  (Ex. M at 136.)

Once a hearing is scheduled, it can be delayed upon a "strong showing of substantial need of such a continuance in order to maintain the fairness and integrity of the process" or if the Chair of the Panel determines that a situation exists that requires a continuance.  (Ex. A at 39.) The hearing was originally scheduled for February 20, 2014.  (Ex. B ¶15.)  King asked for a seven-day continuance which was denied but the hearing date was ultimately moved to February 24, 2014 to permit King's advisor to attend and to allow for additional witness interviews requested by the Panel.  (Ex. B ¶15, Ex. M at 209.)  Five witnesses, in addition to J.B. and King testified.  (Ex. N, transcript of Feb. 24, 2014 hearing.)  The Panel also received the SANE report, reports prepared by Captain Shrewsbury and Mr. Shager, and written statements prepared by each witness.  (Ex. B ¶16, Ex. O, at 16 King's Appeal to DePauw.)  The Panel found King responsible for violating DePauw's Sexual Misconduct Policy and expelled him.  (Ex. P, Panel Finding and Supplementary Notes.)[6]

Because King admitted to sexual activity, the Panel focused on whether J.B. "had given or was in a state to give consent" and whether King should have "known if she was in a state to not give consent."  (Ex. P.)  The Panel had evidence that J.B. had consumed at least nine shots of liquor on December 6, 2013 and determined that J.B. was extremely intoxicated.  (Ex. G; Ex. I.)

---

[6] King did not submit any questions in advance of the hearing, did not request that a single question be asked of any witness during the hearing and called just one witness who saw J.B. from a distance the morning after.  (Ex. N.)

Based on her behaviors, as described by witnesses, the Panel determined, "it should have been apparent to [King] that [J.B.] was extremely intoxicated, to the point that she could not give consent to any sexual activity."  (Ex. P.)

### E.  **The Appeal**.

Students may appeal any finding, conclusion, or sanction imposed by the Panel with the Vice President for Student Life.  (Ex. A at 39.)  An appeal may be based on new evidence, procedural error, or appropriateness of the sanction.  (Ex. A at 40.)  The Vice President may 1) affirm the action taken by the Panel; 2) reverse the Panel's findings of facts and/or responsibility and refer the case back to the Board for another hearing; 3) reverse the Panel's determination of facts and/or responsibility and vacate any sanction; or 4) impose different sanctions.  (*Id.*)

King's current counsel appealed the Panel's determination to Cindy Babington.[7]  King asked for and received a one-week extension to file his appeal, and then asked for a second week's extension which Babington denied.  (Ex. B ¶17, Ex. O.)   King's appeal attacked DePauw's entire process by arguing that:

    a.  DePauw's investigation was not prompt and the delay prejudiced his rights (Ex. Q, Babington's Decision at 1; Ex. O at 3-4);

    b.  DePauw's investigation was not sufficiently thorough (Ex. Q at 2; Ex. O at 5-10);

    c.  the Panel's hearing was not sufficiently thorough and the Panel improperly resolved inconsistent testimony (Ex. Q at 3; Ex. O at 5-18);

    d.  the investigation and hearing process lacked impartiality (Ex. Q at 3; Ex. O at 10-19);

---

[7] Ms. Babington served as Vice President for Student Life and Dean of Students for 16 years. (Ex. M, at 14.)  She was transferred to the position of Vice President for Admission and Financial Aid on July 1, 2014.  (*Id.*)

e.  King was prejudiced by the denial of an opportunity to submit an impact statement to the Panel (Ex. Q at 4; Ex. O at 2); and

f.  The sanction of expulsion was excessive. (Ex. Q at 4; Ex. O at 20-23).

On March 13, 2014, Babington issued her decision.  (Ex. B ¶17, Ex. Q.)  Babington affirmed the Panel's finding of responsibility, but reduced the sanction from expulsion to suspension for the Spring and Fall 2014 semesters, because she did not think the evidence showed that King's conduct was predatory.  (Ex. B ¶17, Ex. Q.)  Babington addressed each of King's arguments:  Because the events took place just prior to Christmas break, which is followed by the Extended Studies session, and J.B.'s uncertainty, some delay was unavoidable. (Ex. Q.)  Any prejudice occasioned by any delay applied equally to King and J.B. (*Id.* at 1-2.) As to King's complaint about the scope of the investigation, it was unclear that more interviews would have altered the Panel's decision.  Additionally, King's own refusal to participate in the investigation by identifying potential witnesses was a limiting factor on the number of people interviewed.  (*Id.* at 2.)[8]

Babington reviewed the audio of the hearing and decided that the hearing was sufficiently thorough, and that it was within the Panel's purview to resolve inconsistent testimony.  (*Id.* at 3.) She further concluded that there was sufficient evidence to support the Panel's finding of responsibility, and that King's bias allegations were unfounded.  With respect to King's complaint about the expertise of his advisor, Babington noted that despite Student Services' referral of a trained member of the Board, not empaneled for his hearing, King chose another DePauw staff member who was not a member of the Board.  (*Id.* at 3.)

---

[8] Indeed, King testified that he could not identify the individuals he observed socializing with Jillian when he entered the basement, and, other than Gates Weaver, could not remember anyone else he saw in the basement.  (Ex. K at 66, 133.)

In response to King's complaint that he was not permitted to submit an impact statement, Babington noted that there was a typographical error in the hearing instructions King was given, and that a typographical error in one document did not negate statements in all other documents describing the process, including the Student Handbook, which all provide for an impact statement by the complainant, but not the respondent.   Moreover, King was not denied the opportunity to describe the impact to the Panel, as he had the opportunity to do so at the hearing. (*Id.* at 4.)

Babington disagreed with the hearing Panel's sanction.   She decided that the expulsion was based, at least in part, on the finding that King's conduct had been predatory.   Babington reviewed evidence related to this assertion and found it insufficient.   She thus determined the expulsion was unduly severe and reduced it to a two-semester suspension.  (*Id.* at 4.)

King also complained that the atmosphere on DePauw's campus was such that he could not receive a fair hearing.  This unsupported allegation is contrary to the facts.  DePauw initiates numerous investigations into initial reports of sexual misconduct where the investigation has not supported formal charges.  (Ex. B ¶19.)  Even in those cases where investigation dictates that formal charges are appropriate, the hearing board does not always find in favor of the complainant.   In the last five (5) academic years, 2009-10 through 2013-14, DePauw has formally processed sexual misconduct charges against 12 students.  (Ex. B ¶19.)  The results of those charges are that 10 students were found responsible for at least one charged violation.  (*Id.*)  Of those students found responsible, 2 were expelled, 4 were suspended, 2 were put on deferred suspension, 1 was put on deferred suspension and later suspended, and 1 was put on deferred suspension and later expelled.  (*Id.*)

**F.   This Action.**

In his motions for preliminary injunction [Dkts. 22, 51], King alleged that DePauw was biased in its investigation and hearing because relatives of J.B. made a substantial financial donation to DePauw.  Specifically, J.B.'s great uncle, R. David Hoover and his wife Suzanne A. Hoover made a significant donation to DePauw and DePauw is naming a new building in honor of the Hoovers.  (Ex. O at 13, 78.) [Dkt. 51 at 7; Dkt. 54 at 10-11]  None of the panel members was aware of any relationship prior to their determination and two of them were unaware of Mr. Hoover's donation.  (Ex. R, Dillon Aff. ¶4, Ex. S, Sutherlin Aff. ¶4, Ex. T, Hernandez Aff. ¶4.)  Babington learned of the relationship between the Hoovers and J.B. before deciding the appeal, but it did not affect her consideration of the appeal.  (Ex. M at 90.)  DePauw's President, Brian Casey was deposed on October 30, 2014.  His testimony was that he did not communicate about this matter to the person who made the decision to charge King and he did not communicate about this matter to any member of the hearing panel.[9]

## ARGUMENT

**I.   Legal Standard.**

Summary judgment is appropriate when there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S.  317, 322 (1986).  The court's function is to determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Disputes concerning material facts are genuine where the conflicting evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson*, 477

---

[9] A transcript of Dr. Casey's deposition is not yet available and DePauw is not yet able to provide citation to this testimony.  DePauw designates this testimony and will supplement the record with the relevant pages of Dr. Casey's deposition transcript on reply.

U.S. at 248.  In deciding whether genuine issues of material fact exist, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).

The burden is upon the movant to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes to demonstrate an absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the non-moving party may not rest upon the pleadings but "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Becker v. Tenebaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990).  Because King's claims are "grounded primarily upon the manner in which [DePauw] officials conducted the process leading to its conclusion that [King] had violated [DePauw's Sexual Misconduct Policy] and its imposition of sanctions. . . this Court's review is substantially circumscribed;  the law does not allow this Court to retry [DePauw's] disciplinary proceeding."  *Doe v. The Univ. of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009).  King's Complaint does not require the Court to "make an independent determination" as to what happened between King and J.B., and it does not call for a judicial determination in favor or against the merits of J.B.'s sexual misconduct charge against King.  *Id.*   The question is whether DePauw acted reasonably in light of the circumstances.

II. **King's Title IX Claims Must Fail Because DePauw's Actions Were Not Motivated by Gender Bias.**

Title IX guarantees that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.  20 U.S.C. § 1681(a). Title IX "bars the imposition of university discipline where gender is a motivating factor in the

12

decision to discipline." *Yusuf v. Vassar College*, 35 F.3d 709, 714 (Ind. Ct. App. 1994).  "Judges must be sensitive to the effects on education of heavy-handed administrative intrusion required by judges interpreting Title IX and other statutes that, along with free-wheeling interpretations of the speech and religion clauses of the *First Amendment*, have made education one of the most heavily regulated American industries." *Doe v. St. Francis Sch. District*, 694 F.3d 869, 873 (7th Cir. 2012).

Neither the Supreme Court nor the Seventh Circuit has set forth a standard for a Title IX challenge to a disciplinary proceeding, but other courts have looked at these claims through four separate standards: erroneous outcome, selective enforcement, archaic assumptions, and deliberate indifference.  *See*, *e.g.*, *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 638 (6th Cir. 2003). King asserts Title IX claims under two theories: erroneous outcome and deliberate indifference. The Court has previously concluded that there is no indication that DePauw's actions were motivated by gender bias.  [Dkt. 60 at 18-19]  Because there is no such evidence, these claims fail.

### A.   Erroneous Outcome.

An erroneous outcome claim "require[s] [King] to demonstrate that the conduct of the university in question was motivated by a sexual bias." *Mallory*, 76 Fed. Appx. at 638. Specifically, in an erroneous outcome claim, the plaintiff alleges his/her innocence and that he or she was wrongly found to have committed an offense based on gender. *Yusuf*, 35 F.3d 709 at 715. "Under the erroneous outcome standard, the question is whether [DePauw's] actions are motivated by sexual bias or if the disciplinary process constitutes a pattern of decision-making whereby [DePauw's] disciplinary procedures governing sexual assault claims is discriminatorily applied or motivated by a chauvinistic view of the sexes." *Bleiler v. Coll. of the Holy Cross*, Civil Action No. 11-11541-DJC, 2013 U.S. Dist. LEXIS 127775, at *17 (D. Mass. Aug. 26,

13

2013) (citing *Doe*, 687 F. Supp. 2d at 756; *Mallory*, 76 Fed. Appx. at 640); *Yusuf*, 35 F.3d at 715.

Stated differently, an erroneous outcome claim requires particular facts that show "some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715.

As a threshold matter, DePauw's Policy is facially gender neutral.  (Ex. A at 36-37.)  In *Bleiler*, the District Court of Massachusetts examined a code of conduct with sexual misconduct provisions similar to DePauw's.  2013 U.S. Dist. LEXIS 127775, at *14.  There, the Court found that "there was no evidence supporting [the] contention that the Code of Conduct is embedded with a gender preference and thus there is no triable issue arising from the Code of Conduct."  *Id.* Similarly, DePauw's Policy is uniformly applicable to male and female students and requires students of either gender to give and receive consent before engaging in any sexual conduct.

King's first argument in his preliminary injunction filings is that all sexual misconduct claims against DePauw students from 2009 through 2014 were against male students and ten of twelve were found responsible.  "DePauw is not responsible for the gender makeup of those who are accused *by other students* of sexual misconduct."  [Dkt. 60 at 18 (emphasis in original)]  To the extent King is arguing that DePauw's disciplinary procedures have a disparate impact on male students, that argument does not support a Title IX claim.  *See Hayden v. Greensburg Community Sch. Corp.*, 743 F.3d 569, 583 (7th Cir. 2014) ("The discrimination must also be intentional in order to support a claim for damages under Title IX.").

King's claim has a "fatal gap" due to "the lack of a particularized allegation relating to a causal connection between the [allegedly] flawed outcome and gender bias."  *Yusuf* 35 F.3d at 715.  Evidence of gender bias such as "statements by members of the disciplinary tribunal,

statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender" are not present here. *Id.*; *see Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 251 (2d Cir. 1995); *Bleiler*, 2013 U.S. Dist. LEXIS 127775, at *15; *see also Mallory*, 76 Fed. Appx. at 639-40 (upholding summary judgment on a student's Title IX claim where there was no evidence that discipline was based on the student's sex).

King follows his statistical argument with complaints about 1) delay in the investigation; 2) treatment of King during the investigation; 3) quality of the investigation; 4) the timing of the hearing; 5)  the relationships between staff persons involved; 6) the Panel's determination; 7) his advisor; and 8) not being allowed to submit an impact statement to the Panel.  None of these complaints evidences gender bias.

1.      The Investigation Was Prompt Under the Circumstances.

        a) *Any Delay Does Not Demonstrate Gender Bias.*

DePauw's Policy purposefully gives a complainant a confidential reporting option and some control over the process, particularly at the beginning.  DePauw allowed J.B. six weeks to decide whether to file a formal complaint before engaging in an investigation. (Ex. B, at ¶¶7-8.) This is not a gender based policy and is dictated by considerations of privacy.  *See* The White House Task Force to Protect Students from Sexual Assault, *Not Alone*, April 2014 pp. 11-12, *available   at*   http://www.whitehouse.gov/sites/default/files/docs/report_0.pdf   (some   sexual assault victims are not immediately sure they want to make a formal complaint, and the victim's decision should be honored to encourage reporting by maintaining confidentiality); Department of Education Violence Against Women Act, 79 Fed. Reg. 35418, 35429 (proposed June 20, 2014) (to be codified at 34 C.F.R. pt. 668.46(b)(4)(iii)).

J.B.'s uncertainty and the calendar, not gender bias, caused any delay.  J.B.'s initial report was made shortly before DePauw's Christmas break and DePauw's Extended Studies

Session.  (Ex. B ¶10.)  DePauw's policy of allowing the complaining student time to decide whether he or she wants DePauw to pursue an investigation is designed to give a sense of control to the complaining student.  The policy does not demonstrate bias and did not prejudice the proceedings.  As evidenced by the interview summaries, witness statements, and the hearing transcript, students who gave testimony about the incident or the surrounding circumstances had adequate memory of the night's events to assist the hearing board in the necessary factual determinations.  (Exs. N, G & I.)  Ultimately, any delay affected King and J.B. equally, barring any inference of gender bias as a result of the delay.

Despite testimony from King's father, Thomas King, (Ex. M at 134-35) that King was given insufficient time to respond to J.B.'s allegations, King was on notice of J.B.'s allegations as of December 18, 2013 when he met with Mr. Shager.  (Ex. E.)  King received a no contact directive from Public Safety on January 22 and met with Mr. Shager again on January 29, 2014.  (Ex. F ¶5 Ex. H.)  The fact that King did not tell his parents and ignored the situation until he declined the interview by Captain Shrewsbury on January 27 does not indicate that DePauw was biased against him.  (Ex. F ¶6.)

b) *DePauw's Treatment of King During its Investigation Does Not Evidence Gender Bias.*

Captain Charlene Shrewsbury conducted the investigation.  She asked both King and J.B. to give a statement and gave them each the opportunity to identify potential witnesses.  (Ex. F ¶¶6-7.)  King complains that he was treated like a criminal.  King was treated as any responding student is treated when the complaint raises the possibility of criminal charges.  Because DePauw has an agreement with the Putnam County Prosecutor that it will forward for review the results of its investigations of sexual misconduct, DePauw officers always issue a *Miranda* warning to individuals who are the subject of an investigation regardless of gender.  (Ex. F ¶6.)

Captain Shrewsbury followed this protocol in beginning her interview of King.  (*Id.*)  J.B. was not read *Miranda* rights because King consented to the sexual contact, and J.B. was not the subject of the investigation.  (Ex. M at 101, Ex. J.)  This does not reflect gender bias—it reflects the fact that King never suggested J.B.'s conduct violated DePauw's Policy or might lead to a criminal investigation.

c)  *DePauw's Investigation Was Thorough; King's Intoxication Was Not an Issue.*

King has argued that DePauw's investigation should have been broader—including interviews of as many as thirty students who were present at the party in the basement of the Delt house. (Ex. O at 5.) However, this scattershot approach to an investigation of a student complaint would not be an efficient use of limited resources and would be particularly inappropriate in this instance, where privacy concerns of both King and J.B. are heightened.  *See*, *e.g.*, *Gorman v. Univ. of R.I.*, 837 F.2d 7, 14-15 (1st Cir. 1988) (requiring the interest in fairness of disciplinary procedures be balanced against the proper allocation of limited resources).  This argument is not well taken where King himself declined to participate in the investigation.  (Ex. F ¶¶6-7.)  King terminated the interview and did not identify any witnesses that could or should be interviewed by Captain Shrewsbury.[10]  (Ex. F ¶7.)  Again, this conduct does not indicate gender bias.

King argues that his level of intoxication was relevant, and the failure to investigate it was gender based.  Not so.  King did not file a complaint against J.B., and at no point has King suggested that he did not consent to the sexual contact.  (Ex. M at 101.)   The reason to investigate intoxication is to determine capacity to consent.  The text messages sent to J.B. by King show that he consented to the encounter.  (Ex. J.)  At the hearing before this Court, King maintained that position.  (Ex. M at 198.)   In light of this, the argument that his level of

---

[10] It was not until after Captain Shrewsbury completed her investigation that King identified a witness to the Panel.  (Ex. F at ¶7.)  This witness, Gates Weaver, was permitted to testify at the hearing.  (Ex. N.)

intoxication was relevant completely ignores the situation presented.   The decision to not evaluate King's level of intoxication was not gender-based; it was based on King's undisputed consent.

King's argument that consent was imputed to him due to his gender has already been rejected by the Sixth Circuit in a very similar situation.   In *Mallory*, 76 Fed. Appx. 634, a male student, Mallory, was found to have violated the code of conduct for sexual contact with a female student.   *Id.* at 636-37.   Mallory was intoxicated, the female student had no memory, and witness testimony confirmed that she was more intoxicated than Mallory.   *Id.* at 636-37.   Like King, Mallory testified that the female made sexual advances.   *Id.* at 636.   The panel found that Mallory violated the code of conduct stated that "the victim's judgment was so impaired that she would not have been capable of making rational decisions about her welfare; as such she could not have given consent to engage in sexual intercourse with the accused student."   *Id.* at 637.   Mallory was expelled.   *Id.*

Mallory filed a Title IX claim.   The university prevailed on its motion for summary judgment because "Mallory had not demonstrated a genuine issue of material fact with regard to whether the University's actions were motivated by Mallory's sex."   *Id.* at 637-38.   On appeal, Mallory argued that "the only evidence at the disciplinary hearing regarding whether [the female student] 'wanted' to have sex was Mallory's written statement indicat[ing] that [the female student] initiated the sexual encounter."   *Id.* at 639.   Thus, Mallory argued that the female student "was not sexually assaulted inasmuch as she initiated or 'wanted' the sexual activity."   *Id.* Mallory argued that the university's focus on the female student's ability to consent, but not his own, "reveals that the University holds an antiquated notion that 'men are sexual aggressors and women are victims.'"   *Id.*   The Sixth Circuit rejected this argument holding that "**the**

18

**University's decision to focus on the ability to consent merely demonstrates the University's policy decision to punish those who engage in sexual conduct with another person when the first person is aware of the other's inability to consent**." *Id.* (emphasis added).

As in *Mallory*, DePauw's Policy prohibits sexual contact with someone who is unable to give consent by reason of incapacitation. (Ex. A at 37 ("To engage in sexual activity with a person one knows or should know is incapacitated is a violation of this policy").)[11] The hearing Panel "saw this case as a question of whether or not [J.B.] had given or was in a state to give consent, and should Ben have known if she was in a state to not give consent." (Ex. P.) The Panel found that "it should have been apparent to Ben that [J.B.] was extremely intoxicated, to the point that she could not give consent to any sexual activity." (*Id.*) The fact that the Panel's finding of responsibility rests on the complaining student's capacity to consent is consistent with DePauw's Policy and does not indicate gender bias.

2.   Complaints about the Panel do not Demonstrate Bias. DePauw's Panel is entitled to a Presumption of Integrity.

King's vague assertions that the Panel was motivated by gender bias are unsupported. The panel members are entitled to a "presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven." *Ikpeazu v. Univ. of Ne.*, 775 F.2d 250, 254 (8th Cir. 1985) (citing *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n.*, 426 U.S. 482, 497 (1976)); *see also Gorman*, 837 F.2d at 15 ("alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences"). King's complaint is that he was found responsible; without specific evidence of gender bias, King's erroneous outcome argument fails. Here, the

---

[11] DePauw's policy that incapacitated individuals are not capable of giving consent is consistent with Indiana law. *See, e.g.*, Ind. Code § 35-42-4-1 (criminalizing as "rape" sexual intercourse or other sexual conduct with another person who is mentally unable to give consent).

Panel was comprised of experienced administrative staff members, and the make-up of the Panel does not indicate any gender bias; it reflects the fact that the panel's composition was consistent with DePauw's Policy. (Ex. A at 38.)

     a)  *Relationships Among Student Life Staff Do Not Evidence Gender Bias.*

King's complaint that the hearing Panel members work closely with each other and have personal relationships with other student life employees who participated in the process reflects a small campus environment; it does not indicate gender bias.  "In a university setting, prior contact among the faculty and students is likely" and does <u>not</u> indicate bias or partiality.  *Holert v. Univ. of Chi.*, 751 F. Supp. 1294, 1301 (N.D. Ill. 1990). Without specific evidence that the Panel members were motivated by bias, it is immaterial that they had prior contact and relationships outside of the hearing process.

     b)  *The Panel Had to Weigh Conflicting Evidence and Make Credibility Determinations.*

King argues that the hearing Panel did not credit his version of the events, but the fact that the hearing Panel ultimately found some witnesses' testimony to be more credible than others does not meet the burden to demonstrate that the entire outcome was flawed due to gender bias.  The Panel had previously reviewed the witness statements and interviews, and asked questions to resolve contradictions and gaps it perceived in the evidence.  (Ex. N.)  After discounting King's testimony due to credibility issues, the Panel was not left with a vacuum of information about J.B.'s demonstration of her capacity to consent.  The Panel credited the testimony of witnesses who gave detailed descriptions of J.B.'s physical manifestations of extreme intoxication, and reasonably concluded that King should have known that J.B. was incapable of consenting to sexual activity.  (Ex. P.)  This approach is reasonable and consistent with DePauw's hearing process, and it does not indicate gender bias.  The Panel's resolution of

20

conflicting testimony is simply evidence that the hearing Panel did its job, especially where, as here, King's own testimony and statements varied throughout the investigation and hearing process.  The Panel did not exclude any testimony King wished to introduce at the hearing. (Exs. N & Q.)   King, like J.B., was permitted to ask questions during the hearing to elicit additional testimony for the Panel's consideration but he declined to ask a single question.  (*Id.*) There was no gender bias where both King and J.B. were subject to the same hearing procedures and the Panel relied on live testimony and written witness statements to reach conclusions as to whether King should have known that J.B. was incapable of consenting to sexual activity.

> c)  *King Was Subject to the Same Procedure as J.B. During the Hearing.*

[King complains about his advisor.   The evidence is that he ignored DePauw's suggestions and selected his own advisor at the last minute.   King rejected DePauw's two suggestions for advisors, one of whom was a trained member of the Sexual Misconduct Board not empaneled in King's case.  (Ex. B ¶15, Ex. M at 209-10, 136, Ex. K at 125-26.)  Instead, his father chose his advisor, and King did not even talk to either of the potential advisors suggested by DePauw.  (Ex. M at 210.)]  Neither King nor J.B. was permitted to have an attorney present in the hearing room.  (Ex. A at 38-39; Ex. B ¶15.)  This procedure is a valid attempt to avoid "undue judicialization" of the hearing.  *Gorman*, 837 F.2d at 14-15.  Moreover, this procedure is not gender-biased, as it applies to all students participating in sexual misconduct hearings regardless of gender.  (Ex. A at 38-39.)

3.     DePauw's Policy Does Not Permit King to Submit an Impact Statement and He Was Not Prejudiced by This Policy.

King's argument that he was denied an opportunity to present an impact statement raises no real issue.   While there was a typo in the instructions which existed regardless of King's gender, he had no statement prepared that he was not permitted to give.  (Ex. M at 73.)  Allowing

the complainant to submit an impact statement after a finding of responsibility reflects Title IX's directive that a hostile environment analysis should be done from the victim's position.  Office of Civil Rights, *Dear Colleague Letter*, Apr. 4, 2011 p.4 *available at* http://www.whitehouse.gov/sites/default/files/dear_colleague_sexual_violence.pdf;  Office of Civil Rights, *Questions and Answers on Title IX and Sexual Violence*, Apr. 29, 2014 pp. 1-3, *available at* http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.  The impact statement is not a vehicle for additional testimony, but rather informs the Panel members as to an appropriate sanction that, upon a finding of responsibility, will restore the complainant's sense of safety on campus.  (Ex. A at 39.)  Title IX does not require similar considerations be made for a student found responsible for sexual misconduct.  *See* Office of Civil Rights, *Questions and Answers*, at 1-3.  This minor inconsistency cannot be linked to any evidence of gender bias operating against King.

**B.    Deliberate Indifference.**

The deliberate indifference standard traditionally applies to claims of sexual harassment and requires the King to "produce evidence that [the defendant] was deliberately indifferent to sexual harassment that was so severe or pervasive that it altered the conditions of [King's] education."  *Hendrichsen v. Ball State Univ.*, 107 Fed. Appx. 680, 684 (7th Cir. 2004).  *See also Mallory*, 76 Fed. Appx. at 638.  To prevail on a deliberate indifference claim, King must prove "that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct."  *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757 (E.D. Tenn. 2009).  Where the University has no knowledge of alleged discrimination, it cannot be said to have intentionally discriminated."  *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1034 (7th Cir. 1997).  "[D]eliberate indifference is more than

22

negligence and approaches intentional wrongdoing." *Milligan v. Bd. of Trustees of Southern Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012) (noting that "deliberate indifference is a more exacting standard than the negligence standard governing employer liability under Title VII").

Claims under the deliberate indifference standard in the Seventh Circuit have been limited to an analysis of liability for an institution that permits a hostile environment to continue. *See*, *e.g.*, *Milligan*, 686 F.3d at 387-88 (upholding summary judgment in favor of university because school's response to report of sexual harassment was reasonable); *Hendrichsen v. Ball State Univ.*, 107 Fed. Appx. 680, 684 (7th Cir. 2004) (holding that school was not deliberately indifferent to sexual harassment where it promptly responded to the harassment). King's claim does not fit within this framework. Indeed, deliberate indifference is the claim that DePauw could be exposed to from complainants that it failed to investigate charges of sexual misconduct and sexual harassment. *See, e.g.*, *Ha v. Northwestern Univ.*, No. 1:14-cv-00895 (N.D. Ill. filed Feb. 21, 2014) (alleging violation of Title IX for failure to adequately respond to sexual harassment and assault by a professor); *Luby v. Univ. of Conn.*, No. 3:13-cv-01605-MPS (D. Conn. filed Feb. 10, 2014) (five separate plaintiffs alleging Title IX violations including being discouraged from reporting rape, hostile environment due to a professor's publication of victim identities, and deliberate indifference).

The deliberate indifference framework has been rejected for claims challenging disciplinary proceedings. *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757-58 (E.D. Tenn. 2009). In *Doe*, despite the plaintiff's allegations that the school's disciplinary proceedings were gender-biased and allegations that the school failed to remedy these issues, the Eastern District of Tennessee dismissed the plaintiff's claim because he had failed to allege that the university's actions were motivated by the plaintiff's gender or "constituted gender harassment or sexual

23

harassment." *Id.* at 758.   A deliberate indifference claim alleging biased disciplinary proceedings survived a motion to dismiss in *Wells v. Xavier University*, 2014 U.S. Dist. LEXIS 31936, 14 (S.D. Oh. 2014).   There, the Southern District of Ohio held that Wells had properly stated a claim for deliberate indifference and considered that the "alleged defective hearing" was the misconduct that the defendant university failed to correct.   *Id.*

In this case, even if this Court permitted a deliberate indifference claim based on an allegedly defective investigation or hearing, there are no factual issues regarding DePauw's process, and King has not demonstrated gender bias.   Further, DePauw's statistical record of the outcomes of its sexual misconduct process in recent years reflects an even-handed approach. (Ex. B ¶19.)   Babington clearly did not ignore the investigation or the hearing process when reviewing King's appeal; she re-examined the evidence heard by the Panel in detail and confirmed that the Panel's finding of responsibility was supported by the evidence. [12]   (Ex. Q at 2-4.)

There is no evidence that Babington herself was motivated by gender bias in reaching her decision.   Her written determination as to the appeal reflects careful and logical consideration of each issue raised by King in his appeal.   (Ex. Q.)   Her decision to reduce King's sanction evidences the fact that she gave independent consideration to the Panel's determination and did not merely rubber-stamp it.   (Ex. Q at 4-5.)   Because a deliberate indifference claim requires proof of more than negligence—proof of something approaching intentional wrongdoing - DePauw was not deliberately indifferent where the Vice President for Student Life re-examined

---

[12] King has argued that DePauw's President, Dr. Brian Casey, also exhibited indifference.   However, there is no evidence that Dr. Casey would have had any reason to doubt the investigation, hearing procedure, or outcome in this matter.

the evidence in good faith without being motivated by gender bias. *See Milligan*, 686 F.3d at 388.

## III.   <u>The Existence of a Contract Precludes The Promissory Estoppel Claim</u>.[13]

A form of contract controls DePauw's relationship with King.  Indiana law is clear: "the legal relationship between a student and a university is one of implied contract."  *Amaya v. Barter*, 981 N.E.2d 1235 (Ind. Ct. App. 2013) (citing *Neel v. Indiana Univ. Bd. of Trustees*, 435 N.E.2d 607, 610 (Ind. Ct. App. 1982); *see also Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992); *Park v. Ind. Univ. Sch. of Dentistry*, 781 F. Supp. 2d 783, 786 (S.D. Ind. 2011) (Lawrence, J.).  Accordingly, as a matter of law, King cannot state a claim for promissory estoppel.  "Promissory estoppel or quasi-contractual remedies permit recovery where *no contract in fact exists*."  *Ind. BMV v. Ash, Inc.*, 895 N.E.2d 359, 367 (Ind. Ct. App. 2008) (internal quotations omitted) (emphasis added); *see also Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F. Supp. 2d 829, 848-49 (S.D. Ind. 2005) (Tinder, J.).  Specifically, King has not alleged any promises in his promissory estoppel claim that are not founded on his contract with DePauw.  Consequently, DePauw should be granted summary judgment on King's promissory estoppel claim because when the promises cited in support of a promissory estoppel claim are based on a valid "contract between the parties, then the promissory estoppel claim becomes unwarranted surplusage."  *Decatur Ventures, LLC*, 373 F. Supp. 2d at 848.

Moreover, even if a promissory estoppel claim was permitted under the circumstances, it would not be meritorious on the undisputed facts.  In order to prove a claim of promissory estoppel, King must show that DePauw made him a promise on which it expected he would rely and upon which actually did rely—to his detriment.  *Weinig v. Weinig*, 674 N.E.2d 991, 997

---

[13] As discussed at page 34, *infra*, the Court should retain subject matter jurisdiction over King's state law claims.

(Ind. Ct. App. 1996).   King testified that before his admission to DePauw he never spoke to anyone at DePauw and did not review any materials that DePauw publishes.  (Ex. K at 12-13.) Consequently, he could not have relied on any statements related to DePauw's disciplinary policies or procedures when he made the decision to attend DePauw.  King's own testimony and the undisputed facts preclude King's promissory estoppel theory and his claim should be dismissed.

**IV.    DePauw is Entitled to Summary Judgment on King's Intentional Infliction of Emotional Distress Claim Because the Evidence Shows that DePauw's Conduct was Neither Extreme nor Outrageous.**

"Intentional infliction of emotional distress is committed by 'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Collins v. Purdue Univ.*, 703 F. Supp. 2d 862, 871 (N.D. Ind. 2010) (quoting *Branham v. Celadon Trucking Service, Inc.*, 744 N.E.2d 514, 522-23 (Ind. Ct. App. 2001)).  Broken down to its constituent parts:   intentional infliction of emotional distress occurs when a defendant (1) engages in extreme and outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another.  *Id.*   "In the appropriate case, the issue may be decided as a matter of law."  *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 970 (Ind. App. 2001).

**A.    DePauw's Conduct was not Extreme and Outrageous as a Matter of Law.**

DePauw's conduct – following its stated process for handling accusations of sexual misconduct – as a matter of law is ***not*** extreme and outrageous.   Defining extreme and outrageous conduct depends on the prevailing cultural norms and values.  *Bradley v. Hall*, 720 N.E.2d 747, 752-53 (Ind. App. 1999).  In cases where a defendant is found liable for intentional infliction of emotional distress, "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"  *Creel v. I.C.E. & Assocs.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)); *see also Branham*, 744 N.E.2d at 523 (same); *Bradley*, 720 N.E.2d at 752-53 (same); *Gable v. Curtis*, 673 N.E.2d 805, 809-10 (Ind. Ct. App. 1996) (same).  DePauw's conduct in this case does not approach anything close to that level.

In *Conwell v. Beatty*, a deputy with the Howard County Sheriff's department was arrested for theft and official misconduct.  In affecting the arrest, the sheriff sent seven officers to the deputy sheriff's home to execute a search warrant and arrest the deputy.  *Conwell v. Beatty*, 667 N.E.2d 768, 773 (Ind. Ct. App. 1996).  After the arrest, the Sheriff called an "'impromptu' press conference" where he "told the press that [the deputy sheriff] had been arrested pursuant to warrants for theft and official misconduct." *Id.*  The Sheriff further told the press the "details provided to the court in support of the arrest and search warrants" as well as information relating to a past incident.  *Id.*  The deputy sheriff was eventually found not guilty and sued the sheriff for intentional infliction of emotional distress.  *Id.* at 775.  The court held that as a matter of law, the sheriff's conduct was not extreme and outrageous.  *Id.* at 777.  Indeed, the fact that the sheriff may have been "more zealous in executing the warrants than the circumstances required does not render his conduct beyond all possible bounds of decency."  *Id.*  Here DePauw followed its policy for dealing with allegations of sexual misconduct.  The fact that King does not like that he was accused of sexual misconduct, or that he has to be exposed to the well-documented system that DePauw has set up to deal with such allegations does not render DePauw's conduct either

extreme or outrageous and King's claim for intentional infliction of emotional distress must fail for this reason alone.

**B.**   **There is no Evidence that DePauw Intended to Cause King Emotional Distress.**

Moreover, there is no evidence suggesting that DePauw intended to cause King emotional distress.  "It is the intent to harm one emotionally that constitutes the basis for the tort of an intentional infliction of emotional distress."  *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991).  The case at hand is similar to *Collins v. Purdue University*.  703 F. Supp. 2d 862 (N.D. Ind. 2010).  In *Collins*, the plaintiff was the subject of a newspaper story suggesting that he was somehow connected with the disappearance of a student.  *Id.* at 867-68.  On a motion for judgment on the pleadings, the court concluded that because the defendant newspaper publisher's "conduct was consistent with the practice of any newspaper reporting local police activities and reporting the details of [the student's] disappearance," the requisite intent to cause emotional distress was not present and, consequently, plaintiff could not state a claim for intentional infliction of emotional distress.  *Id.* at 873-74.

Just as the newspaper publisher was merely following its standard operating procedure, DePauw was following its standard procedure in handling the allegations against King.  As discussed in detail above, DePauw has a written policy for the disposition of allegations of sexual misconduct, and it followed that policy in this instance.  Adherence to such a policy in every situation where there is an accusation of sexual misconduct is necessary for DePauw to comply with the strictures of federal law and to ensure the safety of its student population.  *See Davis v. Monroe County Bd. Educ.*, 526 U.S. 629 (1999) (concluding that where an educational institution receiving federal funding is deliberately indifferent to "student-on-student" sexual harassment a private cause of action exists).  There simply is no evidence that through its

conduct in acting on its standard policy, DePauw possessed any intent to cause King emotional distress.  As a result, King's intentional infliction of emotional distress claim fails as a matter of law.  *See Watters v. Dinn*, 666 N.E.2d 433, 438 (Ind. Ct. App. 1996) (finding that a legitimate motive for the alleged intentional acts "belies [plaintiff's] assertion that [defendant] acted with the sole intent to harm him," and therefore affirming the trial court's grant of summary judgment on an intentional infliction of emotional distress claim).

V.      **DePauw Is Entitled to Summary Judgment on King's Claim for Defamation; It Is Not Properly Pled, and Any Communications Were Privileged.**

        A.      **King Has Not Properly Pled Defamation.**

As a threshold matter, King's defamation claim is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) because it is not pled with particularity as required by *Trail v. Boys and Girls Clubs*, 845 N.E.2d 130, 136 (Ind. 2006) (requiring a plaintiff to "set out the operative facts of the claim" for defamation, including the "alleged defamatory statement in the complaint.").  "Even under the notice pleading standard, a plaintiff is still required to set out the operative facts of the claim, including the alleged defamatory statements, in the complaint." *Cowgill v. Whitewater Publ'g.*, 2008 U.S. Dist. LEXIS 42235, *3 (S.D. Ind. May 29, 2008) (dismissing a defamation claim where the allegations in the complaint "lack[ed] any reference to the number of statements made, to whom the statements were made, or when and in what context they were made.").  *See also, Haegert v. McMullan*, 953 N.E.2d 1223, 1230 (Ind. Ct. App. 2011) (affirming summary judgment in favor of defendant where King failed to specifically identify the allegedly false statements in her complaint).

King's Complaint alleges only that "DePauw employees and representatives have maliciously made statements indicating that King has committed criminal conduct and/or sexual misconduct."  [Dkt. 1 at ¶106]  The Complaint wholly fails to identify the statements allegedly

made, to whom the statements were made, and the context in which they were made. The broad generalization in the Complaint does not constitute actionable defamation; therefore, King's claim for defamation should be dismissed pursuant to Federal Rule of Civil Procedure 12(B)(6).

### B.   Statements by DePauw Employees About King's Conduct Are Privileged.

Notwithstanding King's failure to properly plead a claim for defamation, the defamation claim fails because any communications among DePauw's staff about King regarding the alleged sexual misconduct allegations are privileged. The privilege acts as a complete defense to a defamation action and applies to "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992). Whether the privilege applies to a given statement is a question of law, making it particularly well-suited for summary judgment. *Kelley v. Tanoos*, 865 N.E.2d 593, 597 (Ind. 2007).

DePauw's statements are privileged in two respects. *Id.* The first is the common interest privilege, "intended to facilitate full and unrestricted communication on matters in which the parties have a common interest or duty." *Id.* at 598. The common interest privilege has been applied to a school's communication to students' parents about the termination of a school employee because "[p]arents and schools have a 'corresponding interest' in the free flow of information about administrators and faculty members." *Id.* (citing *Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914, 925 (Ind. Ct. App. 2002)). Application of the common interest privilege in the *Gatto* decision rested on a "joint interest in the welfare of particularized children." *Kelley* at 599. The second is the public interest privilege, which protects communications made to police officers "during the course of a legitimate law enforcement investigation." *Id.* at 600.

30

Statements to private citizens are also privileged to the extent that they enhance the public safety by "facilitating the investigation of suspected criminal activity." *Id.* at 597.

Although King's Complaint does not identify a single defamatory statement, communications by DePauw employees regarding the allegations and in furtherance of the investigation and hearing were undoubtedly regarding the safety of DePauw's campus and the enforcement of DePauw's student Code of Conduct. The employees share a common interest in the safety of DePauw students, including the complainant in this matter, J.B. *See, e.g.*, *Conwell v. Beatty*, 667 N.E.2d 768, 779 (Ind. Ct. App. 1996) (statements between employees while investigating a shoplifting incident are protected by the qualified privilege doctrine).

Second, to the extent that the unidentified statements were allegedly made by DePauw employees as part of an investigation of suspected criminal activity by Captain Shrewsbury, a sworn police officer, they may also be subject to the public interest privilege. *Kelley*, 865 N.E.2d at 600 ("it is well established that in Indiana, communications made to law enforcement to report criminal activity are qualifiedly privileged").

Finally, to the extent King is attempting to complain that DePauw employees made statements communicating the outcome of the hearing or appeal process, such statements were made under a duty to report the outcome of the hearing to the complainant, in accordance with the Federal Educational Rights and Privacy Act and DePauw's Sexual Misconduct Policy (Ex. A at 40.) *See* 34 C.F.R. 99.33(c). Because statements made by DePauw's employees and representatives about King's conduct are privileged, summary judgment should be granted in favor of DePauw on King's defamation claim.

## VI.  <u>The Court Should Retain Jurisdiction Over King's State Law Claims</u>.

If the Court grants judgment in favor of DePauw on the Title IX claims, the Court should retain jurisdiction because the Court and the parties have invested substantial efforts in litigating

all of King's claims.  Although 42 U.S.C. § 1367(c) permits a district court to relinquish jurisdiction over supplemental state law claims if it disposes of all the claims over which it has original jurisdiction by pre-trial motion, it does not require that a district court do so.  To the contrary, the law of this circuit is "clear" that a district court does not automatically lose supplemental subject matter jurisdiction once it grants summary judgment on the federal claims in a case.  *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 500 & n.6 (7th Cir. 1999).  In deciding whether to retain jurisdiction over the state law claims at issue here, the Court "should consider and weigh . . . the values of judicial economy, convenience, fairness, and comity."  *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1999).  "That the jurisdictional hook is eliminated before trial at best only preliminarily informs the balance; the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources can and should make the difference in a particular case."  *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994).  If the "arguable balance" of these factors favors the retention of jurisdiction over the remaining state law claims, it is "entirely acceptable" for the Court to exercise its discretion and decide the remaining claims.  *Id.*

Here, all of these factors cut in favor of the Court's retention of jurisdiction over any remaining state law claims.  Indeed, the parties and the Court have invested significant resources into this litigation already.  The parties have fully briefed two motions for preliminary injunction and the Court held a day-long evidentiary hearing on the second motion.  The Court issued a twenty-seven page order on preliminary injunction.  [Dkt. 60]  Moreover, the remaining state law

claims are straightforward and the subject of a substantial amount of precedent.[14]  Dismissing the

state law claims at this late juncture would leave the parties to start over again in state court, and

would require the state court to duplicate much of the work that has already been done by this

Court.  In addition to the simple fact that the Court has already become familiar with the facts

and parties in this suit, federal law forms an important part of the backdrop of the standard

against which DePauw's execution of its policies and procedures should be judged, even if the

federal claims are dismissed.  Consequently, DePauw submits that the even after dismissing

King's Title IX claims, the Court can and should deny King's promissory estoppel, intentional

infliction of emotional distress, and defamation claims on summary judgment as a matter of law,

and then retain jurisdiction over the remaining state law claims through trial.

**CONCLUSION**

For the foregoing reasons, Defendant, DePauw University respectfully requests that

summary judgment be entered in its favor and against Plaintiff, Benjamin King, on all counts of

King's Complaint.

---

[14] Although King may try to frame his negligence claim as one for "educational malpractice," no Indiana appellate court has ever recognized such a claim.  *Norris v. Bd. of Educ. of Greenwood Cmmt'y Sch. Corp.*, 797 F. Supp. 1452, 1463 (S.D. Ind. 1992) (Tinder, J.) (noting that no Indiana court has recognized "educational malpractice" as a cause of action); *Brown v. Metro Sch. Dist. of Lawrence Twp.*, 945 F. Supp. 1202, 1209 (S.D. Ind. 1996) (same).  No reported case in Indiana has addressed the theory of "educational malpractice," and Federal courts in Indiana have declined to recognize "educational malpractice" as a tort under Indiana law because it is a "policy decision that [the Southern District of Indiana] is not able to make."  *Norris*, 797 F. Supp. at 1463; *see also Brown*, 945 F. Supp. at 1209. Consequently, as a matter of law, King cannot rest his negligence claim on a theory of educational malpractice.  Nor can King proceed on a theory of negligence per se, as he cannot prove that DePauw has violated any statute.  *See Erwin v. Roe*, 928 N.E. 609, 620 (Ind. Ct. App. 2010).  *See also Moore v. Hamilton Southeastern Sch. Dist.*, 2013 U.S. Dist. LEXIS 123507, *31-33 (S.D. Ind. 2013) (Barker, J.) (noting that in order to succeed on a negligence per se claim, the plaintiff must prove violation of a statute in addition to showing the applicability of that statute to the plaintiff's case).

Respectfully submitted,

*/s/ Brian W. Welch*  _____
Brian W. Welch [1556-49]
Margaret M. Christensen [27061-49]
BINGHAM GREENEBAUM DOLL LLP
2700 Market Tower
10 West Market Street
Indianapolis, Indiana  46204
Telephone: 317.635.8900
Fax: 317.236.9907
Email: bwelch@bgdlegal.com
                mchristensen@bgdlegal.com

*Attorneys for Defendant, DePauw University*

## CERTIFICATE OF SERVICE

I certify that on November 3, 2014, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system:

William W. Drummy
Holly A. Reedy
WILKINSON, GOELLER, MODESITT,
WILKINSON & DRUMMY, LLP
333 Ohio Street
Terre Haute, IN 47807
wwdrummy@wilkinsonlaw.com
hareedy@wilkinsonlaw.com
*Attorneys for Plaintiff, Benjamin King*

*/s/ Brian W. Welch*  _____
Attorney for DePauw University

15327615.12

34